No. 25-1368

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

MASSACHUSETTS FAIR HOUSING CENTER; INTERMOUNTAIN FAIR
HOUSING COUNCIL; SAN ANTONIO FAIR HOUSING COUNCIL, INC.,
d/b/a FAIR HOUSING COUNCIL OF SOUTH TEXAS; and HOUSING
RESEARCH AND ADVOCACY CENTER, d/b/a FAIR HOUSING CENTER
FOR RIGHTS & RESEARCH, INC., *on behalf of themselves and all those
similarly situated*,
Plaintiffs-Appellants,

*v.*

THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT
TURNER, *in his official capacity as Secretary of Housing and Urban
Development*; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY
ORGANIZATION; and AMY GLEASON, *in her official capacity as Acting
Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary
Organization*,
Defendants-Appellees,

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 3:25-cv-30041-RGS

### PLAINTIFFS-APPELLANTS' BRIEF

Lila Miller (Bar No. 1216671)
Reed Colfax (Bar No. 1216672)
RELMAN COLFAX PLLC
1225 19th Street NW Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com

April 22, 2025                    *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES.................................................................. iv

CORPORATE DISCLOSURE STATEMENT ...................................... iv

JURISDICTIONAL STATEMENT ................................................... ix

STATEMENT OF THE ISSUES ......................................................... xi

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE................................................................3

   I.  Factual & Legal Background.........................................................3

   II. Proceedings Below.......................................................................7

SUMMARY OF THE ARGUMENT .......................................................9

ARGUMENT .........................................................................................10

   I.   The Dissolution Order Is Appealable. ........................................10

   II.  Plaintiffs' Appeal Neither Presents a Risk of Mootness Nor Calls for an Advisory Opinion. .......................................................................14

   III. Standard of Review.....................................................................17

   IV. The District Court Had Jurisdiction Over Plaintiffs' APA Claim.................17

       A.   The APA Provides for Prospective Injunctive Relief, Including Relief Encompassing Certain Monetary Payments. ...........18

       B.   The District Court Had Jurisdiction Pursuant to the Text of the APA and *Bowen*.................................................24

       C.   The *California* Per Curiam Does Not Deprive the District Court of Jurisdiction..............................................30

   V.  Plaintiffs Remain Entitled to a Temporary Restraining Order. .....................35

       A. Plaintiffs Are Likely to Succeed on the Merits of their APA Claim Against HUD. ...................................................36

       B. Plaintiffs Will Suffer Irreparable Harm Without their FHIP Awards. .........................................44

       C. The Balance of Equities and Public Interest Favor Plaintiffs. .........49

CONCLUSION .....................................................................................50

CERTIFICATE OF COMPLIANCE ....................................................................51

CERTIFICATE OF SERVICE ..............................................................................50

ADDENDUM TO APPELLANTS' BRIEF ...........................................................53

# TABLE OF AUTHORITIES

**Cases** ................................................................................................ **Page(s)**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
--- F. Supp. 3d ---, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ..........................20

*Almeida-León v. WM Cap. Mgmt., Inc.*,
Nos. 20-2089, 21-1806, 21-1807, 2024 WL 2904077 (1st Cir. June
10, 2024) ................................................................................................12

*Am. Ass'n. of Colls. for Tchr. Educ. v. McMahon*,
No. 1:25-cv-00702, 2025 WL 833917 (D. Md. Mar. 17, 2025) ........................38

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ........................................................................37

*Bennett v. Spear*,
520 U.S. 154 (1997) ..........................................................................................36

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ....................................................................................*passim*

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ..........................................................................................36

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. Mar. 21, 2025) ..........................................................*passim*

*Calvary Chapel of Bangor v. Mills*,
984 F.3d 21 (1st Cir. 2020) ..............................................................................11

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ..........................................................................................20

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981) ............................................................................................11

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ..........................................................................................39

*City of Arlington v. Fed. Commc'ns Comm'n*,
569 U.S. 290 (2013) ..........................................................................................43

*Climate United Fund v. Citibank, N.A.*,
--- F. Supp. 3d ---, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) .................31, 38

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ...............................................46

*Coal. for Basic Hum. Needs v. King*,
654 F.2d 838 (1st Cir. 1981)..............................................................48

*Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo*,
551 F.3d 10 (1st Cir. 2008)................................................................17

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022)..........................................................28

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)...........................................................................38

*Dep't of Educ. v. California*,
604 U.S. ---, 145 S. Ct. 966 (2025) (per curiam).........................*passim*

*Does 1-6 v. Mills*,
16 F.4th 20 (1st Cir. 2021)................................................................49

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)......................................................................38, 39

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................39, 41

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021)...........................................................................37

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002)...........................................................19, 23, 24

*Gresham v. Windrush Partners, Ltd.*,
730 F.2d 1417 (11th Cir. 1984) ........................................................48

*Ill. State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979)...........................................................................34

*K-Mart Corp. v. Oriental Plaza, Inc.*,
875 F.2d 907 (1st Cir. 1989) ................................................................46

*Kenworth of Boston, Inc. v. Paccar Fin. Corp.*,
735 F.2d 622 (1st Cir. 1984) ................................................................46

*La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*,
476 U.S. 355 (1986) ............................................................................43

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ..........................................................................34

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...........................................................47, 49

*Lummi Tribe of the Lummi Rsrv., Wash. v. United States*,
870 F.3d 1313 (Fed. Cir. 2017) ...........................................................26

*Maine v. U.S. Dep't of Agric.*,
--- F. Supp. 3d ----, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .........17, 31

*Mangual v. Rotger-Sabat*,
317 F.3d 45 (1st Cir. 2003) ..................................................................15

*Massachusetts v. Nat'l Insts. of Health*,
--- F. Supp. 3d ---, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ...............20

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .............................................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*, 463 U.S. 29 (1983) ..........................................................36, 37, 39

*New York v. Trump*,
No. 1:25-cv-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) ............16, 31

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................35

*R.I. Dep't of Env. Mgmt. v. United States*,
304 F.3d 31 (1st Cir. 2002) ....................................................................x

*S.F. Real Est. Invs. v. Real Est. Inv. Trust of Am.*,
   692 F.2d 814 (1st Cir. 1982)..............................................................12

*Schnitzer Steel Indus., Inc. v. Dingman*,
   639 F. Supp. 3d 222 (D.R.I. 2022) ..................................................35

*United States v. Pedro-Vidal*,
   991 F.3d 1 (1st Cir. 2021)................................................................17

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
   121 F.4th 339 (1st Cir. 2024)...........................................................36

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
   587 F.3d 464 (1st Cir. 2009).............................................................46

*W Holding Co. v. AIG Ins. Co. Puerto Rico*,
   748 F.3d 377 (1st Cir. 2014).............................................................46

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..............................................................................36

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
   --- F. Supp. 3d ----, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) .............16, 30, 31

## Regulations & Statutes

2 C.F.R. § 200.308 ...............................................................................44

5 U.S.C. 551 ...........................................................................18, 19, 25

5 U.S.C. § 702 ..................................................................................*passim*

5 U.S.C. § 706 .......................................................................................43

28 U.S.C. § 1292 ............................................................ xi, 10, 12

28 U.S.C. § 1331 ....................................................................................x

28 U.S.C. § 1361 ....................................................................................x

28 U.S.C. § 2201 ....................................................................................x

31 U.S.C. § 6303 ..................................................................................29

42 U.S.C. § 3601 .......................................................................3, 4, 40, 43

Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 370 (2024)..........................................................................................44

**Other Authorities**

Gov't Acct. Off., Letter Report, Fair Housing: Funding and Activities Under the Fair Housing Initiatives Program (1997).............................4

H.R. Rep. No. 94-1656 (1976)...............................................................20

H.R. Rep. No. 100-711 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 2173, 2176–77...........................................................................................3

U.S. Dep't of Hous. and Urb. Dev., Off. of Pol'y Dev. and Rsch., Study of the Fair Housing Initiatives Program (2011) .........................4

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), Plaintiffs-Appellants Massachusetts Fair Housing Center, Intermountain Fair Housing Council, San Antonio Fair Housing Council, Inc. d/b/a Fair Housing Council of South Texas, and Housing Research and Advocacy Center d/b/a Fair Housing Center for Rights & Research, Inc. state that they are non-profit corporations with no parent corporations and that no public company owns any interest in them.

<u>*s/Lila Miller*</u>
Lila Miller
*Counsel for Plaintiffs-Appellants*

# JURISDICTIONAL STATEMENT

The Plaintiffs-Appellants are a class of 66 non-profit fair housing groups. Plaintiffs brought suit against Defendants-Appellees in the District of Massachusetts, alleging an Administrative Procedure Act ("APA") claim against HUD and an *ultra vires* claim against DOGE.[1] The District Court had jurisdiction under 28 U.S.C. § 1331 because the APA action arose under 5 U.S.C. § 702 and because § 1331 encompasses district courts' authority to review executive actions that are *ultra vires*, *see, e.g.*, *R.I. Dep't of Env. Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002), and under 28 U.S.C. § 1361 and 28 U.S.C. § 2201 because Plaintiffs sought declaratory and/or injunctive relief against all Defendants.

