# 25-1368

# United States Court of Appeals
# for the First Circuit

MASSACHUSETTS FAIR HOUSING CENTER, INTERMOUNTAIN FAIR HOUSING COUNCIL, SAN ANTONIO FAIR HOUSING COUNCIL, INC., d/b/a Fair Housing Council of South Texas, HOUSING RESEARCH AND ADVOCACY CENTER, d/b/a Fair Housing Center for Rights & Research, Inc., on behalf of themselves and all those others similarly situated,

*Plaintiffs-Appellants*,

v.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, in their official capacity as Acting Administrator of U.S. DOGE Service and U.S. DOGE Temporary Organization,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Massachusetts

**BRIEF FOR THE STATES OF NEW YORK, CALIFORNIA, AND MASSACHUSETTS, AND ARIZONA, COLORADO, CONNECTICUT, DELAWARE, HAIWAIʻI, ILLINOIS, MAINE, MARYLAND, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS AND FOR REVERSAL**

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
ANN E. LYNCH
  *Assistant Attorney General*
One Ashburton Place
Boston, MA  02108

ROB BONTA
  *Attorney General of California*
EZRA KAUTZ
BRIAN BILFORD
  *Deputy Attorneys General*
1300 I Street
Sacramento, CA  95814

(*Additional counsel listed on signature pages.*)

LETITIA JAMES
  *Attorney General of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ANTHONY R. RADUAZO
  *Assistant Solicitor General*
    *of Counsel*
28 Liberty Street
New York, New York  10005
(212) 416-6159

Dated: April 29, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION AND INTERESTS OF AMICI ................................... 1

ARGUMENT

    A TEMPORARY RESTRAINING ORDER IS NEEDED TO PREVENT
    IMMEDIATE AND IRREPARABLE HARM FROM DEFENDANTS'
    UNLAWFUL ACTION ............................................................................... 6

        A.   Allowing Defendants to Halt Funding for Fair-Housing
             Organizations Would Cause Immediate Harm to Amici
             States, Their Communities and Residents, and the
             Public Interest............................................................................. 8

        B.   Plaintiffs Are Likely to Prevail on the Merits Because
             Defendants Failed to Account for Substantial Reliance
             Interests. ................................................................................... 26

CONCLUSION ........................................................................................ 30

i

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)...........................................................................28-29

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)...............................................................................26

*Federal Commc'ns Comm'n v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...............................................................................28

*Massachusetts v. Flores*,
   No. 1579CV00448 (Mass. Super. Ct. Hampden Cnty.
   July 3, 2015).........................................................................................16

*Massachusetts v. Moresi Com. Invs., LLC*,
   No. 2484CV01821 (Mass. Super. Ct. Suffolk Cnty. July 11, 2024)...16

*Massachusetts v. National Insts. of Health*,
   No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025)...............6

*Massachusetts v. Peabody Props., Inc.*,
   No. 2179CV00098 (Mass. Super. Ct. Hampden Cnty.
   Feb. 26, 2021).......................................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
   Auto. Ins. Co.*,
   463 U.S. 29 (1983).................................................................................26

*People ex rel. Ill. Dep't of Hum. Rts. v. Peoples Co-op Mgmt. Serv.*,
   No. 2019-CH-08393 (Ill. Cir. Ct. Cook Cnty., Ch. Div.
   July 17, 2019)........................................................................................18

*Securities & Exch. Comm'n v. Chenery Corp.*,
   332 U.S. 194 (1947)...............................................................................27

*State v. Meldahl*,
   No. 27-cv-19-16424, 2021 WL 6932402 (Minn. Dist. Ct.
   Nov. 15, 2021) ......................................................................................15

**Cases**                                                                      **Page(s)**

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................6-7

**Statutes**

*Federal*

Housing and Community Development Act of 1987,
    Pub. L. No. 100-242, 101 Stat. 1815 (1988)..........................................1

5 U.S.C. § 706 ...................................................................... 26

42 U.S.C.
    § 3616 ................................................................... 4-5, 22
    § 3616a .................................................................. passim

*State*

California Fair Employment and Housing Act,
    Cal. Gov't Code § 12900 et seq............................................3

Massachusetts Antidiscrimination Law,
    Mass. Gen. Laws, ch. 151B, § 1 et seq....................................3

New York Human Rights Law, N.Y. Exec. Law § 290 et seq..................3

**Rule & Regulations**

Fed. R. App. P. 29.........................................................2

2 C.F.R. § 200.340 .......................................................27

24 C.F.R.
    § 115.300 ............................................................22
    § 115.304 ............................................................22

## Miscellaneous Authorities                                        Page(s)

Andrew Gumbel, *Apartments for $20,000 a Month: Residents Scramble After Wildfires Deepen LA's Housing Crisis*, https://www.theguardian.com/us-news/2025/jan/22/la-wildfires-housing-crisis ................................................................. 25

Cal. C.R. Dep't, *Complaint Process*, https://calcivilrights.ca.gov/complaintprocess/ ................................. 10

Cal. C.R. Dep't, Press Release, *Bakersfield Apartments Settle with State over Alleged Sexual Harassment of Tenants by Longtime Property Manager* (Feb. 13, 2025), https://calcivilrights.ca.gov/2025/02/13/bakersfield-apartments-settle-with-state-over-alleged-sexual-harassment-of-tenants-by-longtime-property-manager/ .................... 3

Cal. C.R. Dep't, Press Release, *Bay Area Housing Providers to Pay $3 Million to Settle CRD Lawsuit Alleging Discrimination Against Families with Children* (Feb. 14, 2023), https://calcivilrights.ca.gov/2023/02/14/bay-area-housing-providers-to-pay-3-million-to-settle-crd-lawsuit-alleging-discrimination-against-families-with-children/ .................. 14

Cal. C.R. Dep't, Press Release, *Civil Rights Department Announces Settlements over Alleged Appraisal Discrimination Against Black and Latino Family in the Bay Area* (Apr. 14, 2025), https://calcivilrights.ca.gov/2025/04/14/civil-rights-department-announces-settlements-over-alleged-appraisal-discrimination-against-black-and-latino-family-in-the-bay-area/ .............................. 16

Cal. Dep't of Hous. & Cmty. Dev., *Grants & Funding* (n.d.), https://www.hcd.ca.gov/grants-and-funding ........................................ 4

Cal. Off. of Att'y Gen., Press Release, *Attorney General Rob Bonta Announces Guidance to Prevent Discriminatory Housing Practices* (Apr. 21, 2023), https://oag.ca.gov/news/press-releases/attorney-general-rob-bonta-announces-guidance-prevent-discriminatory-housing .............. 3

iv

**Miscellaneous Authorities**                                    **Page(s)**

David Wagner, *LA Fire Victims Are Suddenly Thrust Into an Unforgiving Rental Housing Market*, LAist (Jan. 13, 2025), https://laist.com/news/housing-homelessness/los-angeles-fires-palisades-eaton-rental-housing-rent-market ............................ 25