On April 14, 2025, the District Court entered an order (hereinafter "Dissolution Order") dissolving its March 26, 2025 Temporary Restraining Order. Plaintiffs-Appellants filed their Notice of Appeal on April 16, 2025. As described in greater detail in Section I of the Argument, *infra*, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a) because the Dissolution Order is the functional equivalent of an interlocutory order dissolving an injunction.[2]

---

[1] Plaintiffs use "HUD" to refer to Defendants U.S. Department of Housing and Urban Development and Secretary Scott Turner. Plaintiffs use "DOGE" to refer to Defendants U.S. DOGE Service, U.S. DOGE Service Temporary Organization, and Acting Administrator Amy Gleason.

[2] Although the temporary restraining order bound only HUD, the motion to dissolve was brought on behalf of all Defendants.

**STATEMENT OF THE ISSUES**

1. Whether the District Court erred in concluding that the Supreme Court's summary order in *Department of Education v. California*, 604 U.S. ---, 145 S. Ct. 966 (2025) (per curiam), mandated a finding that the District Court lacked jurisdiction over this case?

2. Whether the District Court erred in finding that Plaintiffs are "likely seeking to enforce a contractual obligation to pay money" rather than seeking prospective injunctive relief?

3. Whether the temporary restraining order should be restored based on Plaintiffs' strong showing of a likelihood of success on the merits, the undisputed record of irreparable harm, the balance of the equities, and the public interest?

**INTRODUCTION**

This case arises from Defendants' unlawful midstream termination of more than six dozen fair housing grants. Plaintiffs-Appellants are a class of non-profit fair housing organizations who received Fair Housing Initiatives Program ("FHIP") grants from Defendant-Appellee HUD. Plaintiffs rely on their FHIP awards to survive: Without such awards, Plaintiffs could not provide the essential fair housing services that Congress has deputized them to provide, and many would be forced to close entirely. On February 27, HUD abruptly stripped Plaintiffs of their FHIP awards through a boilerplate letter that pointed to an inapplicable executive order and briefly parroted a federal regulation. HUD did not provide any sort of meaningful explanation for a decision that presents an existential threat to many FHIP recipients.

Plaintiffs challenged the termination of their FHIP awards under the APA, and the District Court rightly entered a temporary restraining order to reinstate Plaintiffs' grants. A684. A week later, the Supreme Court issued a short per curiam ruling in *Department of Education v. California*, another case arising from an agency's grant terminations. 604 U.S. ---, 145 S. Ct. 966, 968 (2025) (per curiam) (staying temporary restraining order pending appeal). Defendants here sought to dissolve the temporary restraining order based on this interim ruling. A689. The

District Court granted their motion through a paperless electronic order, based solely on a determination that the *California* per curiam requires a finding that Plaintiffs' APA claim belongs in the Court of Federal Claims pursuant to the Tucker Act. A724–A725. The District Court overread a barebones and preliminary ruling on a stay request to control this case, when it does not. The requisite case-specific jurisdictional analysis shows that Plaintiffs properly pursued an APA claim before the District Court.

Not only did the District Court have jurisdiction, but it correctly found in its original order that temporary relief was appropriate. Plaintiffs are likely to succeed on the merits of their APA claim because HUD's termination decision was inadequately explained, reached an unreasonable outcome, ignored important reliance interests, and wrongly considered an irrelevant executive order. Plaintiffs have shown they face irreparable harm without their FHIP awards: Plaintiffs are small non-profits that simply cannot absorb the loss of a significant portion of their budgets, and Defendants have not even contradicted their assertions of injury. Plaintiffs accordingly ask this Court to reverse and vacate the Dissolution Order, restore the temporary restraining order, and remand this matter for preliminary injunction proceedings.

## STATEMENT OF THE CASE

## I.     Factual & Legal Background.

Congress has long recognized that non-profit fair housing organizations play a critical and disproportionately large role in realizing the broad remedial goals of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. The House Report on the Fair Housing Amendments Act of 1988 noted that "fair housing organizations are burdened with primary enforcement responsibility" but lacked sufficient resources to carry this burden. H.R. Rep. No. 100-711, at 16 (1988), as reprinted in 1988 U.S.C.C.A.N. 2173, 2176–77 (footnotes omitted).

So, Congress provided resources. In 1992, Congress amended the FHA to establish FHIP awards, which direct funding to qualified, private non-profit fair housing agencies to provide intake, testing, investigation, conciliation, and/or litigation of discrimination claims, and to conduct fair housing education programs with the goal of increasing the effectiveness of the FHA. *See* 42 U.S.C. § 3616a. The FHA mandates that HUD award three different categories of FHIP grants whenever Congress appropriates funds under the relevant statutory provision, and it enumerates the specific activities that grant recipients should perform with their FHIP awards. *Id.*

Under the FHIP grant structure, receipt of a FHIP award establishes a grantor/grantee relationship wherein recipients, like Plaintiffs here, owe deliverables and report on their progress to HUD each quarter. A719–A723 (Decl. of M. St. Cyr on behalf of Plaintiff Massachusetts Fair Housing Center ("MFHC")). HUD in turn monitors Plaintiffs' activities and, pending review of the quarterly reports, disburses grant funds for work performed. *Id.* Critically, Plaintiffs do not automatically receive payment, nor can they merely submit invoices for reimbursement. *Id.*

Congress's plan worked. The U.S. Government Accountability Office noted the effectiveness of the fair housing organization model in a comprehensive analysis of FHIP in 1997. Gov't Acct. Off., Letter Report, Fair Housing: Funding and Activities Under the Fair Housing Initiatives Program (1997), available at https://perma.cc/DYA9-39WZ. In 2011, a HUD study concluded that FHIP grantee organizations added enormous value to the agency because they screen out non-meritorious cases and generate valuable testing evidence, among other benefits. *See* U.S. Dep't of Hous. and Urb. Dev., Off. of Pol'y Dev. and Rsch., Study of the Fair Housing Initiatives Program (2011), at iii, available at https://www.huduser.gov/publications/pdf/fhip_2011.pdf (hereinafter "HUD

Study"). It is unsurprising, then, that Congress has appropriated FHIP funding every year since the program's inception.

The success and importance of FHIP grants is also evident in the breadth and depth of the fair housing services that Plaintiffs provide. Plaintiffs help individuals and families avoid homelessness, stave off evictions, find safe places to live, ensure that their homes are accessible, and seek redress for discrimination. A29–A35, ¶¶ 65–88 (Complaint) (describing the Named Plaintiffs' FHIP activities). When it comes to challenging systemic discrimination, Plaintiffs are uniquely situated to gather pattern-and-practice style evidence through testing and other investigative tools, enabling them to obtain broad relief for scores of consumers. *See* HUD Study at 15 (describing work under FHIP Private Enforcement Initiative grants).

On February 27, 2025, HUD, at the express "direction" of DOGE, terminated 78 FHIP grants, effective immediately. *See, e.g.*, A161–A162 (MFHC's Termination Notice). The termination decision was communicated via a standardized form letter. HUD stated, without further explanation, that Plaintiffs' awards "no longer effectuate[d] program goals and agency priorities." *Id.* (hereinafter "Termination Notice" or "Notice"). The Notice terminated the grantor/grantee relationship moving forward, but did not affect money owed for

work already performed: to the contrary, HUD instructed Plaintiffs that if they submitted "final reports," they would receive payment for "any expenses incurred prior to the date of termination." *Id.*

The termination of their FHIP awards immediately harmed Plaintiffs, who were forced to lay off staff members, turn away clients, abandon existing clients, halt programs, cancel events, hold back previously planned public outreach, break leases, and assess how long they could operate prior to complete closure. *See* A88–A89, ¶¶ 35–36, 42, A171–A173, ¶¶ 36–42, 45, A400–A403, ¶¶ 32–33, 35–39, A481–A484, and A6340–A646 (Plaintiff declarations describing immediate and irreparable harm). Plaintiff MFHC was forced to turn away clients in crisis, such as a victim of domestic violence facing displacement from her shelter. *See* A89, ¶ 43. Plaintiff Intermountain Fair Housing Council ("IFHC") laid off a staff member and faces cutting its service area by 25%, which would deprive 10 Idaho counties of all eviction defense services. *See* A171–A172, ¶¶ 36, 41. Plaintiff San Antonio Fair Housing Council, Inc., d/b/a Fair Housing Council of South Texas ("FHCST"), laid off half its staff and faced closure in a matter of months without its FHIP grant. *See* A400, 403, ¶¶ 32, 40. Housing Research and Advocacy Center, d/b/a Fair Housing Center for Rights and Research ("HRAC") cancelled events, ceased training programs, and is scrambling to cover costs. *See* A481–A484, ¶¶ 18–25,

## II. Proceedings Below.

The Named Plaintiffs initiated this action on March 13 on behalf of themselves and a class of other FHIP grantees who received the form termination letter on February 27. A11. The Defendants are HUD, Secretary of HUD Scott Turner, the U.S. DOGE Service, the U.S. DOGE Service Temporary Organization, and Acting Administrator of DOGE Amy Gleason. *Id.* Plaintiffs assert an APA claim against HUD, arguing that the termination decision was arbitrary, capricious, and contrary to law. *Id.* Plaintiffs assert an *ultra vires* claim against DOGE, arguing that it lacked the authority to direct FHIP award terminations. *Id.* Plaintiffs filed a motion for a temporary restraining order as to all Defendants alongside their Complaint, A47, though Plaintiffs later narrowed their request for temporary relief to cover only HUD, A674.