Debra Kamin, *Cuts to Housing Nonprofits Will Spur Discrimination, Democrats Say*, N.Y. Times (Mar. 17, 2025), https://www.nytimes.com/2025/03/17/realestate/warren-waters-hud-doge-budget-cuts.html ..................................... 25

Elena Patel et al., Brookings Inst., *Make It Count: Measuring Our Housing Supply Shortage* (Nov. 26, 2024), https://www.brookings.edu/articles/make-it-count-measuring-our-housing-supply-shortage/ ......................................... 24

Fair Hous. Advocs. of N. Cal., Press Release, *Discrimination Complaint Alleging Race Discrimination in Home Appraisal Process Settled with Appraiser* (May 7, 2024), https://www.fairhousingnorcal.org/press-releases-and-statements/discrimination-complaint-alleging-race-discrimination-in-home-appraisal-process-settled-with-appraiser ... 16

Fair Hous. Just. Ctr., *Disability Discrimination Alleged in Brooklyn Apartment Buildings* (Mar. 4, 2025), https://fairhousingjustice.org/enforcement/disability-discrimination-alleged-in-brooklyn-apartment-buildings/ ............... 17

Fair Hous. Just. Ctr., *Discrimination Alleged in Design and Construction of Thousands of NYC Apartments* (Feb. 20, 2025), https://fairhousingjustice.org/enforcement/discrimination-alleged-in-design-and-construction-of-thousands-of-nyc-apartments/ .......... 17

Fair Hous. Just. Ctr., *Fair Housing Groups Settle Lawsuit with Facebook* (Mar. 19, 2019), https://fairhousingjustice.org/enforcement/opening-acts-march-19-2019/ ....................................... 19

H.R. 4233, 118th Cong. § 206 (2023) ..................................... 21

**Miscellaneous Authorities**                                      **Page(s)**

H.R. Res. 1078, 117th Cong. (2022) .......................................... 9

Housing Opportunities Made Equal (HOME), Press Release,
*HOME Receives $350k to Support Local COVID-Related
Housing Issues* (Nov. 16, 2021),
https://www.homeny.org/announcements/home-receives-350k-
to-support-local-covid-related-housing-issues ..................................... 18

Kenneth Temkin et al., U.S. Dep't of Hous. & Urb. Dev.,
*Study of the Fair Housing Initiatives Program* (2011),
https://www.huduser.gov/Publications/pdf/FHIP_2011.pdf....... passim

Maggie McCarty & Jennifer J. Marshall, Cong. Rsch. Serv.,
R48253, *Transportation, Housing and Urban Development, and
Related Agencies (THUD) Appropriations for FY2025* (2025),
https://www.congress.gov/crs_external_products/R/PDF/R48253
/R48253.3.pdf ................................................................................ 22

Mass Comm'n Against Discrimination, *File a Complaint of
Discrimination at the MCAD* (n.d.), https://www.mass.gov/decision-
tree/file-a-complaint-of-discrimination-at-the-mcad ........................... 10

Mass. Exec. Off. of Hous. & Livable Cmtys., *Apply for the
Alternative Housing Voucher Program* (n.d.),
https://www.mass.gov/how-to/apply-for-the-alternative-
housing-voucher-program-ahvp ............................................................ 4

Mass. Exec. Off. of Hous. & Livable Cmtys., *HomeBASE* (n.d.),
https://www.mass.gov/info-details/homebase.................................... 4

Mass. Exec. Off. of Hous. & Livable Cmtys., *Homeless Priority:
Eligibility and Screening* (n.d.), https://www.mass.gov/info-
details/homeless-priority-eligibility-and-screening ............................ 4

Mass. Exec. Off. of Hous. & Livable Cmtys., *Rental Assistance:
Housing Vouchers* (n.d.), https://www.mass.gov/rental-
assistance-housing-vouchers ................................................................ 4

**Miscellaneous Authorities**                            **Page(s)**

Mass. Exec. Off. of Hous. & Livable Cmtys., *Section 8 Homeownership Program* (n.d.), https://www.mass.gov/info-details/section-8-homeownership-program ........................................... 4

Mass. Off. of Att'y Gen., Press Release, *AG Healey Obtains Multiple Settlements in Fair Housing Cases on Behalf of Tenants with Disabilities* (Feb. 28, 2017), https://www.mass.gov/news/ag-healey-obtains-multiple-settlements-in-fair-housing-cases-on-behalf-of-tenants-with-disabilities ............................................................. 3

Mass. Off. of Att'y Gen., Press Release, *AG Healey Secures Multiple Fair Housing Settlements on Behalf of Low-income Tenants in Massachusetts* (Oct. 9, 2018), https://www.mass.gov/news/ag-healey-secures-multiple-fair-housing-settlements-on-behalf-of-low-income-tenants-in-massachusetts ............................................................. 3

Mass. Off. of Att'y Gen., Press Release, *Governor Maura Healey Signs Most Ambitious Legislation to Address Housing Costs in State History* (Aug. 6, 2024), https://www.mass.gov/news/governor-maura-healey-signs-most-ambitious-legislation-to-address-housing-costs-in-state-history ....... 24

Mass. Off. of Att'y Gen., Press Release, *In Recognition of Fair Housing Month, AG Healey Announces Resolutions in Four Housing Discrimination Cases* (Apr. 7, 2022), https://www.mass.gov/news/in-recognition-of-fair-housing-month-ag-healey-announces-resolutions-in-four-housing-discrimination-cases ............................................................. 3

Mass. Off. of Att'y Gen., Press Release, *Investigation by AG's Office Reveals Widespread Housing Discrimination by South Shore Real Estate Brokers* (Aug. 13, 2020), https://www.mass.gov/news/investigation-by-ags-office-reveals-widespread-housing-discrimination-by-south-shore-real-estate-brokers .................................................... 3, 13-14

**Miscellaneous Authorities**                                    **Page(s)**

N.Y. Div. of Homes & Cmty. Renewal, *Section 8 - Family Self-Sufficiency Program* (n.d.), https://hcr.ny.gov/section-8-family-self-sufficiency-program ........................................... 4

N.Y. Div. of Homes & Cmty. Renewal, *Section 8 - Housing Choice Voucher Program* (n.d.), https://hcr.ny.gov/hcv ....................... 4

N.Y. Div. of Homes & Cmty. Renewal, *Section 8 - Stability Voucher Program* (n.d.), https://hcr.ny.gov/section-8-stability-voucher-program .................................................... 4

N.Y. Div. of Hum. Rts., *File a Complaint* (n.d.), https://dhr.ny.gov/complaint .......................................... 10

N.Y. State Homes & Cmty. Renewal, *Governor Hochul Announces Expanded Efforts to Combat Housing Discrimination Across New York* (Feb. 24, 2023), https://hcr.ny.gov/news/governor-hochul-announces-expanded-efforts-combat-housing-discrimination-across-new-york ................. 23