The District Court held a hearing on March 25 and granted Plaintiffs' request for temporary relief on March 26. A684. The District Court's order was grounded in this Court's decision in *California v. U.S. Department of Education*, 132 F.4th 92 (1st Cir. Mar. 21, 2025). *Id.* The Parties agreed to extend the temporary restraining order until May 16 and to brief the propriety of a preliminary injunction in the interim. A67.

On April 4, the Supreme Court stayed the temporary restraining order at issue in the *California* litigation. 145 S. Ct. 966. The interim ruling, issued on a truncated timeline, without traditional merits briefing, and without argument, included just two paragraphs of relevant discussion. One paragraph indicated that the APA claims at issue in that case may belong in the Court of Claims pursuant to the Tucker Act; the other relied on the Court's view that the Plaintiffs-States had the "financial wherewithal to keep their programs running" and thus were not likely to suffer irreparable harm. *Id.*

Defendants here invoked the *California* per curiam to seek dissolution of the temporary restraining order on April 7. A689. The District Court granted Defendants' request on April 14, concluding that the *California* per curiam constituted an "unmistakable directive that . . . the proper forum for this case is the Court of Federal Claims." A724–A725. This determination did not address Plaintiffs' argument that, under the still-controlling decision in *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988), Plaintiffs' APA claim belongs in federal district court. Plaintiffs filed an assented-to motion to stay proceedings, arguing that the reasoning of the Dissolution Order foreclosed all possibility of preliminary relief and justified an immediate appeal. A726. The District Court stayed proceedings. A731. This appeal followed. A733.

## SUMMARY OF THE ARGUMENT

As a threshold matter, this Court has jurisdiction immediately because the Dissolution Order effectively denies Plaintiffs any access to preliminary relief. Without appellate review, Plaintiffs will suffer the same forms of irreparable harm that animated the temporary restraining order in the first place. Appellate review is also the only way to ensure that rote application of the Supreme Court's preliminary ruling in another case does not wrongly expel Plaintiffs from the proper forum. Based on the expedited timeline for this case, there is little-to-no risk of either mootness or an advisory opinion.

When the facts and circumstances of this particular case are evaluated—as they must be—binding precedent ordains that Plaintiffs' claim is properly considered under the APA. *See Bowen*, 487 U.S. 879. Contrary to the District Court's determination and Defendants' arguments, *Bowen* controls this analysis, and *Bowen* confirms that the Tucker Act does not apply because Plaintiffs seek prospective injunctive relief, not money damages. The *California* per curiam, which reaffirmed *Bowen*'s dispositive holding, does not mandate a different result, especially because the allegations and arguments at issue here are materially distinct from those in *California*.

Because the Tucker Act does not divest the District Court (or this one) of jurisdiction, the Dissolution Order should be reversed and the temporary restraining order reinstated. Plaintiffs are likely to prevail on their APA claim, and without temporary relief, they face imminent and irreparable harm. The balance of the equities and public interest likewise favor preliminary relief. Defendants cannot show that the District Court abused its discretion in entering the temporary restraining order in the first place, and it should be restored while the Parties brief the propriety of a preliminary injunction.

## ARGUMENT

### I.     The Dissolution Order Is Appealable.

Just as this Court entertained an appeal from a temporary restraining order in the *California* case, it can and should exercise jurisdiction over Plaintiffs' appeal from the Dissolution Order. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir. 2025) (denying stay of a temporary restraining order but finding jurisdiction to review).

The applicable statute, 28 U.S.C. § 1292(a)(1), generally provides for interlocutory review of injunctions, and this Court has recognized that this provision may be invoked when the refusal of a temporary restraining order has the "practical effect of refusing an injunction" and will have "serious, perhaps

irreparable, consequences" that can be "effectually challenge[ed] only by an immediate appeal." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84, 88–89 (1981) (internal quotation marks omitted); *Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 27 (1st Cir. 2020) (same). All three factors are met here.

*First*, the dissolution of the temporary restraining order has the practical effect of denying injunctive relief entirely because the District Court's reasoning extends to, and thus appears to resolve *ex ante*, any motion for a preliminary injunction. The District Court dissolved the temporary restraining order based on a determination that *California* per curiam necessarily foreclosed jurisdiction over Plaintiffs' APA claim. A724–A725 (relying on the Supreme Court's "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"). The District Court's determination was as to "this case" in its entirety, *see id.*, and thus was not limited to the temporary restraining order. That would foreclose not just a motion for a preliminary injunction, but Plaintiffs' entire APA claim. Indeed, the determination appears broad enough to sweep in Plaintiffs' *ultra vires* claim against DOGE. The Dissolution order thus had the "practical effect" of denying a preliminary injunction. *Carson*, 450 U.S. at 84.

Indeed, when Plaintiffs sought a stay pending expedited appeal—which had the effect of staying the preliminary injunction briefing that otherwise would have

been forthcoming—on the grounds that the District Court's jurisdictional determination made further injunction briefing and consideration futile, the District Court did not disagree or instruct Plaintiffs to proceed with their preliminary injunction motion; it stayed the case. In other words, the Dissolution Order's logic effectively deprives Plaintiffs of the opportunity to seek preliminary relief. A decision that effectively resolves all preliminary relief is more akin to an injunction than a temporary restraining order, and thus can be considered under Section 1292(a). *See, e.g.*, *Almeida-León v. WM Cap. Mgmt., Inc*., Nos. 20-2089, 21-1806, 21-1807, 2024 WL 2904077, at *4 (1st Cir. June 10, 2024) (collecting cases).[3]

Plaintiffs do not contend that this Court's reversal of the District Court would result in entry of a preliminary injunction. Rather, it will resurrect Plaintiffs' opportunity to file a motion for a preliminary injunction to keep their awards in place during the pendency of this case.[4] And under this Court's precedents, that is sufficient to confer appellate jurisdiction over the District Court's order.

_____

[3] The proceedings below included full briefing by the parties and an opportunity to be heard at a hearing, which courts have considered when extending Section 1292(a) to appeals from temporary restraining orders. *See, e.g.*, *S.F. Real Est. Invs. v. Real Est. Inv. Trust of Am.*, 692 F.2d 814, 816 (1st Cir. 1982) (reviewing a temporary restraining order where all parties had notice, filed briefs, and had opportunity to present oral argument).

[4] Although not acknowledged by Defendants in their opposition to expedited briefing and consideration, the temporary restraining order may be extended during

***Second***, Plaintiffs face irreparable harm in the absence of preliminary relief. *See Infra* Section V.B. In their response to Plaintiffs' request for expedited briefing and consideration, Defendants dismiss the amount at issue as "minor," but for many Plaintiffs, the stakes could not be higher. Defs.' Resp. in Opposition to Pltfs.' Emergency Mot. for Expedited Briefing Schedule at 8. FHIP awards often make up a giant proportion of recipients' annual budgets, sometimes as high as 90%. *Infra* Section V. It should go without saying, then, that for many Plaintiffs, survival hangs in the balance. When HUD first terminated Plaintiffs' FHIP awards, Plaintiffs were forced to lay off staff members, turn away clients, stop work on behalf of existing clients, halt programs, cancel events, hold back previously planned public outreach, break leases, and assess how long they could operate prior to complete closure. A35–A40, ¶¶ 89–108 (describing harm to Named Plaintiffs); *see also* ECF A79, A163, A392, A476, and A632 (Plaintiff declarations describing harm). Without the temporary restraining order, Plaintiffs face the same harms in the absence of immediate appellate review.

***Third***, in light of this risk of imminent and irreparable harm, an immediate appeal is the only effective means of challenging the District Court's determination

_____

such briefing because a favorable decision from this Court would likely constitute "good cause" under Federal Rule of Civil Procedure 65(b)(2).

as to jurisdiction. In staying the case, the District Court appeared to agree with Plaintiffs' argument that its jurisdictional determination in the Dissolution Order foreclosed all preliminary relief. Filing a doomed motion for a preliminary injunction would prolong Plaintiffs' exposure to irreparable harm, and waste both judicial and party resources, without changing the scope or nature of this appeal.

## II.    Plaintiffs' Appeal Neither Presents a Risk of Mootness Nor Calls for an Advisory Opinion.

In challenging Plaintiffs' request for expedited briefing and consideration, Defendants argued that the question presented would be moot by the time this Court acted, making the resolution of Plaintiffs' appeal an advisory opinion. This argument is wrong and does not present a bar to appellate review.

Defendants' mootness concerns have arguably been resolved by the briefing schedule set by the Court, which would permit resolution before May 16, the date on which the underlying temporary restraining order would have expired. Restoration of the temporary restraining order before that date would pause the irreparable harm to Plaintiffs, not address a moot issue.