N.Y. State, *The New York Housing Compact* (n.d.), https://www.governor.ny.gov/programs/new-york-housing-compact ................................................... 24

N.Y. State Off. for People with Developmental Disabilities, *Housing* (n.d.), https://opwdd.ny.gov/types-services/housing ............. 4

Nat'l Fair Hous. All., *2024 Fair Housing Trends Report* (2024), https://nationalfairhousing.org/wp-content/uploads/2023/04/2024-Fair-Housing-Trends-Report-FINAL_07.2024.pdf..... 9, 17, 19, 23

Nat'l Fair Hous. All., Press Release, *HUD's Next Secretary Must Safeguard Civil Rights and Solve the Nation's Fair and Affordable Housing Crisis* (Jan. 16, 2025), https://nationalfairhousing.org/huds-next-secretary-must-safeguard-civil-rights-and-solve-the-nations-fair-and-affordable-housing-crisis/ ................................................ 25

viii

**Miscellaneous Authorities**                                    **Page(s)**

Nat'l Fair Hous. All., Press Release, *New HUD Filing Alleges Ohio Company Gross Residential Violated the Fair Housing Act's Accessibility Requirements at Properties in Four States* (Mar. 18, 2024), https://nationalfairhousing.org/new-hud-filing-alleges-ohio-company-gross-residential-violated-the-fair-housing-acts-accessibility-requirements-at-properties-in-four-states/ ......................................................... 17

Nat'l Fair Hous. Alliance, *Federal Court Advances Landmark Housing Discrimination Case Against Deutsche Bank, Ocwen, and Altisource to Trial* (Apr. 3, 2025), https://nationalfairhousing.org/federal-court-advances-landmark-housing-discrimination-case-against-deutsche-bank-ocwen-and-altisource-to-trial/ .................................................... 20

Nat'l Fair Hous. Alliance, *NFHA and Fellow Fair Housing Advocates File Complaint Against National Tenant Screening Software Company* (May 14, 2024), https://nationalfairhousing.org/nfha-and-fellow-fair-housing-advocates-file-complaint-against-national-tenant-screening-software-company/ ............................................................. 19

Nat'l Low Income Hous. Coal., *The Gap: A Shortage of Affordable Homes* (n.d.), https://nlihc.org/gap....................................24

Off. of N.Y. State Att'y Gen., Press Release, *A.G. Schneiderman Announces Settlement with Long Island Non-Profit to End Race-Based Housing Discrimination* (May 17, 2017), https://ag.ny.gov/press-release/2017/ag-schneiderman-announces-settlement-long-island-non-profit-end-race-based ............. 14

Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Announces $4.5 Million Grant to Fund Fair Housing Programs* (May 6, 2020), https://ag.ny.gov/press-release/2020/attorney-general-james-announces-45-million-grant-fund-fair-housing-programs ..................................................... 18

**Miscellaneous Authorities**                                  **Page(s)**

Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Announces $970,000 in Grants to Fund Fair Housing Programs in the Capital Region* (Feb. 21, 2025), https://ag.ny.gov/press-release/2025/attorney-general-james-announces-970000-grants-fund-fair-housing-programs ................... 18

Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Stops Discriminatory Practices at Long Island Real Estate Brokerage* (Mar. 15, 2023), https://ag.ny.gov/press-release/2023/attorney-general-james-stops-discriminatory-practices-long-island-real-estate ........................................... 3

Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Stops Illegal Housing Discrimination in New York City* (Aug. 20, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-stops-illegal-housing-discrimination-new-york-city ............................................... 3

Sen. Anna M. Kaplan, Press Release, *Senate and Assembly Pass Seven Bills to Combat Housing Discrimination and Advance Fair Housing Goals* (June 14, 2021), https://www.nysenate.gov/newsroom/press-releases/2021/anna-m-kaplan/senate-and-assembly-pass-seven-bills-combat-housing ............................................... 23

U.S. Census Bureau, Press Release, *Nearly Half of Renter Households Are Cost-Burdened, Proportions Differ by Race* (Sept. 12, 2024), https://www.census.gov/newsroom/press-releases/2024/renter-households-cost-burdened-race.html .............. 25

U.S. Dep't of Hous. & Urb. Dev., *Contact FHIP Organizations* (n.d.), https://www.hud.gov/helping-americans/contact-fhip .................. 8, 23

U.S. Dep't of Hous. & Urb. Dev., *Fair Housing Assistance Program* (n.d.), https://www.hud.gov/stat/fheo/assistance-program ................. 22

**Miscellaneous Authorities**                                                      **Page(s)**

U.S. Gov't Accountability Off., *The Affordable Housing Crisis
   Grows While Efforts to Increase Supply Fall Short* (Oct. 12,
   2023), https://www.gao.gov/blog/affordable-housing-crisis-
   grows-while-efforts-increase-supply-fall-short ................................. 24

Yancey Roy, *State Senate OKs 2 Bills to Reduce Discriminatory
   Real Estate Practices*, N.Y. State Senate (Feb. 27, 2022),
   https://www.nysenate.gov/newsroom/in-the-news/2022/anna-
   m-kaplan/state-senate-oks-2-bills-reduce-discriminatory-
   real-estate ......................................................................... 23

## INTRODUCTION AND INTERESTS OF AMICI

Through statutory amendments to the Fair Housing Act, Congress established the Fair Housing Initiatives Program (FHIP) to provide funding to private, nonprofit housing organizations that work to "prevent or eliminate discriminatory housing practices" and to enforce federal and state fair-housing laws. *See* Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 561, 101 Stat. 1815, 1942 (1988) (now codified at 42 U.S.C. § 3616a). (*See* A. 17, 20.) The statute requires the U.S. Department of Housing and Urban Development (HUD) to provide funds to FHIP organizations to carry out investigatory, enforcement, education, and outreach activities aimed at rooting out discrimination in the provision of housing, *see* 42 U.S.C. § 3616a(a), and Congress has specifically appropriated funds to HUD for this purpose every year since FHIP's inception in 1988 (*see* A. 12, 20).

However, in February 2025, HUD suddenly cancelled seventy-eight preexisting FHIP grants to housing organizations engaged in fair-housing work in thirty-three States, effective immediately and with no prior warning. (*See* A. 638.) HUD offered no rationale for its action beyond a blanket assertion that the decision was made at the direction of the President and

the Department of Government Efficiency—which has no statutorily dele-gated authority at all, let alone any authority over FHIP—because the grants purportedly "no longer effectuate[] the program goals or agency priorities." (*See* A. 161.)

Amici States and municipalities New York, California, Massachu-setts, Arizona, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington (collectively "Amici States") submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) in support of the plaintiff FHIP organiza-tions that filed this lawsuit challenging HUD's action as unlawful. Plaintiffs appeal from an order of the U.S. District Court for the District of Massachusetts (Stearns, J.) that dissolved a previously issued tempo-rary restraining order (TRO) and allowed HUD's action to go forward.