Further, regardless of the timing, this appeal presents an actual and extant controversy. *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (explaining that mootness doctrine confirms that standing exists at all stages of a case). In the absence of a temporary restraining order or appellate review, Plaintiffs

will face the irreparable harm that they identified at the outset of the case. The question of whether the root of that harm (HUD's action) violates the APA can be addressed only if the predicate jurisdictional issue is resolved. The nature of this threshold inquiry has not changed since Plaintiffs initially made their request for a temporary restraining order, and the need for preliminary relief is as pressing today as it was on March 13.

As to the risk of an advisory opinion, there is none. The jurisdictional basis for the District Court's dissolution of the temporary restraining order predetermined all potential preliminary relief. A724–A725. The outcome of this appeal will thus dictate not only whether Plaintiffs may seek preliminary relief but also whether they may pursue their APA claim at all. There is no reason to force Plaintiffs to go through a futile preliminary injunction process. Absent review by this Court now, Plaintiffs would return to the District Court; brief and present the preliminary injunction motion; receive the preordained denial of the injunction for want of jurisdiction; and return to this Court weeks later with the same question they now present.

Notably, the Government has not concerned itself with the expiration of temporary restraining orders when pursuing appellate review in recent similar cases. For example, in *California*, the Department of Education—which was

represented at the intermediate level by the same counsel now representing Defendants in this appeal—sought Supreme Court review of a temporary restraining order a mere 12 days before it was set to expire, a shorter interval than what is at issue here, and the Supreme Court issued its order a mere three days before the order was set to expire.

Moreover, resolving the merits is especially important here because the central issue presented by Plaintiffs' appeal—whether the interim per curiam order in *California* sub silentio overrules longstanding precedent in this area such as to reroute grant termination challenges wholesale to the Court of Claims—has arisen in multiple other funding termination cases within this Circuit in the past two weeks. *See, e.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, --- F. Supp. 3d ----, 2025 WL 1116157, at *12–15 (D.R.I. Apr. 15, 2025) (granting injunction, finding *California* per curiam carried little weight, and applying preexisting precedent); *New York v. Trump*, No. 1:25-cv-39, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025) (denying Government's request for reconsideration of order enforcing injunction based on *California* per and applying preexisting precedent); *Maine v. U.S. Dep't of Agric.*, --- F. Supp. 3d ----, 2025 WL 1088946, at *18–20 (D. Me. Apr. 11, 2025) (granting temporary restraining order, finding *California* per curiam carried little weight, and applying preexisting precedent).

Unlike the District Court here, these courts have considered and rejected federal agency arguments that the *California* order is alone dispositive as to jurisdiction. Thus, in addition to resolving a very-much-alive dispute in this case, appellate review will promote consistency and clarity within this Circuit.

## III.    Standard of Review.

The Dissolution Order turned on a question of law and therefore receives *de novo* review, either as a legal conclusion underlying the dissolution of preliminary relief, *Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo*, 551 F.3d 10, 15–16 (1st Cir. 2008), or as a determination that jurisdiction is lacking, *United States v. Pedro-Vidal*, 991 F.3d 1, 4 (1st Cir. 2021).

## IV.    The District Court Had Jurisdiction Over Plaintiffs' APA Claim.

The District Court erred in finding that it lacked jurisdiction over Plaintiffs' APA claim. The federal government has waived sovereign immunity for APA claims "seeking relief other than money damages." 5 U.S.C. § 702. The APA in turn defines "relief" as including "the whole or a part of an agency . . . grant of money [or] assistance." 5 U.S.C. § 551(11). The key Supreme Court decision on the scope of relief available under the APA, *Bowen*, confirms that this waiver extends to prospective injunctive relief, including the parameters of an ongoing agency relationship, even when "an agency's action may result in the disbursement

of funds." *California*, 145 S. Ct. at 968 (citing *Bowen*, 487 U.S. at 910). Here, Plaintiffs request an injunction that preserves the grantor/grantee relationship as it existed prior to the February 27 Termination Notice. This relief falls squarely within the APA's waiver of sovereign immunity and aligns with the relief that the Supreme Court approved in *Bowen*. The *California* per curiam does not change this straightforward application of statutory text and binding precedent, both because that interim ruling reaffirmed, not overruled, *Bowen* and because the facts and circumstances at issue here are materially distinct.

### A. The APA Provides for Prospective Injunctive Relief, Including Relief Encompassing Certain Monetary Payments.

The text, structure, and legislative history of the APA demonstrate that the waiver of sovereign immunity in 5 U.S.C. § 702 was intended to encompass an order reinstating a grantor/grantee relationship, which is prospective injunctive relief. The APA's waiver of sovereign immunity does not extend to "money damages," such as money due on a contract. But "money damages" is different from prospective injunctive relief that may result in monetary payments. The Supreme Court's decisions in *Bowen* and *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212 (2002), explain how to differentiate between these two types of relief and how thus to resolve the attendant jurisdictional questions.

*First*, when Congress amended § 702 in 1976 to permit suits for "relief" other than "money damages," the APA already defined "relief" to include "the whole or a part of an agency . . . grant of money [or] assistance." *See* 5 U.S.C. § 551(11). The legislative history confirms that Congress did not intend, in excluding "money damages" claims from the APA, to bar claims for specific reinstatement of a grant agreement.

As the Court in *Bowen* observed, at the time of the 1976 amendment the term "money damages" typically referred to "a sum of money used as compensatory relief," as opposed to "specific relief," which referred to "an attempt to give the plaintiff the very thing to which he was entitled." 487 U.S. 879, 895 (1988) (quoting *Md. Dep't of Human Resources v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985)). This distinction is reinforced in the language of the House Report accompanying the amendment, which explicitly contrasted actions for "specific relief" (authorized by § 702) from "the recovery of money damages," which it acknowledged must be brought in the Court of Claims H.R. Rep. No. 94-1656, at 11–13.[5]

---

[5] As *Bowen* made clear, it was well-understood at the time that "specific relief" could take the form of an equitable order to perform on an agreement that included payment of money unlawfully withheld. *Id.* (citing contemporaneous cases). Congress is presumed to be familiar with the state of the law when it legislates. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97 (1979).

Moreover, the House Report explicitly cited the "administration of Federal grant-in-aid programs" as a type of case for which the new provision would *permit* judicial review in district courts—an assertion that would be illogical if Congress believed that any order resulting in the reinstatement of federal grant funds constituted "money damages." *See* H.R. Rep. No. 94-1656, at 11-13. Thus, the phrase "relief other than money damages" as used in § 702 has always encompassed the reinstatement of an agency grant of money or assistance.[6]

**Second**, as the Supreme Court just observed in *California*, the relevant APA precedent for injunctive relief under the APA is *Bowen*. 145 S. Ct. 968. In *Bowen*, the Supreme Court considered whether the Court of Claims had exclusive jurisdiction over an APA challenge to the Department of Health and Human Services' ("HHS" or "the agency") refusal to reimburse certain Medicare

---

[6] Other courts have relied on the distinction between money damages and specific relief in affirming the jurisdiction of district courts to set aside unlawful agency actions that effectively terminate or change ongoing grantor/grantee relationships. *See, e.g.*, *Massachusetts v. Nat'l Insts. of Health*, --- F. Supp. 3d ---, 2025 WL 702163, at *6-7 (D. Mass. Mar. 5, 2025) (noting that Plaintiffs' challenge to a rate-change notice impacting grant reimbursement does not seek "claims for past pecuniary harms" but was brought to preserve [Plaintiffs'] ongoing and prospective [grant] agreements"); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 752378, at *8–9 (D.D.C. Mar. 10, 2025) ("Plaintiffs are not seeking compensation for their losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount withheld pursuant to the agency policy; Plaintiffs seek only invalidation of the policy, including the withholding of payment that flowed from it."), *stay denied* 145 S. Ct. 753 (Mem.).

expenditures. 487 U.S. at 882. Similar to the FHIP grants at issue here, the agency's "reimbursement" to the states under the Medicaid program took the form of quarterly advance payments based on a state's estimates of its work. *Id.* at 883–84. These estimates were subject to adjustment based on work performed, and disputed funds could be "disallowed" and withheld by the HHS or held by the state pending resolution of the dispute. *Id.* Massachusetts sought APA review of HHS's refusal to reimburse certain funds. *Id.*

The Supreme Court sided with Massachusetts in an opinion with two key holdings. The Court first rejected the notion that a claim is one for "money damages," and thus outside the scope of the APA, merely because the requested relief may ultimately result in some monetary payments. *Id.* at 900–01. The Court explained that the state was not seeking "monetary compensation" but rather was "seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 900. The Court went on: "The fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief." *Id.* at 900–01. Thus, injunctive relief remains available under the APA even if its implementation entails monetary payments.