Amici States have strong public and sovereign interests in reinstatement of the TRO. Amici States are invested in ensuring that all of their constituents have access to fair, safe, and affordable housing. Amici States have enacted their own fair-housing laws that support and

build upon the federal Fair Housing Act,[1] and Amici States vigorously enforce federal and state housing laws to protect tenants and homebuyers from discrimination in the provision of housing accommodations.[2] Amici States also provide various forms of rental and housing assistance to low-

---

[1] *See, e.g.*, New York Human Rights Law, N.Y. Exec. Law § 290 et seq.; California Fair Employment and Housing Act, Cal. Gov't Code § 12900 et seq.; Massachusetts Antidiscrimination Law, Mass. Gen. Laws ch. 151B, § 1 et seq.

[2] *See, e.g.*, Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Stops Illegal Housing Discrimination in New York City* (Aug. 20, 2024); Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Stops Discriminatory Practices at Long Island Real Estate Brokerage* (Mar. 15, 2023); Mass. Off. of Att'y Gen., Press Release, *In Recognition of Fair Housing Month, AG Healey Announces Resolutions in Four Housing Discrimination Cases* (Apr. 7, 2022); Mass. Off. of Att'y Gen., Press Release, *Investigation by AG's Office Reveals Widespread Housing Discrimination by South Shore Real Estate Brokers* (Aug. 13, 2020); Mass. Off. of Att'y Gen., Press Release, *AG Healey Secures Multiple Fair Housing Settlements on Behalf of Low-income Tenants in Massachusetts* (Oct. 9, 2018); Mass. Off. of Att'y Gen., Press Release, *AG Healey Obtains Multiple Settlements in Fair Housing Cases on Behalf of Tenants with Disabilities* (Feb. 28, 2017); Cal. C.R. Dep't, Press Release, *Bakersfield Apartments Settle with State over Alleged Sexual Harassment of Tenants by Longtime Property Manager* (Feb. 13, 2025); Cal. Off. of Att'y Gen., Press Release, *Attorney General Rob Bonta Announces Guidance to Prevent Discriminatory Housing Practices* (Apr. 21, 2023). (For sources available online, all URLs appear in the Table of Authorities. All websites were last visited April 29, 2025.)

income families,[3] persons with disabilities,[4] individuals seeking housing to escape domestic violence or at risk of homelessness,[5] and first-time home buyers.[6] In addition, many Amici States operate enforcement agencies—some of which are administered pursuant to HUD certification and the Fair Housing Assistance Program (FHAP), *see* 42 U.S.C. § 3616— that investigate and adjudicate complaints of housing discrimination.[7]

---

[3] *See, e.g.*, N.Y. Div. of Homes & Cmty. Renewal, *Section 8 - Housing Choice Voucher (HCV) Program* (n.d.); N.Y. Div. of Homes & Cmty. Renewal, *Section 8 - Family Self-Sufficiency Program* (n.d.); Cal. Dep't of Hous. & Cmty. Dev., *Grants & Funding* (n.d.); Mass. Exec. Off. of Hous. & Livable Cmtys., *Rental Assistance: Housing Vouchers* (n.d.).

[4] *See, e.g.*, N.Y. State Off. for People with Developmental Disabilities, *Housing* (n.d.); Cal. Dep't of Hous. & Cmty. Dev., *Grants & Funding*, *supra*; Mass. Exec. Off. of Hous. & Livable Cmtys., *Apply for the Alternative Housing Voucher Program (AHVP)* (n.d.).

[5] *See, e.g.*, N.Y. Div. of Homes & Cmty. Renewal, *Section 8 - Stability Voucher Program* (n.d.); Mass. Exec. Off. of Hous. & Livable Cmtys., *Rental Assistance: Housing Vouchers* (n.d.); Mass. Exec. Off. of Hous. & Livable Cmtys., *Homeless Priority: Eligibility and Screening* (n.d.); Mass. Exec. Off. of Hous. & Livable Cmtys., *HomeBASE* (n.d.).

[6] *See, e.g.*, Cal. Dep't of Hous. & Cmty. Dev., *Grants & Funding*, *supra*; Mass. Exec. Off. of Hous. & Livable Cmtys., *Section 8 Homeownership Program* (n.d.).

[7] Under the FHAP program, HUD provides grants to state and local agencies charged with administering fair-housing laws, whereas under the FHIP program, HUD provides grants to nonprofit housing organizations engaged in fair-housing outreach, education, investigation and enforcement work. *Compare* 42 U.S.C. § 3616 (FHAP), *with id.* § 3616a(a) (FHIP).

*See* 42 U.S.C. § 3616. Organizations that receive FHIP grants play an essential role in furthering these critical fair-housing efforts by educating community members of their rights and obligations under state and federal housing laws, assisting individuals in accessing government housing programs in Amici States, mediating and investigating claims of housing discrimination, and representing individuals in enforcement actions brought in Amici States' agencies and courts. That work is essential to Amici States' own efforts at enforcing housing laws and preventing discrimination. FHIP organizations also serve a vital role in preserving limited state resources by screening out nonmeritorious claims of discrimination so that Amici States can focus their efforts on other cases.

If allowed to take effect, HUD's sudden and unlawful action will immediately and severely upend the important work of these FHIP organizations, resulting in more housing discrimination being left undetected and unredressed in Amici States. This substantial and widespread disruption of FHIP organizations' work will cause severe harms to Amici States and their communities and residents, who rely on FHIP organizations for assistance in accessing safe and affordable housing and in efficiently resolving claims of housing discrimination. Indeed, HUD's

unlawful action threatens the financial viability of housing organizations at a time of increasing housing insecurity across the country, when the demand for FHIP organizations' services is particularly high. Amici States will face significant additional burdens if they are compelled to meet those demands on their own, without the invaluable assistance of FHIP organizations. The harms to Amici States and the public from HUD's action weigh heavily in favor of reinstating the TRO pending preliminary injunction proceedings in the district court.

## ARGUMENT

### A Temporary Restraining Order Is Needed to Prevent Immediate and Irreparable Harm from Defendants' Unlawful Action

Allowing defendants to proceed with their abrupt and unlawful elimination of seventy-eight FHIP grants would irreparably harm Amici States, their residents, and the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).[8] In Amici States' experience,

---

[8] The denial of a TRO is assessed under the same standard as the denial of a preliminary injunction. *See, e.g.*, *Massachusetts v. National Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *8 (D. Mass. Mar. 5, 2025).