The Supreme Court then found that the Tucker Act did not provide plaintiffs with an adequate remedy for this challenge because the sought-after relief included an injunction to set aside the disallowance decision, which was prospective in nature and thus was beyond what the Court of Claims could award. *Id.* at 905. The Court explained that the reversal (or grant) of a Medicaid disallowance is prospective because it necessarily impacts what expenses will or will not qualify for reimbursement moving forward, which in turn affects a state's budgeting, expectations of future funds, and the "ongoing relationship" between the federal government (the grantor) and state (the grantee). *Id.* at 907.[7] In other words, setting aside a disallowance determination may affect both a state's entitlement to funds past due *and* the work that will qualify for reimbursement in the future. For this reason, the Court acknowledged that where the availability of reimbursement for grant-related work is at stake, "it [may be] important to seek judicial review—perhaps in the form of a preliminary injunction—as promptly as possible after the agency action becomes final." *Id.* at 907.[8] The Court thus held that Massachusetts properly sought equitable prospective relief under the APA in district court.

---

[7] The Supreme Court characterized an allowance as "an adjustment . . . in the size of the federal grant to the state that is payable in huge quarterly installments," *id.* at 893, like the quarterly reporting and payment approvals for FHIP grants, A719.

[8] The Supreme Court also noted that it was important for district courts to retain jurisdiction over claims where it was uncertain on a given factual record whether

The Supreme Court's later decision in *Great-West Life & Annuity Insurance Co. v. Knudson*—which was not an APA case—addressed the distinction between money damages and equitable relief in a different context and, in so doing, confirmed *Bowens'* finding that the APA permits forward-looking injunctive relief, even where it will include future payments. 534 U.S. at 212. There, the Petitioner was an insurance company that sought reimbursement of money it had already paid on behalf of an individual for medical expenses following that individual's recovery of a personal injury settlement. It was undisputed that the money at issue was money "past due" under the contract: the medical expenses had already been paid for and the Court mentioned no ongoing obligations between the parties, and certainly no ongoing grantor/grantee relationship. On this basis, the Supreme Court found that the relief sought was legal, not equitable in nature, and thus not recoverable under the Employee Retirement Income Security Act. *Id.* at 211–12. The *Knudson* court distinguished the facts at issue there from *Bowen* on the basis that *Bowen* involved prospective injunctive relief, which did not apply to a case

---

or not the relief would be prospective in nature. *See id.* at 907 n.43. ("[W]hether injunctive or declaratory relief is appropriate in a given case will not always be apparent at the outset. Since, as a *category of case*, alleged 'improper Medicaid disallowances' cannot always be adequately remedied in the Claims Court, as a jurisdictional, or threshold matter, these actions should proceed in the district court. Then, the district court judge can award proper relief.") (emphasis in original).

that dealt with the exclusively past due funds sought by the insurer, which were properly categorized as a contractual legal remedy. *Id.* at 212.

These two precedents are easily harmonized. *Bowen* tells us what's cognizable relief under the APA (prospective injunctive relief, including when it entails some monetary payments), and *Knudson* tells us what's not (money past due on a contract). The upshot is that federal district courts have jurisdiction over APA claims that seek prospective injunctive relief, even if it may ultimately require an agency's expenditure of funds.

## B. The District Court Had Jurisdiction Pursuant to the Text of the APA and *Bowen*.

The Dissolution Order wrongly determined that jurisdiction was lacking and that "this case" belongs in the Court of Federal Claims. A724–A725. But Plaintiffs seek forward-looking injunctive relief to reestablish the grantor/grantee relationship, which falls squarely within the text of the APA and was embraced by *Bowen*. The District Court thus had jurisdiction over Plaintiffs' APA claim.

There is nothing retrospective about either HUD's termination of Plaintiffs' FHIP awards or the relief Plaintiffs seek. The Termination Notice specifies that Plaintiffs should complete a final closeout process, which includes HUD reimbursing Plaintiffs for expenses incurred to date. A161–A162 at 83–84. Thus, Plaintiffs APA claim does not seek money owed past work, which HUD has agreed

it must pay. What has been terminated is the Parties' forward-looking relationship. Reinstatement of that relationship is not money damages. Rather, grant reinstatement will impose obligations and rights on both parties. Plaintiffs will have the obligations to undertake and achieve certain deliverables and report on those deliverables to HUD. A719 (Decl. of M. St. Cyr). HUD will then review Plaintiffs' reporting and performance and disburse funds as applicable. *Id.* This process will continue for the life of the grant. *Id.* At no point are Plaintiffs entitled to simply invoice HUD and expect remuneration, *id.*, nor would grant reinstatement necessarily result in a Court order to pay a specific sum of money. Under these circumstances, a court order to resume business as usual plainly constitutes forward-looking equitable relief, not money damages, under both the text of the APA and governing precedent.

Plaintiffs' request for relief is permitted by the express text of the APA, which contemplates "relief" in the form of a "grant of money" or "assistance." 5 U.S.C. 551(11). And because Plaintiffs seek to reestablish the grantor/grantee relationship moving forward, not money past due on a contract, their claims are controlled by *Bowen*, 487 U.S. 879.[9] Plaintiffs do not ask for an order instructing

---

[9] Given that Plaintiffs do not request or need judicial review to seek reimbursement for past work, this case presents an easier question than in *Bowen*, where the

HUD to pay each of them a specific amount, but rather an order to restore their relationship and the mutual obligations that it entails. Such an order likely would result in the payment of Congressionally appropriated, already-obligated FHIP funding in the future, but only pending Plaintiffs' completion of their deliverable activities. This is the primary purpose of the relief Plaintiffs seek: to provide a path forward for their essential work enforcing the FHA.

Moreover, just as in *Bowen*, the purely prospective relief Plaintiffs seek would not even be available in the Court of Claims, which further undermines the Dissolution Order's jurisdictional determination. *See* 487 U.S. at 879 ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief."); *see also, e.g.*, *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1318–19 (Fed. Cir. 2017) (Court of Federal Claims lacked jurisdiction over tribes' claim that they were statutorily entitled to more money under a formula for "strings-attached [block] grants," because such relief would modify a grantor/grantee relationship and was not "a free and clear transfer of money").Thus, *Bowen* both controls Plaintiffs' APA claim and confirms that the District Court had jurisdiction.

---

Supreme Court acknowledged that it was "likely" that HHS would "reimburse Massachusetts the requested sum" as a result of the decision. 487 U.S. at 910.

*Knudson* does not move the needle in this case. Unlike the insurer in *Knudson*, Plaintiffs here do not seek "money damages" or "past due sums." HUD appeared to anticipate paying for completed work as part of its termination process, and so Plaintiffs do not ask for a court order for such payment; their requested relief is instead the forward-looking restoration of the Parties' relationship and mutual obligations. Also unlike the insurer in *Knudson*, Plaintiffs claims are not contractual in nature. The only misconduct Plaintiffs allege against HUD is that the termination decision was arbitrary, capricious, and contrary to law, and thus violated the APA, because it was backed by an inadequate, implausible, and unreasonable explanation. Plaintiffs' APA claim does not turn on the contents of their grants—Plaintiffs do not argue that HUD violated the terms and conditions of the agreements, *see infra* Section V.A, nor has HUD alleged that any Plaintiffs breached any portion of the agreements. Plaintiffs' claim may be resolved without ever looking at the agreements.[10] These claims do not turn on whether, or how much, HUD ultimately must pay Plaintiffs under the grants.

---

[10] Tellingly, in the proceedings below, neither side relied on the grant provisions, nor did either side rely on contract cases or theories. Rather, Plaintiffs asked the District Court to apply cases from the robust body of APA law that applies to agency action, none of which had to do with grants. *See generally* A62-A66.

Plaintiffs' claim is not transformed into a contract claim by HUD's belated explanation, proffered for the first time in a post-decisional affidavit, that it terminated FHIP grants because they contained DEI-related language or activities. *See* A669, ¶ 7 (Decl. of M. Ammon). That is, it is the *defendants* that injected into this case reference to the contents of the FHIP grants, not the Plaintiffs, and pointing to certain words in a grant award does not change the nature of the claims at issue. Courts have "explicitly rejected the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act because to do so would deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (citation and internal quotation marks omitted). In addition, HUD's stated defense implicates only one of the many APA violations that Plaintiffs have challenged: whether HUD's belated explanation, if accepted, is reasonable. HUD's post-hoc rationale neither salvages the inadequacy of the Termination Notice itself nor changes the fact that the termination decision is contrary to law. *See Infra* Section V.A.1 and V.A.2; *see also* A62–A66. Accordingly, even were the Court to consider the Ammon Declaration and accept the explanation therein, it could still resolve the other APA defects

without reference to the contents of Plaintiffs' grants. HUD's only defense accordingly does not change the nature of Plaintiffs' APA claim.[11]

The same result would obtain even if this Court were instead to evaluate Plaintiffs' claim under the test set forth in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). Under *Megapulse*, courts assess whether the "essence" of an action is one in contract, an inquiry that requires consideration of "the source of the rights upon which the plaintiff bases its claims," and "the type of relief sought (or appropriate)." 672 F.2d at 968. This case starts and ends with APA review of HUD's February 27 termination and its inconsistency with the statutory framework; it does not involve a contract. And Plaintiffs seek prospective injunctive relief, not money damages. Accordingly, Plaintiffs' APA claim does not "so clearly present[] a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims." *Id.* at 968.