FHIP organizations deliver substantial public benefits by processing, investigating, and enforcing claims of housing discrimination. In addition, through education and mediation efforts, as well as work to review and screen claims of housing discrimination, such organizations often address housing issues without the need for Amici States to spend significant time and resources investigating and adjudicating claims brought before state agencies or courts. Terminating those programs would inflict severe and immediate harm on Amici States' communities, which depend on these services to efficiently address housing emergencies and claims of discrimination in the provision of housing. In addition, plaintiffs are likely to succeed on the merits of their claims. HUD failed to provide any reasoned explanation for its action, let alone an explanation that adequately addressed the substantial reliance interests that have been upended. *See id.*

**A.    Allowing Defendants to Halt Funding for Fair-Housing Organizations Would Cause Immediate Harm to Amici States, Their Communities and Residents, and the Public Interest.**

In the experience of Amici States, housing organizations that participate in FHIP provide immense benefits to Amici States and their communities and residents. Nationally, 111 housing organizations receive FHIP grants from HUD to perform critical enforcement, outreach, and education work in communities across forty-five States and the District of Columbia.[9] In several crucial ways, this work complements the efforts of Amici States to provide safe, fair, and affordable housing to their residents while easing administrative burdens on Amici States.

*First*, FHIP organizations serve as a first-line housing resource for communities and individuals in Amici States. With longstanding ties in the communities they serve, these organizations effectively provide outreach and education to individuals and families who may not be aware of their legal rights under federal, state, and local laws or government resources that are available to them. *See* 42 U.S.C. § 3616a(d)(3) (directing

---

[9] *See* U.S. Dep't of Hous. & Urb. Dev., *Contact FHIP Organizations* (n.d.).

8

HUD to fund nonprofit organizations that "support community-based education and outreach activities"). Because of the well-established role that many FHIP organizations have built in their respective communities, individuals in Amici States often turn to FHIP organizations first when faced with a housing emergency—for example, an individual with a disability seeking an accommodation from a landlord, a parent that has been denied housing on account of their family status, or a person seeking housing to escape violence from a domestic partner. (*See, e.g.*, A. 81-82, 396.) Nationally, as Congress has acknowledged, the vast majority of housing-discrimination claims are initially filed with local fair-housing organizations, which "serve as the front line in the effort to resolve housing discrimination." *See* H.R. Res. 1078, 117th Cong. (2022). Indeed, of the approximately 34,000 claims of housing discrimination filed across the country in 2023, over 75% of those claims were brought to FHIP organizations in the first instance.[10]

When FHIP organizations receive a housing inquiry from a community member, they counsel the individual on their options under

---

[10] *See* Nat'l Fair Hous. All., *2024 Fair Housing Trends Report* 6 (2024).

applicable fair-housing laws, and provide assistance in applying for available government resources. (*See, e.g.*, A. 81, 83, 394.) In addition, FHIP organizations investigate reports of discrimination in housing and, where appropriate, help individuals file claims with state agencies—like the New York Division of Human Rights, the California Civil Rights Department, or the Massachusetts Commission Against Discrimination[11]—that are statutorily charged with investigating and adjudicating claims of housing discrimination, or with Amici States' attorneys general.[12] By preliminarily assessing and investigating claims of housing discrimination, FHIP organizations help distinguish meritorious complaints from those that do not reflect genuine violations of federal or state fair-housing laws.[13] (*See* A. 642.) This vital screening function reduces the number of nonmeritorious complaints that state housing authorities receive and

---

[11] *See* Kenneth Temkin et al., U.S. Dep't of Hous. & Urb. Dev., *Study of the Fair Housing Initiatives Program* ("*FHIP Study*"), at x (2011); *see also* N.Y. Div. of Hum. Rts., *File a Complaint* (n.d.); Mass Comm'n Against Discrimination (MCAD), *File a Complaint of Discrimination at the MCAD* (n.d.); Cal. C.R. Dep't, *Complaint Process* (n.d.).

[12] *See FHIP Study*, *supra*, at 45 (reporting that 14% of investigations conducted by housing organizations in 2006 resulted in a complaint filed with HUD, a state agency, or a state attorney general).

[13] *See id.* at 53-54.

process. Indeed, in approximately 43% of the complaints that FHIP organizations screen in the first instance, the housing organization finds that no actionable discrimination occurred.[14] In those instances, the FHIP organization may decline to pursue administrative remedies on behalf of the individual and instead direct the complainant to alternative resources to address their concerns, or assist the individual in mediating a resolution with their housing provider, see *infra* 11-12. As a result of these efforts, Amici States' agencies are able to dedicate more time and resources to investigating and resolving bona fide claims of housing discrimination.

*Second*, in cases that *do* exhibit evidence of discrimination, the involvement of a FHIP organization often results in a resolution that is reached more efficiently, and better promotes Amici States' fair-housing goals, than in those cases that are handled without their assistance. For instance, FHIP organizations are frequently able to mediate housing disputes without the need to refer the matter to state enforcement agencies at all.[15] (*See* A. 394.) In approximately 27% of cases, the housing organization is able to resolve the dispute through alternative means—

---

[14] *See id.* at xi, 45.

[15] *See id.*

like negotiating a reasonable accommodation on behalf of a disabled tenant, or educating a landlord of its obligation to accept rental applications from individuals with children.[16] (*See* A. 86, 398-399.) This work, in turn, further reduces the number of claims that Amici States need to process, investigate, and resolve. And it alleviates demands on safety-net resources in Amici States, such as shelter systems. (*See* A. 82.)

Moreover, when FHIP organizations do initiate formal complaints with Amici States' fair housing agencies on behalf of individuals, those complaints generally present claims of discrimination more clearly and effectively, and with stronger substantiating evidence, than complaints that are initiated without such assistance. As a result, when FHIP organizations bring complaints to Amici States' agencies, Amici States are often able to process and evaluate those claims more efficiently and are better able to root out discriminatory conduct. Indeed, complaints that are processed and filed by a housing organization are more likely to result in a positive finding of discrimination by the state agency, and take less time to process and review, than other complaints.[17] Similarly, assess-

---

[16] *See id.* at x, 1, 45, 53.

[17] *See id.* at xi.

ment and representation by a FHIP organization is associated with improved outcomes for complainants before state agencies.[18]

*Third*, as Congress directed, FHIP organizations also play a crucial role in investigating the conduct of housing providers and lenders in the field. *See* 42 U.S.C. § 3616a(b)(1)-(2). In doing so, FHIP organizations often work collaboratively with Amici States in pursuing legal actions against housing providers that FHIP organizations' investigations suggest have engaged in discriminatory practices. For example, after a FHIP organization conducted an investigation into the rental practices of real-estate brokers and agents operating in Massachusetts's South Shore, it brought significant evidence to the Massachusetts Attorney General's Office showing that several brokerages were systematically denying rental applications from families with children.[19] The Massachusetts Attorney General relied on that evidence to bring claims against those brokerages, ultimately resulting in successful settlements that required the defendants to, among other things, pay restitution to victims, partici-

---

[18] *See id.* at 56-57.