---

[11] HUD's entire Tucker Act argument is premised on the notion that Plaintiffs' grants qualify as contracts, but federal law indicates otherwise. Congress defined agency procurement contracts as those where "the principal purpose of the relationship is to acquire . . . property or services for the direct benefit or use of the United States," 31 U.S.C. § 6303, which is not true of FHIP awards. Congress defined grant agreements separately from contracts for scenarios when "the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose." *Id.* § 6304.

### C. The *California* Per Curiam Does Not Deprive the District Court of Jurisdiction.

The District Court wrongly determined that the *California* per curiam displaced this straightforward application of statutory text and binding precedent. For that to be true, the Supreme Court would have had to overrule *Bowen*, but the per curiam in fact validated *Bowen*'s central tenet. Moreover, the *California* per curiam was not a final resolution on the merits, even for that case. There also exist material distinctions between Plaintiffs' claim here and the States' claims there. Most notably, HUD instructed Plaintiffs on how to seek reimbursement on work already performed as of February 27, and only terminated the grant relationship moving forward, a factual scenario that was not in front of the Supreme Court.

***First***, *Bowen* is dispositive unless this Court determines that it was overruled *sub silentio* in the *California* per curiam. That would be an anomalous result given that the per curiam reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910). Far from overruling the precedent that governs Plaintiffs' claim, the Supreme Court confirmed that the central tenet of *Bowen* still stands. As one district court persuasively observed: "[T]he Supreme Court has repeatedly made clear that lower courts should follow the case which directly controls, leaving to the Supreme Court

the prerogative of overruling its own decisions. And the case that directly controls, the one that the Court must follow, is *Bowen*." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *14–15 (cleaned up) (citing *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023)).

The Dissolution Order ignored the *California* per curiam's approving citation of *Bowen*. Instead, without even acknowledging or attempting to analyze *Bowen*—the case that controls this analysis— the District Court determined that *California* imposed an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims." Every other district court within this Circuit has rejected the federal agencies' *California*-based arguments and instead confirmed jurisdiction consistent with *Bowen*. *See Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *12–15; *New York*, 2025 WL 1098966, at *2; *Maine*, 2025 WL 1088946 at *18–20; *see also, e.g.*, *Climate United Fund v. Citibank, N.A.*, --- F. Supp. 3d ---, 2025 WL 1131412, at *13 (D.D.C. Apr. 16, 2025).

***Second***, there are both legal and factual distinctions between the *California* case and this one. The States in *California* were not seeking restoration of a grantor/grantee relationship with the Department of Education because the States themselves were not grantees. The States also tethered their APA claims to the

terms and conditions of their grant agreements. This linkage meant that resolving the States' claims necessarily would have entailed interpreting their agreements, like enforcing a contract. Here, by contrast, Plaintiffs' APA claim can be resolved without even looking at their grant documents, which renders the Tucker Act inapplicable. *Supra* Section IV.B.

As to relief, the States in *California* were not party to the grantor/grantee relationship, and they did not argue that their requested relief would have reimposed mutual obligations on themselves and the Department of Education. Rather, the issue for the States was whether they would have to use their own funds to cover the loss of federal funding, a purely financial inquiry. 145 S. Ct. at 969 (noting that states "ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum"). By contrast, Plaintiffs here seek to reestablish an ongoing relationship between themselves and HUD.

As to the nature of the claims, the States consistently relied on and referred to the language in their grants to plead and support their APA claim. The States' Complaint alleged that "the terms and conditions of the TQP and SEED grant awards do not authorize termination on the[] grounds" invoked by the Department of Education. *California v. U.S. Dep't. of Educ.*, No. 1:25-cv-10548, ECF No. 1 ¶ 14 (D. Mass. Mar. 6, 2025); *see also, e.g.*, *id.* ¶ 131 ("Further, the terms and

conditions of the relevant grant awards do not authorize termination of a grant based on failure to effectuate agency priorities."). Count II of the States' Complaint was premised on the assertion that "[n]o term or condition for any TQP or SEED grant award authorizes termination for failure to effectuate agency priorities," and, as such, "the Termination Letter was not issued pursuant to the terms and conditions of the federal award." *Id.* ¶¶ 183–84 (citation and internal quotation marks omitted). The States pursued this theory before the Supreme Court: In the section of their brief opposing the Department of Education's Tucker Act arguments, the States explicitly invoked the terms of their grant agreements, asserting that "[D]efendants have not identified any term or condition of any TQP or SEED award that would authorize termination on the grounds they have asserted." Brief for Respondent at 23, *Dep't. of Educ. v. California*, 604 U.S. ---, 145 S. Ct. 966 (Apr. 4, 2025) (No. 24A910).

Given the States' reliance on terms and conditions both for Count II and to respond to the agency's jurisdictional challenge, the District Court's conclusion in the Dissolution Order that these arguments merely "buttressed" APA review more generally is wrong. A724–A725. The States premised their APA claims on the provisions in the grant agreements themselves, making it impossible to evaluate

their claims without construing terms and conditions in the grant agreements, much like evaluating a contract with the United States.

Not so here. Plaintiffs do not argue that HUD's action was inconsistent with the terms and conditions of their awards; they argue that HUD's action was inconsistent with federal law. This Court need not look at Plaintiffs' grant agreements to assess their claims. For that reason, Plaintiffs do not analyze the terms or conditions of their grant agreements when explaining why Defendants' action violated the APA. *See Infra* Section V.A.

**Third**, the potential implications of the *California* per curiam are further diminished because that interim order is not a final ruling on the merits and receives "considerably less precedential value than an opinion on the merits." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180–81 (1979). *See also Labrador v. Poe*, 144 S. Ct. 921, 928–929 (2024) (Kavanaugh, J., concurring in the grant of a stay) (distinguishing a ruling on an emergency stay application from "a final merits ruling"). This limitation makes sense: Because the ordinary explication and analysis do not appear in a summary order, there is little to be gleaned in terms of general applicability. For example, the Supreme Court did not explain, beyond conclusory statements, why the District Court in the *California* case may have lacked jurisdiction. It is unsurprising, then, that other federal district

courts considering challenges to agency grant terminations have retained

jurisdiction after conducting a fulsome analysis. *See Supra*. The outcome of the

*California* per curiam, without more, does not reflexively preclude Plaintiffs' APA

claim. *Nken v. Holder*, 556 U.S. 418, 433 (2009) (noting that the availability of

preliminary relief "is dependent upon the circumstances of the particular case").

    ***In sum***, the District Court erred when determining that the *California* per

curiam necessarily deprived it of jurisdiction over Plaintiffs' APA claim because

*Bowen* remains the controlling and dispositive authority. The per curiam sheds

little light on this case, both because of the posture of that particular order and

because of the factual differences between that case and this one.

## V.    Plaintiffs Remain Entitled to a Temporary Restraining Order.

    After correcting for the jurisdictional error, it is apparent that reversal and

vacatur of the Dissolution Order—which would reinstate the temporary restraining

order—is both necessary and proper. Just as Plaintiffs met the standard for

preliminary relief when the District Court entered the temporary restraining order,

they meet it now. The legal standard for a temporary restraining order "mirrors that

for a preliminary injunction." *Schnitzer Steel Indus., Inc. v. Dingman*, 639 F. Supp.

3d 222, 226 (D.R.I. 2022) (citing *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I.

2016)). "The district court must consider 'the movant's likelihood of success on the

merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quotation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## A. Plaintiffs Are Likely to Succeed on the Merits of their APA Claim Against HUD.

Agency action may be set aside under Section 706(2) of the APA if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) (quoting 5 U.S.C. § 706(2)(A)).[12] Each of the provisions in Section 706 provides an independent basis for relief, meaning that HUD's termination decision can be invalidated either because it was arbitrary, capricious, and an abuse of discretion or because it was contrary to law. *Bowman*

---

[12] Final agency actions "mark the consummation of the agency's decisionmaking process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). The terminations here meet both prongs: they announced HUD's definitive decision, effective immediately.

*Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974).

Plaintiffs are likely to show that HUD's termination decision flunked both tests.

### 1. HUD's Termination Was Arbitrary and Capricious.

The "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency falls short of this standard when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). HUD's termination of Plaintiffs' FHIP grant violated every one of these bedrock principles and therefore must be set aside.