[19] *See* Mass. Off. of Att'y Gen., Press Release, *Investigation by AG's Office Reveals Widespread Housing Discrimination by South Shore Real Estate Brokers* (Aug. 13, 2020).

pate in fair-housing training courses, and adopt company-wide compliance measures.[20] Similarly, after a FHIP organization in New York uncovered evidence that a Long Island housing development had a practice of limiting home purchases to white individuals of German heritage, the Attorney General initiated a lawsuit against the developer, resulting in a settlement that required the developer to halt its discriminatory practices and regularly report to the Attorney General to demonstrate compliance with fair-housing laws.[21] As another example, a FHIP organization in California brought significant evidence to the California Civil Rights Department demonstrating that a property-management company in the San Francisco Bay Area had adopted overly restrictive rules that discouraged rental applications from families with young children. Based on that evidence, the Department filed a lawsuit, which yielded a consent decree prohibiting these rules and requiring restitutionary payments to affected families.[22]

---

[20] *Id.*

[21] *See* Off. of N.Y. State Att'y Gen., Press Release, *A.G. Schneiderman Announces Settlement with Long Island Non-Profit to End Race-Based Housing Discrimination* (May 17, 2017).

[22] *See* Cal. C.R. Dep't, Press Release, *Bay Area Housing Providers to Pay $3 Million to Settle CRD Lawsuit Alleging Discrimination Against Families with Children* (Feb. 14, 2023).

And in Minnesota, a referral from one FHIP organization led the Minnesota Attorney General's Office to file a lawsuit against a Minneapolis landlord, after the organization's evidence showed that the landlord violated the rights of renters by permitting infestations "of Biblical plague proportions," and falsely misrepresenting to tenants that he could prevent home inspections by city officials and charge excessive late fees beyond those permitted under state law.[23] The lawsuit led to a successful judgment against the landlord, and a permanent injunction barring him from engaging in those illegal and deceptive practices.[24]

When Amici States work alongside FHIP organizations in these ways, Amici States benefit from the organizations' local knowledge and skilled investigations, which often yield evidence that makes cases stronger than they would have been without the participation of the housing organization.[25] For instance, in California, one FHIP organization leveraged its knowledge of the local real estate market to support multiple

---

[23] *See State v. Meldahl*, No. 27-cv-19-16424, 2021 WL 6932402, at *2 (Minn. Dist. Ct. Nov. 15, 2021).

[24] *See id.* at *18.

[25] *See, e.g.*, *FHIP Study*, *supra*, at 46-49.

complaints filed with the California Civil Rights Department alleging racially discriminatory appraisals, which yielded settlements mandating corrective action by appraisers, a lender, and an appraisal-management company.[26] Similarly, in Massachusetts, another FHIP organization's field investigations revealed substantial evidence that several housing providers in Western Massachusetts routinely discriminated against hearing impaired individuals who rely on sign language and families with children, and engaged in racial discrimination based on voice profiling. After this evidence was referred to the Massachusetts Commission Against Discrimination, the Commonwealth was able to obtain successful settlements with, or judgments against, each of the housing providers.[27]

_____

[26] Cal. C.R. Dep't, Press Release, *Civil Rights Department Announces Settlements over Alleged Appraisal Discrimination Against Black and Latino Family in the Bay Area* (Apr. 14, 2025); Fair Hous. Advocs. of N. Cal., Press Release, *Discrimination Complaint Alleging Race Discrimination in Home Appraisal Process Settled with Appraiser* (May 7, 2024).

[27] *See, e.g.*, Assurance of Discontinuance, *Massachusetts v. Moresi Com. Invs., LLC*, No. 2484CV01821 (Mass. Super. Ct. Suffolk Cnty. July 11, 2024), File Ref. No. 1; Final J. by Consent, *Massachusetts v. Peabody Props., Inc.*, No. 2179CV00098 (Mass. Super. Ct. Hampden Cnty. Mar. 23, 2021), File Ref. No. 4; Findings of Fact, Rulings of Law and Order for

(continued on the next page)

*Fourth*, FHIP organizations fulfill an important enforcement role in Amici States by bringing their own legal actions in state and federal courts. FHIP organizations handle many enforcement actions on behalf of persons with disabilities in particular. Such claims often allege that a landlord has refused to make reasonable accommodations in rental units or apartment buildings—such as accessible kitchens, light switches, toilets, or parking spaces.[28] For many individuals with disabilities, the denial of these types of accommodations is equivalent to the outright denial of housing.[29] For instance, when an Illinois landlord and property manager failed to accommodate a renter's severe physical and medical disabilities, a local FHIP organization assisted the individual in submit-

---

J., *Massachusetts v. Flores*, No. 1579CV00448 (Mass. Super. Ct. Hampden Cnty. Feb. 22, 2017), File Ref. No. 16; Judgment, *id.* (Mass. Super. Ct. Hampden Cnty. Mar. 8, 2017), File Ref. No. 17.

[28] *FHIP Study*, *supra*, at xi, 59; *see also 2024 Fair Housing Trends Report*, *supra*, at 3, 9; Fair Hous. Just. Ctr., *Discrimination Alleged in Design and Construction of Thousands of NYC Apartments* (Feb. 20, 2025); Fair Hous. Just. Ctr., *Disability Discrimination Alleged in Brooklyn Apartment Buildings* (Mar. 4, 2025). (*See also* A. 82, 395-396, 398.)

[29] Nat'l Fair Hous. All., Press Release, *New HUD Filing Alleges Ohio Company Gross Residential Violated the Fair Housing Act's Accessibility Requirements at Properties in Four States* (Mar. 18, 2024).

ting a formal request for a reasonable accommodation, which included doorways that could fit her wheelchair and a bathroom and bedroom that were large enough to accommodate her caretaker and medical equipment. After the landlord still refused to provide those accommodations, another local FHIP organization successfully represented the individual in litigation against the landlord. The parties ultimately agreed to a settlement that included restitutionary payments to the individual, while the Illinois Attorney General's Office pursued civil penalties and injunctive relief against the landlord.[30]

FHIP organizations also play an important role in advocating on behalf of individuals and families in rural and underserved parts of Amici States.[31] In these ways, Amici States have recognized that FHIP organi-

---

[30] *See generally* Complaint, *People ex rel. Ill. Dep't of Hum. Rts. v. Peoples Co-op Mgmt. Serv.*, No. 2019-CH-08393 (Ill. Cir. Ct. Cook Cnty., Ch. Div. July 17, 2019).