***First***, HUD's explanation was inadequate. "[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). "That "reasoned explanation requirement . . . ensure[s] that agencies offer genuine justifications for important

decisions, reasons that can be scrutinized by courts and the interested public."
*Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Where an agency's
explanation is conclusory, instead of reasoned, it is insufficient. *See Encino*
*Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (explaining the need for an
analysis). HUD's single-sentence reason for terminating Plaintiffs' awards does not
even merit the label "explanation," let alone satisfy the agency's obligation to
reasonably explain its decisions. HUD copied and pasted from the applicable
regulations, asserting that Plaintiffs' awards "no longer effectuate[] program goals
or agency priorities," without saying how or why that might be the case.[13]

 The utter absence of an explanation is all the more problematic because
HUD's decision to strip Plaintiffs of their grants midstream is indisputably a
*change* in the agency's position. An agency may modify its policies, but the APA
"ordinarily demand[s] that [the agency] display awareness that it is changing

---

[13] Other courts faced with this exact language have rejected its adequacy under the
APA. *See, e.g.*, *Climate United Fund*, 2025 WL 1131412, at *15 ("In the letters
terminating the grant programs, EPA provided no individualized reasoning as to
anything Plaintiffs themselves did[.]"); *Am. Ass'n. of Colls. for Tchr. Educ. v.*
*McMahon*, No. 1:25-cv-00702, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025)
("[T]he Department's use of a template or boilerplate letter issued to all Grant
Recipients further strengthens Plaintiffs' argument that the Department did not
consider individual, or any, data or information.").

position" and "show that there are good reasons for the new policy." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino*, 579 U.S. at 222 (quoting *Fox Television Stations*, 556 U.S. at 515–16) (internal quotation marks omitted). HUD's Notice did not acknowledge the agency's about-face or identify any new priorities, and it certainly did not offer good reasons for the change in course. *See Fox*, 566 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

As noted above, HUD's explanation is not salvaged by the affidavit from Matthew Ammon, A669. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025) (rejecting agency declaration that provided detail not found in grant termination letter and citing to *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–20 (1971)). Even if the Court were to credit the declaration, it still does not provide a "rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As an example, the apparent word search for DEI-related terms and activities resulted in terminating FHCST's

grant merely because it observed that Texas is a large and diverse state. A736 (Declaration of S. Tamez). A methodology such as this is both overbroad and imprecise, and it is proven unreasonable by the scattershot results.

*Second*, HUD's stated reasoning runs counter to the evidence and reaches an implausible result. Plaintiffs' FHIP awards fund precisely the activities that Congress enumerated in the FHIP statute, which were themselves expressly designed to promote the anti-discrimination goals reflected in the FHA. *Compare* A29–A35, ¶¶ 65-88 (describing the Named Plaintiffs' FHIP activities), *with* 42 U.S.C. § 3616a (enumerating FHIP activities). It is impossible to say that Plaintiffs' FHIP awards do not effectuate FHIP goals. As to changed agency priorities, HUD disclosed none in the Notice or elsewhere. A bare statement of the Administration's concern for illegal DEI programs cannot suffice. The FHA prohibits discrimination on the basis of race and sex, including giving preferences on those bases. *See, e.g.*, 42 U.S.C. § 3604(a)–(e). HUD has not explained how grants that further the non-discrimination purposes of the FHA could in fact promote illegal race- and sex-based preferences.[14]

---

[14] To the extent HUD has or will change its priorities, it must do so consistently with the FHA and Congressional appropriations. *See Infra* Section V.A.2.

***Third***, HUD failed to consider important reliance interests, even though they "must be taken into account." *Fox*, 566 U.S. at 515. Here, multiple parties rely on the FHIP awards that HUD abruptly terminated. First, Congress relies upon FHIP awards to carry out its policy objectives; it uses FHIP awards to enable organizations like Plaintiffs to fill the enforcement gap and ensure compliance with the FHA. Second, Plaintiffs rely on their FHIP awards to plan and undertake their activities, hire and pay staff, and serve their clients and communities. Third, Plaintiffs' clients rely on FHIP awards to receive essential services. For example, Plaintiffs' clients need Plaintiffs to continue participating in the FHIP program so they won't have to face an eviction alone, so they can access safe and affordable housing, and so they can pursue meritorious discrimination claims. HUD's termination cut through each of these layers without a thought for the personal and profound consequences on the fair housing ecosystem that Congress created through FHIP awards.[15]

***Fourth***, HUD relied on improper considerations when terminating Plaintiffs' FHIP awards. The Termination Notice expressly states that the February 27 decision was "at the direction of the President of the United States pursuant to the

---

[15] Notably, although Plaintiffs raised this point in their initial brief, the Ammon Declaration does not assert that HUD did, in fact, consider reliance interests.

Executive Order 14158, 'Establishing and Implementing the President's [DOGE],' and at the direction of said Department of Government Efficiency (DOGE)." *See, e.g.*, A161–A162 at 83-84 (MFHC's Termination Notice). But the FHIP scheme— whether looking at the FHIP statute, the FHIP regulations, or the incorporated Office of Management and Budget regulations—is unrelated to the topics covered in the DOGE Executive Order ("E.O."), which encompasses "government-wide software, network infrastructure, and information technology (IT) systems." A75. The E.O. is similarly unrelated to the FHA, unrelated to HUD, unrelated to grants in general, and unrelated to FHIP specifically. A DOGE-related E.O. simply has no place in a FHIP decision, and certainly cannot form the basis for a FHIP award termination.[16]

All said, HUD's termination decision bears all the hallmarks of arbitrary and capricious agency action. HUD has offered no defense other than a post-decisional affidavit that does not cure the defects at any rate. The termination of Plaintiffs' FHIP grants should be set aside.

---

[16] In addition to these flaws, as Plaintiffs argued below, HUD also acted arbitrarily and capriciously by deviating from its presumptive termination procedures. A65.

## 2. HUD's Termination Was Contrary to Law.

Even if HUD's termination decision were not arbitrary and capricious—and it was—HUD's conduct would be independently invalid under the APA based on the FHA and Congressional appropriations statutes. When an agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 297 (2013). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986). HUD's termination of Plaintiffs' grants runs counter to Congressional intent and enactments and therefore is "not in accordance with law." 5 U.S.C. 706(2)(a).

In amending the FHA to establish FHIP grants, Congress expressly intended to increase the resources available for fair housing enforcement activities. By eliminating Plaintiffs' grants, HUD has necessarily decreased the resources going toward this work, a result wholly at odds with Congress's stated goals. HUD has also violated the express text of the FHA. Congress stated that HUD "*shall*" use any funds set aside for the FHIP program to make the enumerated grants. 42 U.S.C. § 3616a. This means that once Congress has appropriated FHIP funding— as it has done every year—HUD must obligate it for grants like those Plaintiffs

received. Indeed, HUD cannot lawfully use the funds for anything other than the purposes laid out in the FHIP statute, which is the purpose for which the funds were appropriated. *See* 2 C.F.R. § 200.308(i); *see also* Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 370 (2024). Even if there were a way to repurpose these funds, HUD has not attempted to do so.[17]

Finally, Congress did not provide HUD with authority to take direction from other agencies, either in general or in its administration of FHIP. The FHA is silent as to FHIP-related input from other agencies, let alone from DOGE. So too are the applicable regulations. HUD cannot stray beyond these bounds, yet it did so expressly in the Termination Notice.

HUD's termination of Plaintiffs' FHIP awards undermines Congressional appropriations, Congressional intent, and express statutory text. It should therefore be set aside as contrary to law.

**B. Plaintiffs Will Suffer Irreparable Harm Without their FHIP Awards.**

The loss of Plaintiffs' FHIP awards will have immediate and irreparable consequences, and Defendants have provided no evidence or argument to dispute this reality. Plaintiffs' injuries fall into two overarching categories. First, the loss of their FHIP awards creates dire economic conditions that will force layoffs and/or

---

[17] On this topic, too, the Ammon Declaration is silent.

near-term closure for most Plaintiffs. Second, the terminations will impair all Plaintiffs' missions and programs. Either type of injury alone would merit preliminary relief. Both types of injuries are inevitable given Plaintiffs' dependence on their FHIP awards and given the nature of Plaintiffs' structure and operations.

**First**, because FHIP awards make up such a substantial portion of Plaintiffs' budgets, Plaintiffs are not able to absorb the loss of this funding stream.[18] *See, e.g.*, A632 (Decl. of L. Rice) (describing financial precarity of Plaintiffs); A84, ¶ 17 (MFHC's annual budget is less than $900,000); A397, ¶ 16 (Fair Housing Center of South Texas's annual budget is $500,000). As a result, Plaintiffs had to lay off staff when their FHIP awards were first terminated, and further layoffs will be necessary if temporary relief is not reinstated. Upon receipt of the termination letter, IFHC immediately laid off one staff member, and it will need to lay off an additional four staff members without temporary relief. A165–A166, ¶ 8–9. FHCST will need to reduce from seven full- and part-time employees and three per diem team members down to just three employees. A395, ¶ 8. HRAC rescinded an offer for a paid position that was funded by the now-cancelled grant. A479, ¶ 7. This Court has just recently confirmed that staffing cuts constitute irreparable harm for purposes of

---

[18] Unlike the Plaintiff-States in *California*, Plaintiffs here do not have the "financial wherewithal" to cover the costs while the litigation unfolds.

preliminary relief. *California*, 132 F.4th at 100 (irreparable harm "include[es] staff layoffs"); *see also W Holding Co. v. AIG Ins. Co. Puerto Rico*, 748 F.3d 377 (1st Cir. 2014).