[31] *See, e.g.*, *FHIP Study*, *supra*, at D-1 to D-2; Housing Opportunities Made Equal (HOME), Press Release, *HOME Receives $350k to Support Local COVID-Related Housing Issues* (Nov. 16, 2021).

zations fulfill a critical need for investigating and redressing claims of housing discrimination in "fair housing deserts."[32]

*Fifth*, consistent with Congress's directive that FHIP funds be allocated to organizations that "discover and remedy discrimination in the public and private real estate markets" and "respond to new or sophisticated forms of discrimination," 42 U.S.C. § 3616a(b)(2)(B)-(C), FHIP organizations employ their expertise in investigating discriminatory housing practices to challenge new kinds, or previously undetected kinds, of housing discrimination. For example, FHIP organizations have recently investigated and initiated enforcement actions alleging unlawful bias in the algorithmic models used in Facebook's housing advertisements,[33] and by tenant-screening software companies.[34] As another recent example,

---

[32] *See* Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Announces $4.5 Million Grant to Fund Fair Housing Programs* (May 6, 2020); Off. of N.Y. State Att'y Gen., Press Release, *Attorney General James Announces $970,000 in Grants to Fund Fair Housing Programs in the Capital Region* (Feb. 21, 2025).

[33] *See* Fair Hous. Just. Ctr., *Fair Housing Groups Settle Lawsuit with Facebook* (Mar. 19, 2019); *see also 2024 Fair Housing Trends Report*, *supra*, at 27.

[34] *See* Nat'l Fair Hous. Alliance, *NFHA and Fellow Fair Housing Advocates File Complaint Against National Tenant Screening Software Company* (May 14, 2024).

nineteen FHIP organizations across several States brought enforcement actions against banks and mortgage companies after a multiyear investigation showed that foreclosed properties in Black and Latino communities were not maintained or marketed to the same standards as those in other, predominately white communities.[35]

HUD's abrupt and unlawful action here threatens to immediately curtail FHIP organizations' critical fair-housing work, to the detriment of Amici States and their communities and residents. In fact, FHIP grants typically make up more than 50% of a housing organization's overall funding for combined enforcement, education, and outreach efforts,[36] and finance approximately 70% of a housing organization's investigation and enforcement work.[37] Moreover, interruptions in federal funding—even if temporary—are especially harmful to FHIP organizations because investigations and enforcement actions often take years to complete, and require experienced staff members with specialized knowledge that

---

[35] *See* Nat'l Fair Hous. Alliance, *Federal Court Advances Landmark Housing Discrimination Case Against Deutsche Bank, Ocwen, and Altisource to Trial* (Apr. 3, 2025).

[36] *See FHIP Study*, *supra*, at x. (*See also* A. 84, 397.)

[37] *See FHIP Study*, *supra*, at x.

cannot easily be replaced.[38] In addition, a steady stream of government funding helps FHIP organizations raise private funds by giving donors confidence that their donations will be well-spent.[39] Indeed, HUD began issuing multi-year grants, rather than single-year grants, for the explicit purpose of providing greater financial stability to FHIP organizations.[40] (A. 636-637.) And Congress has consistently appropriated funds for the FHIP program to support the "greater organizational continuity and capacity" of such groups. *See, e.g.*, H.R. 4233, 118th Cong. § 206 (2023).

In response to HUD's action here, FHIP organizations have already been forced to lay off staff; pause investigations, enforcement actions, and education campaigns; and, in some instances, cease services altogether in certain regions in Amici States. (*See, e.g.*, A. 88-90, 171, 400-402, 481-484, 639-640.) And many FHIP organizations report that HUD's action poses an existential threat to their financial viability that may force them to shutter operations completely if HUD's action is not halted. (*See, e.g.*, A. 89-90, 403, 640-641.)

---

[38] *See id.* at 39.

[39] *Id.*

[40] *See id.* at x.

Amici States cannot simply backfill the enforcement and advocacy void that will be created if FHIP organizations within Amici States substantially reduce or cease operations. In enacting FHIP, Congress envisioned that grassroots housing organizations would have the primary role of educating, counseling, and advocating on behalf of individuals and families facing housing discrimination, and uncovering discriminatory housing practices in the field, while state FHAP agencies would perform the complementary function of processing, investigating, and adjudicating the complaints initiated by those grassroots housing organizations. *Compare* 42 U.S.C. § 3616 (cooperation with state and local agencies administering fair-housing laws), *with id.* § 3616a (fair housing initiatives program).[41] In other words, the two programs are interdependent. In recognition of this fact, Congress has consistently appropriated significant federal funding to support both state and local agencies (through FHAP) and nonprofit fair housing enforcement organizations (through FHIP) to

---

[41] *See also* 24 C.F.R. §§ 115.300, 115.304; U.S. Dep't of Hous. & Urb. Dev., *Fair Housing Assistance Program* (n.d.).

effectuate this overarching enforcement scheme.[42] Because States and housing organizations perform distinct roles in this framework, Amici States' agencies are not organized, funded, or legislatively authorized to deliver all of the outreach, investigatory, counseling, and advocacy services that housing organizations provide on behalf of individuals and communities in Amici States. (*See* A. 645.)

Moreover, demand for assistance with housing claims already far outstrips supply. In Amici States, a single FHIP organization often provides services in multiple counties or even the entire State.[43] (*See* A. 81.) And, as explained (*supra* at 9), in some jurisdictions, housing organizations receive and process the vast majority of complaints of housing discrimination in the first instance.[44] (A. 642.) Amici States understand the importance of this work, and have adopted their own programs to support FHIP organizations' efforts to root out discriminatory

---

[42] Current appropriations include $26 million for FHAP and $56 million for FHIP. *See* Maggie McCarty & Jennifer J. Marshall, Cong. Rsch. Serv., No. R48253, *Transportation, Housing and Urban Development, and Related Agencies (THUD) Appropriations for FY2025* (2025).

[43] *See* U.S. Dep't of Hous. & Urb. Dev., *Contact FHIP Organizations, supra.*

[44] *2024 Fair Housing Trends Report*, *supra*, at 3.

conduct by housing providers.[45] But Amici States simply do not have the resources to meet all of the needs of community members who rely on the critical education, counseling, and advocacy services that housing organizations provide. Indeed, HUD itself has acknowledged that in the absence of FHIP organizations, "most enforcement and investigatory work . . . would no longer occur."[46]

Maintaining the services that FHIP organizations provide is critical. Amici States are currently facing an historic and unprecedented shortage of affordable housing.[47] Researchers estimate that the United States needs approximately 7.1 million affordable rental homes to meet current

---

[45] *See, e.g.*, N.Y. State Homes & Cmty. Renewal, *Governor Hochul Announces Expanded Efforts to Combat Housing Discrimination Across New York* (Feb. 24, 2023); Yancey Roy, *State Senate OKs 2 Bills to Reduce Discriminatory Real Estate Practices*, N.Y. State Senate (Feb. 27, 2022); Sen. Anna M. Kaplan, Press Release, *Senate and Assembly Pass Seven Bills to Combat Housing Discrimination and Advance Fair Housing Goals* (June 14, 2021).

[46] *See FHIP Study*, *supra*, at iii.