The economic repercussions go far beyond staffing: Many Plaintiffs face complete closure. *See, e.g.*, A90–A91, ¶ 49 (MFHC faces closure in eight months); A174, ¶ 48 (IFHC faces closure in six months); A392, ¶ 40 (FHCST faces closure in six months). An existential threat to an organization is an irreparable injury. *See, e.g.*, *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009); *Kenworth of Boston, Inc. v. Paccar Fin. Corp.*, 735 F.2d 622, 625 (1st Cir. 1984). The same is true of difficult-to-quantify financial harm. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (irreparable harm includes lost sales because they were difficult to calculate and monetize). And while Plaintiffs are making these difficult choices, they must contend with budgeting chaos and planning uncertainty, itself something that district courts have acknowledged constitutes irreparable harm. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017).

***Second***, the prospective termination of Plaintiffs' FHIP awards will necessarily require them to halt or limit their FHIP-related programming, which will undercut Plaintiffs' fair housing missions and purposes. This, too, is an

irreparable injury. *See California*, 132 F.4th at 100 (irreparable harm includes "program disruptions"); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-9 (D.C. Cir. 2016) (reversing denial of preliminary injunction and finding irreparable harm established). Plaintiffs will have to eliminate or reduce core activities that were funded by FHIP awards, that were managed by staff members that will be (or have been) laid off, and/or that were impacted when Plaintiffs redirected scarce funding to fill the budgetary hole created by the termination of their FHIP awards. For example, MFHC will need to stop its lead poisoning investigation, which protects families with young children, A82, ¶ 9, and FHCST will need to stop all testing activities and abandon ongoing investigations, eliminating a large swath of fair housing enforcement in its region. A395–A396, ¶ 10–11. HRAC will be forced to halt its outreach activities midstream, losing the time and money it has spent on drafts and planning. A479, ¶ 6–8.

Critically, these reductions and eliminations will have ripple effects that inflict tangible harm on Plaintiffs' clients and communities. For example, MFHC takes on acute cases within its region, like helping survivors of domestic violence avoid homelessness, but termination of its FHIP grant has forced the organization to stop accepting new clients. A82, ¶ 9. MFHC has already turned away a person who was evicted from public housing because of domestic violence and is now

facing displacement from temporary shelter. *Id.* ¶ 10. Plaintiff FHCST uses its FHIP funding to provide similar services to domestic violence survivors, people facing evictions, and people with disabilities, such as ensuring that a wheelchair user can access her shower. A394-A395, ¶ 6–7. Loss of FHIP funding will significantly impair, if not eliminate, these services. This injury is particularly acute because Plaintiffs are often the only housing agencies in their regions. A165–A166; A82, ¶ 9. Plaintiffs provide an essential and unique pipeline to safe, affordable, and accessible housing—the loss of which courts have deemed to be irreparable. *See, e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423–24 (11th Cir. 1984).

Plaintiffs' injuries are unavoidable because they flow directly from Plaintiffs' reliance on FHIP awards, which are the backbone of Plaintiffs' operations, and from Plaintiffs' status as non-profit organizations whose programs and activities derive from Congress's directive in the FHIP provision of the FHA. Accordingly, the harm is necessarily felt by all Plaintiffs. *Coal. for Basic Hum. Needs v. King*, 654 F.2d 838 (1st Cir. 1981) (entering preliminary injunction for class of 145,000 people who received delayed welfare payments because it was likely that recipients would be harmed without benefits).

## C. The Balance of Equities and Public Interest Favor Plaintiffs.

Where the government is a party, as it is here, the Court's inquiry into the balance of the equities and the public interest merges. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). This is because the public has an important interest in making sure government agencies follow the law. *League of Women Voters*, 838 F.3d at 12 (same).

As to the equities, against the stark reality of the severe harm that Plaintiffs confront, HUD has asserted only that the agency may not be able to recoup FHIP funds disbursed during the pendency of the temporary restraining order. This Court has previously found that such an injury "is not of a type and magnitude that grabs equities' emergency attention when compared to the harm" that is caused by abruptly terminating statutorily mandated grants and disrupting settled expectations. *California*, 132 F.4th at 100. As this Court put it, in language applicable here, the government's claimed harm is that "the funds will go to programs Congress intended to fund—in amounts that in total do not exceed Congress's direction—consistent with priorities previously published by the Department in accordance with applicable regulations." *Id.* The equities favor maintaining that status quo while the legality of Defendants' action is litigated.

As to the public interest, it is beyond dispute that the public is benefitted from ensuring that Plaintiffs will both continue to exist and continue their FHIP-funded activities. By contrast, it cannot be said that the public will benefit from the grant terminations when the very purpose of FHIP is to ensure adequate implementation of an anti-discrimination statute and to protect the public's right to equal housing opportunity.

Now, as before, all four factors in the temporary restraining order analysis favor immediate relief to protect Plaintiffs and the public alike. The District Court's entry of a temporary restraining order was not an abuse of discretion, and that order should be restored.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court vacate and reverse the Dissolution Order, reinstate the temporary restraining order, and remand this case for preliminary injunction proceedings.

Dated: April 22, 2025

Respectfully submitted,

*s/Lila Miller*
Lila Miller (Bar No. 1216671)
Reed Colfax (Bar No.1216672)
RELMAN COLFAX PLLC
1225 19th Street NW Suite 600
Washington, DC 20036

Telephone: (202) 728-1888
Facsimile: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because the brief contains 11,653 words. The brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft Word 2016 in proportionately spaced 14-point Times New Roman typeface.


Dated: April 22, 2025 *s/ Lila Miller*
Lila Miller
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I electronically filed the foregoing

brief and appendix with the Clerk of the Court for the United States Court of

Appeals for the First Circuit using the appellate CM/ECF system.


Dated: April 22, 2025                     *s/ Lila Miller*
                                          Lila Miller
                                          *Counsel for Plaintiffs-Appellants*

# ADDENDUN TO APPELLANTS' BRIEF

| TABLE OF CONTENTS | | |
|---|---|---|
| **Docket No.** | **Document** | **Page** |
| 42 | Order Granting Defendants' Motion to Dissolve Temporary Restraining Order | 55 |

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 4/14/2025 at 2:29 PM EDT and filed on 4/14/2025

| | |
|---|---|
| **Case Name:** | Massachusetts Fair Housing Center et al v. Department of Housing and Urban Development et al |
| **Case Number:** | 3:25–cv–30041–RGS |
| **Filer:** | |
| **Document Number:** | 42(No document attached) |

**Docket Text:**
 **Judge Richard G. Stearns: ELECTRONIC ORDER entered granting [37] Motion.**

**Defendants move to dissolve this court's [31] Temporary Restraining Order based on the Supreme Court's recent stay of a similar order in *Department of Education v. California*, 604 U.S. –– (2025) (per curiam). Plaintiffs oppose the motion on two grounds: (1) that plaintiffs "face exactly the type of irreversible injury that the" Supreme Court found lacking in the *California* Order, namely, a threat to their continued viability; and (2) that plaintiffs' "claims in this case derive exclusively from federal statute," in contrast to the claims in *California*, which purportedly derived "directly from the terms of the grant agreements at issue." Opp'n [Dkt # 41] at 1. For the following reasons, the court will allow the motion.**

**The court begins, and ends, its analysis with plaintiffs' second argument (because, if the court likely lacks jurisdiction, there is no longer any likelihood of success on the merits –– at least, not for the purposes of this specific action in this specific forum –– which moots any**

**inquiry into irreparable harm). Plaintiffs correctly note that, unlike the operative complaint here, the Complaint in *California* references "the terms of the grant agreements at issue." *Id.* What plaintiffs ignore, however, is that these references occur only in the context of buttressing the larger APA–based argument that the Department of Education did not terminate the grants in accordance with any statutory or regulatory authorization (the Department of Education simply cited to 2 C.F.R. § 200.340(a)(4) as authorizing the termination of the grants); the Complaint itself does not assert any independent claim based on the language of the grant agreement. The Supreme Court nonetheless found that the government was likely to succeed in showing that the plaintiffs in *California* sought to enforce a contractual obligation to pay money. Because plaintiffs assert essentially the same claim here –– that the agency did not terminate the grant in accordance with statutory or regulatory authority –– it follows that plaintiffs are likewise likely seeking to enforce a contractual obligation to pay money.**

**This decision should not be read as an endorsement of the brusque and seemingly insensitive way in which the terminations were announced nor as casting doubt on the First Circuit's assessment that the plaintiffs in *California* case may well likely succeed on the merits of at least some of their claims. The court is merely deferring (as it must) to the Supreme Court's unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims. (RGS, law3)**

**3:25–cv–30041–RGS Notice has been electronically mailed to:**

Zoila E. Hinson      zhinson@relmanlaw.com, jhogan@relmanlaw.com

Julian N. Canzoneri      julian.canzoneri@usdoj.gov, CaseView.ECF@usdoj.gov, MKohler1@usa.doj.gov

Daniel Ordorica      dordorica@hfmgpc.com, jhogan@relmanlaw.com

Lila Miller      lmiller@relmanlaw.com

Rebecca Livengood      rlivengood@relmanlaw.com

Reed Colfax      rcolfax@relmanlaw.com

Yiyang Wu      ywu@relmanlaw.com, jtrenco@relmanlaw.com, sogundare@relmanlaw.com

Robert William Hunter      rhunter@relmanlaw.com

**3:25–cv–30041–RGS Notice will not be electronically mailed to:**