[47] *See* N.Y. State, *The New York Housing Compact* (n.d.); Mass. Off. of Att'y Gen., Press Release, *Governor Maura Healey Signs Most Ambitious Legislation to Address Housing Costs in State History* (Aug. 6, 2024); *see also* U.S. Gov't Accountability Off., *The Affordable Housing Crisis Grows While Efforts to Increase Supply Fall Short* (Oct. 12, 2023). (*See also* A. 82.)

demand, and no State presently has an adequate supply of such housing.[48] Meanwhile, housing costs continue to rise. According to a recent U.S. Census Bureau analysis, nearly half of all renting households in the United States now spend more than 30% of their income on rent alone.[49] In addition, the housing markets in Amici States like California and North Carolina have incurred significant additional stress—and increased risk of exposure to unlawful housing practices—due to the mass displacement of residents during recent natural disasters in those States.[50] As several lawmakers have emphasized, HUD's heedless action will further exacerbate these challenges, as it means that more housing discrimination will

---

[48] *See, e.g.*, Nat'l Low Income Hous. Coal., *The Gap: A Shortage of Affordable Homes* (n.d.); *see also* Elena Patel et al., Brookings Inst., *Make It Count: Measuring Our Housing Supply Shortage* (Nov. 26, 2024).

[49] *See* U.S. Census Bureau, Press Release, *Nearly Half of Renter Households Are Cost-Burdened, Proportions Differ by Race* (Sept. 12, 2024).

[50] *See* Andrew Gumbel, *Apartments for $20,000 a Month: Residents Scramble After Wildfires Deepen LA's Housing Crisis*, Guardian (Jan. 22, 2025); David Wagner, *LA Fire Victims Are Suddenly Thrust Into an Unforgiving Rental Housing Market*, LAist (Jan. 13, 2025); Nat'l Fair Hous. All., Press Release, *HUD's Next Secretary Must Safeguard Civil Rights and Solve the Nation's Fair and Affordable Housing Crisis* (Jan. 16, 2025).

go unchecked and that more individuals will be excluded from an already restricted market.[51]

**B.   Plaintiffs Are Likely to Prevail on the Merits Because Defendants Failed to Account for Substantial Reliance Interests.**

Plaintiffs are also likely to succeed on the merits of their claims. HUD's determination to void seventy-eight preexisting FHIP grants, with no explanation or consideration of the consequences to Amici States and their residents and communities, was arbitrary and capricious. As a result, HUD's determination is likely to be deemed unlawful and set aside. *See* 5 U.S.C. § 706(2)(A).

As plaintiffs persuasively argue (*see* Pls.-Appellants' Br. at 37-40), HUD's action was arbitrary because it failed to comply with the basic procedural requirement of administrative rulemaking that it provide "adequate reasons for its decisions." *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Under this requirement, HUD needed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and

---

[51] *See* Debra Kamin, *Cuts to Housing Nonprofits Will Spur Discrimination, Democrats Say*, N.Y. Times (Mar. 17, 2025).

the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). An agency that "entirely fail[s] to consider an important aspect of the problem" does not meet this requirement. *Id.*

HUD provided no rationale for its action beyond the vague statement that the FHIP grants "no longer effectuate[] the program goals or agency priorities." (A. 161.) This boilerplate assertion plainly fails to provide a reasoned explanation because it neither describes the facts underlying HUD's action nor explains how such facts could warrant elimination of the seventy-eight grants at issue here. Instead, HUD simply quoted language from an Office of Management and Budget regulation applicable to grant terminations, 2 C.F.R. § 200.340(a)(4). This vague and indecisive statement leaves FHIP organizations, and the States that depend on those organizations, with no choice but to "guess at the theory underlying the agency's action." *See Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). In any event, as plaintiffs explain (*see* Pls.-Appellants' Br. at 40), it is implausible for HUD to claim that the cancelled FHIP grants no longer effectuate program goals or agency priorities. Indeed, those grants are specifically designed to serve the very goals and

priorities that Congress established in adopting the FHIP program—such as investigating discriminatory housing practices, enforcing federal and state housing laws, and educating the public of their rights and obligations under those laws. *See* 42 U.S.C. § 3616a(a)(1)-(2).

Of particular salience here, HUD's "explanation" in its grant-revocation letters provides no indication that the agency considered the significant reliance interests of the FHIP housing organizations that depend on FHIP grants, or the impacts to Amici States from eliminating such funding. It is well-established that when an agency policy "has engendered serious reliance interests," those interests must be accounted for, and adequately addressed, when the agency subsequently changes course based on new agency priorities. *See Federal Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Relevant reliance interests include those of third parties affected by the change in policy, such as States and local governments. *See Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31-32 (2020).

HUD's action here implicates substantial reliance interests. As explained (see *supra* at 20-21), FHIP organizations depend on federal funding for their continued operations, and any interruption to that funding

28

will immediately imperil their ability to provide vital housing services to communities and residents in Amici States. Indeed, for nearly forty years (A. 17, 20), Amici States have relied on the steady flow of federal funding to FHIP organizations, which has enabled those organizations to take on key counseling, investigation, and advocacy functions that complement Amici States' efforts to ensure access to fair and affordable housing for their constituents. See *supra* at 21-25. HUD was required to assess these significant reliance interests and weigh them "against competing policy concerns" before reaching its determination. *See Regents of the Univ. of Cal.*, 591 U.S. at 33. HUD's failure to do so—or to consider possible alternatives having less severe impacts for FHIP organizations and Amici States—renders its decision arbitrary and capricious. *Id.* at 32-33.

# CONCLUSION

The district court's order should be reversed, and the temporary restraining order should be reinstated.

Dated:  New York, New York
        April 29, 2025

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
ANN E. LYNCH
  *Assistant Attorney General*
One Ashburton Place
Boston, MA  02108

ROB BONTA
  *Attorney General*
  *State of California*
EZRA KAUTZ
BRIAN BILFORD
  *Deputy Attorneys General*
1300 I Street
Sacramento, CA  95814

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*

By:   */s/ Anthony R. Raduazo*
      ANTHONY R. RADUAZO
      Assistant Solicitor General

28 Liberty Street
New York, NY 10005
(212) 416-6159

*(Counsel listing continues on following page.)*

30

KRISTIN K. MAYES
  *Attorney General*
  *State of Arizona*
2005 N. Central Avenue
Phoenix, AZ  85004


PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway, 10th Floor
Denver, CO  80203


WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT  0610


KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE  19801


BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC  20001

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI  96813


KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle Street
Chicago, IL  60601


AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME  04333


ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD  21202


KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Boulevard
St. Paul, MN  55155

*Counsel listing continues on following page.)*

31

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

JEFF JACKSON
  *Attorney General*
  *State of North Carolina*
114 West Edenton Street
Raleigh, NC 27603

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

## Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements


1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains __5,648__ words, **or**

☐ this brief uses a monospaced typeface and contains _____ lines of text.


2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using
Century Schoolbook_____ in
14 point_____, **or**

☐ this document has been prepared in a monospaced typeface using
_____ with
_____.


(s) _Anthony R. Raduazo_____

Attorney for _New York et al._____

Dated: _April 29, 2025_____