# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————

MASSACHUSETTS FAIR HOUSING CENTER; INTERMOUNTAIN FAIR HOUSING COUNCIL; SAN ANTONIO FAIR HOUSING COUNCIL, INC., d/b/a Fair Housing Council of South Texas; HOUSING RESEARCH AND ADVOCACY CENTER, d/b/a Fair Housing Center for Rights & Research, Inc., on behalf of themselves and all those similarly situated,
Plaintiffs-Appellants,

v.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY ORGANIZATION; AMY GLEASON, in their official capacity as Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization,
Defendants-Appellees.

————————

On Appeal from the United States District Court
for the District of Massachusetts

————————

## BRIEF FOR APPELLEES

————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI
SARAH CLARK GRIFFIN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7216*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8727*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS

TABLE OF AUTHORITIES

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE CASE ......................................................................... 2

     A.    Statutory Background ...................................................................... 2

     B.    Factual and Procedural Background .............................................. 3

SUMMARY OF ARGUMENT ......................................................................... 6

STANDARD OF REVIEW ............................................................................. 11

ARGUMENT .................................................................................................. 11

I.    This appeal will become moot on May 16, when the TRO would have
expired on its own terms, and there is thus no reason for this Court to
attempt to resolve it on the merits ........................................................ 11

II.    Plaintiffs are not entitled to a TRO, because they are not likely to
succeed on the merits of their challenge ............................................... 16

     A.    The district court lacks jurisdiction over plaintiffs' challenge,
which must be brought in the Court of Federal Claims ........................ 16

     B.    The grant termination decisions at issue are committed to agency
discretion by law .......................................................................... 23

     C.    The grant termination decisions did not violate the APA ...................... 26

III.    The equities do not support a TRO ...................................................... 30

CONCLUSION .............................................................................................. 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITES

**Cases:**                                                                 **Page(s)**

*Akebia Therapeutics, Inc. v. Azar,*
  976 F.3d 86 (1st Cir. 2020) ............................................................. 11

*Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.,*
  357 F.3d 62 (D.C. Cir. 2004) .................................................... 17, 22

*American Sci. & Eng'g, Inc. v. Califano,*
  571 F.2d 58 (1st Cir. 1978) ...................................................... 17, 23

*Bennett v. New Jersey,*
  470 U.S. 632 (1985) ...................................................................... 19

*Boaz Hous. Auth. v. United States,*
  994 F.3d 1359 (Fed. Cir. 2021) ................................................... 17

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ........................................................... 20, 21, 22

*California v. U.S. Dep't of Educ.,*
  132 F.4th 92 (1st Cir. 2025) ................................................... 4-5, 18

*Calvary Chapel of Bangor v. Mills,*
  984 F.3d 21 (1st Cir. 2020) ............................................................ 1

*Cohen v. Postal Holdings, LLC,*
  873 F.3d 394 (2d Cir. 2017) ........................................................ 17

*Columbus Reg'l Hosp. v. United States,*
  990 F.3d 1330 (Fed. Cir. 2021) ................................................... 19

*Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora*
  *(In re Corporacion de Servicios Medicos Hospitalarios de Fajardo),*
  805 F.2d 440 (1st Cir. 1986) ........................................................ 11

*Crowley Gov't Servs., Inc. v. GSA,*
  38 F.4th 1099 (D.C. Cir. 2022) ............................................... 16, 20

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2012) ........................................................ 31

*Department of Educ. v. California,*
  145 S. Ct. 966 (2025) ....................................... 1, 5, 7, 15, 16, 18, 19, 22, 30

*Diaz v. Johnson,*
No. 19-1501, 2020 WL 9437887 (1st Cir. Nov. 12, 2020) ....................................... 18

*Federal Commc'ns Comm'n v. Prometheus Radio Project,*
592 U.S. 414 (2021) .............................................................................. 26, 27

*Great-West Life & Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002) .............................................................................. 19, 20

*Gulf of Me. Fisherman's All. v. Daley,*
292 F.3d 84 (1st Cir. 2002) ....................................................................... 12

*Hall v. McLaughlin,*
864 F.2d 868 (D.C. Cir. 1989) ................................................................... 28

*Harris v. University of Mass. Lowell,*
43 F.4th 187 (1st Cir. 2022) ...................................................................... 12

*Heckler v. Chaney,*
470 U.S. 821 (1985) ........................................................................... 8, 24, 25

*Lincoln v. Vigil,*
508 U.S. 182 (1993) ....................................................................... 8, 23, 24, 26

*Maine Cmty. Health Options v. United States,*
590 U.S. 296 (2020) ................................................................................ 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012) ................................................................................ 16

*Megapulse, Inc. v. Lewis,*
672 F.2d 959 (D.C. Cir. 1982) ................................................................... 17

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ................................................................... 24

*Nathan M. ex rel. Amanda M. v. Harrison Sch. Dist. No. 2,*
942 F.3d 1034 (10th Cir. 2019) ................................................................. 13

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................................ 30

*Pietrangelo v. Sununu,*
15 F.4th 103 (1st Cir. 2021) ................................................................. 11, 13

iv

*Quint v. Vail Resorts, Inc.*,
  No. 23-1404, 2025 WL 926879 (10th Cir. Mar. 27, 2025) ........................ 12

*Rhea Lana, Inc. v. United States*,
  925 F.3d 521 (D.C. Cir. 2019) ...................................................... 28

*Shansky v. United States*,
  164 F.3d 688 (1st Cir. 1999) ....................................................... 27

*Sprague Elec. Co. v. Tax Ct. of the U.S.*,
  340 F.2d 947 (1st Cir. 1965) ....................................................... 17

*U.S. Conference of Catholic Bishops v. U.S. Dep't of State*,
  No. 1:25-cv-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ................. 21

*United States v. J & E Salvage Co.*,
  55 F.3d 985 (4th Cir. 1995) ........................................................ 20

*United States v. Juvenile Male*,
  564 U.S. 932 (2011) ................................................................ 13

*United States v. Munsingwear, Inc.*,
  340 U.S. 36 (1950) ................................................................. 15

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ..................................................... 31

**Statutes:**

Administrative Procedure Act (APA),
  5 U.S.C. § 701(a)(2) .............................................................. 23

Fair Housing Act,
  42 U.S.C. § 3601 *et seq.* .......................................................... 2

Tucker Act,
  28 U.S.C. § 1491(a)(1) ............................................................ 17

28 U.S.C. § 1292(a)(1) ............................................................... 1

28 U.S.C. § 1331 .................................................................... 1

28 U.S.C. § 1361 .................................................................... 1

28 U.S.C. § 2201 ................................................................................. 1

42 U.S.C. § 3616a(a) .................................................................... 3, 24, 25

42 U.S.C. § 3616a(a)(2) .................................................................... 24

**Regulatory Materials:**

2 C.F.R. § 200.340 ........................................................................... 20

2 C.F.R. § 200.340(a) ....................................................................... 25

24 C.F.R. § 84.1 .............................................................................. 25

Exec. Order No. 14,158,
90 Fed. Reg. 8441 (Jan. 29, 2025) .............................................. 29

**Rule:**

Fed. R. Civ. P. 65(b)(2) ..................................................................... 12

**Other Authorities:**

Guidance for Grants and Agreements,
85 Fed. Reg. 49,506 (Aug. 13, 2020) .......................................... 26

Judgment, *California v. U.S. Dep't of Educ.*,
No. 25-1244 (1st Cir. Apr. 23, 2025) ........................................... 16

13C Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure*, Westlaw (database updated Apr. 2025) ....................... 11

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1361, and 2201. A14. The district court dissolved its temporary restraining order on April 14, 2025, A9, and plaintiffs filed a notice of appeal challenging that dissolution on April 16, 2025, A733.

Much of plaintiffs' argument regarding appellate jurisdiction is mistaken, but their bottom-line conclusion that this Court has jurisdiction is correct. The denial of a temporary restraining order would generally not be subject to immediate appeal, unless the plaintiff could show that it "had the practical effect of denying injunctive relief, will likely cause serious (if not irreparable) harm, and can only be effectually challenged by means of an immediate appeal." *Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 27 (1st Cir. 2020). This case, however, concerns the dissolution of an order that, while styled as a temporary restraining order, would have been subject to immediate appeal as an injunction. *See Department of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). Although denial of a temporary restraining order is not ordinarily tantamount to denial of a preliminary injunction, 28 U.S.C. § 1292(a)(1) extends to orders "dissolving injunctions." Because the order at issue here was an injunction for purposes of § 1292(a)(1), its dissolution is subject to immediate appeal under that provision.

## STATEMENT OF THE ISSUES

Plaintiffs challenge the termination of certain grants provided by the U.S. Department of Housing and Urban Development (HUD). The district court granted

plaintiffs a temporary restraining order (TRO). With the government's consent, the court extended the TRO through May 16 so that the parties could brief, and the court could decide, plaintiffs' forthcoming preliminary-injunction motion. When the Supreme Court issued a stay in an analogous grant-termination case, the district court dissolved the TRO. Plaintiffs appeal the TRO dissolution. The issues presented are:

1. Whether this appeal will become moot on May 16, 2025, when the TRO would have expired on its own terms.

2. Whether plaintiffs have shown a likelihood of success on the merits, or whether the district court was instead correct that plaintiffs' suit must be brought in the Court of Federal Claims; or whether the government's alternative arguments are correct that the decision to terminate the grants at issue here is committed to HUD's discretion and that HUD's decision to terminate the grants at issue here did not violate the Administrative Procedure Act.

3. Whether the equities support a TRO here.

## STATEMENT OF THE CASE

### A.     Statutory Background

HUD administers the Fair Housing Act, which authorizes the agency to investigate and adjudicate housing discrimination complaints. *See* 42 U.S.C. § 3601 *et seq.* The Fair Housing Initiatives Program (FHIP)—through which Congress has authorized the HUD Secretary to "make grants to," or "enter into contracts or cooperative agreements with," various entities that "formulat[e] or carr[y] out programs

to prevent or eliminate discriminatory housing practices"—supplements these efforts. *Id.* § 3616a(a).

## B. Factual and Procedural Background

**1.** In February 2025, HUD's internal "DOGE task force"—established by HUD Secretary Scott Turner and composed of HUD employees—conducted an award-by-award review of FHIP grants in collaboration with HUD's Office of Fair Housing and Equal Opportunity. A672. This review identified 78 FHIP grants for termination on the basis that they no longer effectuated the program's goals or agency priorities. A672. Specifically, the review concluded that these grants were incompatible with one or more of the President's executive orders because the grants "include language that specifically imposes DEI, DEIA, and/or 'equity' actions, initiatives, plans, programs, grants, contracts, performance requirements, or preferences" and that authorizes the use of federal funds for activities "beyond the scope of the statutorily enumerated protections of the Fair Housing Act and other Civil Rights laws." A672-73. The review further concluded that using federal funds for purposes beyond the scope of those laws "dilutes and diminishes the availability of Federal funds to carry out the specific, statutorily-authorized functions of the Department." A673. The review therefore determined that HUD is best able to meet its statutory duties by terminating the grants in question and refocusing its efforts "toward effectuating the plain language of these statutes." A673.

A HUD employee exercising delegated authority to perform certain duties of the Deputy Secretary of HUD "agreed with the task force's analyses, adopted their

reasoning as [his] own, and executed the termination letter for each of those 78 FHIP awards on February 27, 2025." A673; *see* A671; *see also* A161-62; A384-91; A474-75; A627-31. The terminated FHIP grants are a subset of HUD's open FHIP grants, as the award-by-award review determined that not all of the open FHIP grants warranted termination. A673.

**2.** Plaintiffs are four non-profit organizations that engage in activities related to combatting housing discrimination. A14-16. Each has received one or more FHIP grants from HUD. A14-16. HUD terminated plaintiffs' FHIP grants on February 27. A12-16. Plaintiffs allege that, as of that day, they were collectively slated to receive approximately $660,000 in additional grant funds this year, and two were slated to receive additional funds in the next one to two years. A15-16.

Plaintiffs filed suit on March 13, challenging the grant terminations under the Administrative Procedure Act (APA) and seeking to have their funding reinstated. *See* A5; A43-45. The same day, plaintiffs moved to certify a class of similarly situated grant recipients and for a TRO requiring HUD to reinstate their grants. *See* A5; A47. The government filed its opposition to both motions on March 21. A7; A648.

The district court issued a TRO on March 26, directing HUD to reinstate plaintiffs' FHIP grants. A685; *see also* A684 n.1 (noting that plaintiffs had withdrawn their request for emergency relief as to the U.S. DOGE Service, its acting administrator, and the U.S. DOGE Service Temporary Organization). The district court's analysis in support of the TRO relied entirely on this Court's decision in *California v. U.S.*

*Department of Education*, 132 F.4th 92 (1st Cir. 2025), denying a stay pending appeal of a similar order. A684-85. The district court stated that it saw "no meaningful way to distinguish this case from *California* [*v. U.S. Department of Education*]" and thus it was "adopt[ing] the First Circuit's reasoning in full." A685 n.2. The TRO was set to "remain in effect for 14 days." A686. With the government's consent, the court extended the TRO through May 16 so that the parties could brief, and the court could decide, plaintiffs' forthcoming preliminary-injunction motion. A687.

Three days later, the Supreme Court stayed the order at issue in *California v. U.S. Department of Education. See Department of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). The Court explained that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968. That was so, the Court explained, because the "APA's limited waiver of [sovereign] immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered." *Id.* (quotation omitted). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits" seeking such relief. *Id.*

In light of that decision, the government moved to dissolve the TRO in this case. A689. The district court granted that motion on April 14, explaining that "plaintiffs assert essentially the same claim here" as did the plaintiffs in *Department of Education v. California* and thus the court was bound by "the Supreme Court's unmistakable directive

that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims." A724-25.

Plaintiffs appealed the district court's dissolution of the TRO, and the district court stayed its proceedings pending resolution of this appeal. A731; A733-34. Under the briefing schedule set by this Court, briefing will conclude by May 12, with any oral argument to be scheduled as soon as practicable thereafter. Order, Apr. 18, 2025.

## SUMMARY OF ARGUMENT

**I.** This appeal will become moot on May 16, because the TRO would have expired then on its own terms even if it had not been dissolved.

An appeal challenging an order generally becomes moot when the order expires because a court can no longer give the challenger any effectual relief. Because this appeal challenges the district court's order dissolving the TRO, the relief that plaintiffs could receive from this Court is properly limited to a judgment reversing or vacating that order. Such a judgment would have no force past the date that the TRO would have expired. Because the TRO would have expired on its own terms after May 16 and could not have been extended for any additional time without the government's consent, any decision from this Court vacating or reversing the district court's dissolution of the TRO after that point would have no effect. Even if this Court were to forgo oral argument and expend the substantial judicial resources required to fully resolve this appeal in the few days between the reply brief deadline and May 16, this appeal would become moot immediately after.

Plaintiffs suggest that it would be more expedient for the Court to answer certain legal questions in this appeal, rather than waiting for an eventual preliminary injunction appeal. But expediency is no basis to avoid Article III's case or controversy requirement, nor is the prospect that a decision from this Court would promote consistency and clarity amongst district courts. And the possibility that plaintiffs could benefit from a judgment entitling them to broader relief does not mean that it is within this Court's authority to issue such a judgment in the context of this appeal.

**II. A.** Plaintiffs are not entitled to a TRO because the district court lacks jurisdiction over their suit. The APA provides a limited waiver of sovereign immunity for claims against the United States seeking non-monetary relief. Where a party seeks funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is suit under the Tucker Act, not the APA.

Just last month, the Supreme Court granted a stay of an order to make payments in an analogous context, concluding that the government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA because the Tucker Act granted the Court of Federal Claims jurisdiction over such suits. *Department of Educ. v. California*, 145 S. Ct. at 968. The Supreme Court's reasoning applies with full force in the present case. Plaintiffs here have brought a claim "to enforce a contractual obligation to pay money," *id.* (quotation omitted). The source of plaintiffs' purported rights to payment are the grant agreements in question, which

bear all the hallmarks of contracts. Plaintiffs' concern is their loss of federal funds and the relief they request is the reinstatement of their grant awards.

Plaintiffs' attempt to recharacterize their suit as seeking an injunction reinstating the grantor-grantee relationship is unavailing. The present case is not just one that "may ultimately result in some monetary payments" (Br. 21)—the receipt of specific monetary payments is the entire purpose of this suit. And that the Court of Federal Claims lacks the general equitable powers of a district court (*see* Br. 26) does not provide a basis for circumventing the exclusive jurisdictional provisions of the Tucker Act—it reflects the fact that Congress has determined that specific performance should be generally unavailable in contract claims against the government.

**B.** HUD's grant termination decisions are not reviewable under the APA for the additional reason that they are committed by law to agency discretion. In deciding how to allocate its resources, an agency must engage in "'a complicated balancing of a number of factors . . . within its expertise,'" including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

The grant program at issue here provides significant discretion in determining how best to allocate appropriated funds across grant applicants. The statute governing

FHIP grants does not direct the Secretary how to choose between grant applicants or how to prioritize amongst the Fair Housing Act rights sought to be vindicated. And the fact that FHIP funds are designed to support private enforcement of those rights as a supplement to federal government enforcement only reinforces this discretion.

**C.** Even if HUD's discretionary grant termination decisions were subject to review, they do not violate the APA, as they were reasonable and reasonably explained. HUD terminated the grants in question after conducting an award-by-award review of FHIP grants, through which it identified a subset of the existing FHIP grants that, in HUD's judgment, no longer effectuated the program's goals or agency priorities. *Inter alia*, HUD concluded that the grants in question "dilute[d] and diminishe[d] the availability of Federal funds to carry out the specific, statutorily-authorized functions of the Department." A673. HUD therefore determined that it was best able to meet its statutory duties by terminating the grants in question.

Plaintiffs suggest that the grant termination decisions are unreasonable because, in plaintiffs' view, their FHIP grants do still effectuate the program goals and agency priorities. Br. 40. But the allocation of grant money amongst organizations based on an assessment of program goals and agency priorities is an assessment for HUD to make, not plaintiffs. The fact HUD terminated only some FHIP grants further supports the reasonableness of the termination decisions here, as does the fact that HUD identified and terminated grants on the basis of common characteristics. Nor are the grant terminations contrary to law. Contrary to plaintiffs' assertion, HUD's decisions about

how to allocate the resources in question does not run counter to a congressional intention "to increase the resources available for fair housing enforcement activities," Br. 43.

**III. A.** The balance of equities does not support a TRO here. To the extent it would have any practical effect here, a TRO risks irreparably harming the public fisc. If plaintiffs receive funds while a TRO is in place, HUD will be left with no meaningful recourse to reclaim them even if it prevails. In addition, a TRO would harm the President's ability to execute core executive branch policies. By requiring the government to expend money in support of causes that are inconsistent with the Executive Branch's policy objectives, a TRO would inflict an irreparable loss of control vested in the agency and in the President and, by extension, an irreparable harm on the public.

**B.** Plaintiffs, meanwhile, would not be irreparably harmed absent a TRO, as the gravamen of plaintiffs' injury is monetary—the classic example of reparable harm. If plaintiffs prevail in the appropriate forum, they will receive funds to the extent required by law. That fact fatally undermines plaintiffs' assertion of irreparable harm. Moreover, any purported irreparable harm that would arise after May 16 cannot be the basis for restoring a TRO that would have expired on that date in any event. And to the extent plaintiffs ask this Court to consider the harm they may suffer if a preliminary injunction were to be denied, that request is premature.

## STANDARD OF REVIEW

The denial of injunctive relief is reviewed for abuse of discretion, with legal questions reviewed de novo and factual findings for clear error. *See Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020).

## ARGUMENT

**I.    This appeal will become moot on May 16, when the TRO would have expired on its own terms, and there is thus no reason for this Court to attempt to resolve it on the merits.**

This appeal will become moot on May 16, because the TRO would have expired then on its own terms even if it had not been dissolved.

An appeal challenging an order generally becomes moot when the order expires. *See Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora* (*In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*), 805 F.2d 440, 449 (1st Cir. 1986) (holding that challenge to injunction became moot when the injunction expired on its own terms); *accord* 13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3533.3.2 & n.2, Westlaw (database updated Apr. 2025) (collecting dozens of courts of appeals cases). At that point, a court can "no longer give any effectual relief to the potentially prevailing party." *Pietrangelo v. Sununu*, 15 F.4th 103, 105 (1st Cir. 2021) (quotation omitted).

Put differently, a court of appeals cannot adjudicate the legality of an order once it has expired on its own terms, because the court's decision would make no practical difference. That basic principle applies with full force here. The district court entered the TRO on March 26 and extended it with the government's consent through May 16.

After that date, the TRO would have expired on its own terms and could not have been extended for any additional time without the government's consent. *See* Fed. R. Civ. P. 65(b)(2). Plaintiffs' appeal of the TRO's early termination will therefore become moot at that time. At that point, any decision from this Court vacating or reversing the district court's dissolution of the TRO would have no effect, because the TRO would be expired in any event.

Briefing in this appeal is currently set to conclude on May 12, with any oral argument to be scheduled as soon as practicable thereafter. Order, Apr. 18, 2025. Even if this Court were to forgo oral argument and expend the substantial judicial resources required to fully resolve this appeal within a few days of the end of briefing, this appeal would become moot immediately after. *Cf.* Br. 14 (asserting that the briefing schedule set by the Court "would permit resolution before May 16"). There is thus no meaningful possibility of a decision in this appeal with any practical effect.

Plaintiffs cannot avoid mootness by observing that the reasoning behind the TRO dissolution would apply in the context of a preliminary-injunction motion. *See* Br. 15. The relevant question is whether this Court's judgment, not its reasoning, has any practical effect. *See Harris v. University of Mass. Lowell*, 43 F.4th 187, 192 (1st Cir. 2022) (reiterating that the question is whether a court can "grant any effectual relief" (quoting *Gulf of Me. Fisherman's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002))); *see also Quint v. Vail Resorts, Inc.*, No. 23-1404, 2025 WL 926879, at *3 (10th Cir. Mar. 27, 2025) (noting that a "possible, indirect benefit in a future [appeal] cannot save this [appeal] from

mootness," as resolution of the first appeal "could do nothing more than 'tell the parties who was right' about the propriety of the now non-operative stay order without altering any real world conditions" (alterations in original) (first quoting *United States v. Juvenile Male*, 564 U.S. 932, 937 (2011) (per curiam); and then quoting *Nathan M. ex rel. Amanda M. v. Harrison Sch. Dist. No. 2*, 942 F.3d 1034, 1046 (10th Cir. 2019))). As discussed above, a judgment reversing or vacating the TRO would have no force past the date that the TRO would have expired. If an appeal could be saved from mootness on the ground that the Court's reasoning, as distinguished from its judgment, could have practical effect, an appeal of a preliminary injunction that had expired would be justiciable on the ground that the reasoning behind this Court's decision could apply in the context of the district court's final resolution of the merits. But it is well settled that such appeals are moot. Asking this Court to preemptively provide guidance that might be relevant to a future order of the district court indeed asks this Court "to render an advisory opinion, which Article III prohibits." *Pietrangelo*, 15 F.4th at 105.

Plaintiffs' argument boils down to the assertion that it would be more expedient for the Court to answer certain legal questions in this appeal, rather than waiting for any eventual preliminary injunction appeal. Br. 15 ("There is no reason to force Plaintiffs to go through a futile preliminary injunction process."); *id.* ("Absent review by this Court now, Plaintiffs would . . . return to this Court weeks later with the same question they now present."). But expediency is no basis to avoid Article III's case or controversy requirement. Nor is plaintiffs' assertion that a decision from this Court

would "promote consistency and clarity" among district courts in this circuit. Br. 16-17. If the Court is not able to grant effectual relief in this specific appeal, it must be dismissed as moot.

Plaintiffs' assertion that they will suffer harm unless and until they receive some form of preliminary relief (Br. 14-15) likewise does not save this case from mootness. As explained, the relief that this Court could provide in this appeal is limited to the challenged order—that is, the dissolution of the TRO. The TRO cannot have any effect beyond May 16, when it would have expired. The possibility that plaintiffs would benefit from a judgment entitling them to broader relief does not mean that it is within this Court's authority to issue such a judgment in the context of this appeal. Rather, to the extent that plaintiffs seek relief after May 16, the proper vehicle for that relief is a motion for a preliminary injunction, which the district court retains jurisdiction to resolve. Plaintiffs' decision to delay that motion pending this appeal—to which the government, which is not prejudiced by such sequencing, consented—is a litigation choice that does not entitle plaintiffs to relief from this Court that is jurisdictionally barred.

Circumventing briefing and resolution of an actual preliminary injunction motion in district court would also cause serious practical problems. The TRO was entered quickly, with the government's opposition filed just eight days after the complaint. The TRO did not contain any reasoning beyond citing this Court's decision in *U.S. Department of Education v. California*. The limited factual and legal basis for the

14

TRO does not substitute for the more fulsome record that could be developed by litigating a preliminary injunction motion, both in terms of the evidence and arguments that the parties may advance and the reasoning that the district court may articulate.

Although this Court would have jurisdiction to resolve this case before May 16, there is no practical reason to do so. Even if this Court issued an opinion before that day, the appeal would become moot in a matter of days, and the losing party would have a substantial basis to seek vacatur of any opinion and judgment entered by this Court. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950).

The procedural posture of *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), was materially different in this regard. *But see* Br. 15-16. There, the government sought a stay of a restraining order that required the immediate disbursement of significant funds—it did not attempt to fit a full appeal, from briefing to decision, into the period before the order was set to expire. Nor did it attempt to pretermit, as plaintiffs do here, the preliminary injunction proceedings that were taking place at the time in district court. Rather, that was a classic instance of a party seeking immediate relief from a judicial order that continued to cause harm—which the district court's dissolution of the TRO in this case will no longer do as of May 16. Indeed, consistent with the government's position in this case, in *California*, the government moved to place briefing in abeyance, explaining that the district court's then-forthcoming ruling on a preliminary injunction motion would "likely result in the dissolution of" the "order being challenged in [that] appeal, which would moot [the]

appeal." Mot. to Hold Briefing Schedule in Abeyance 2-3, *California v. U.S. Dep't of Educ.*, No. 25-1244 (1st Cir. Mar. 27, 2025). And after the district court's order expired on its own terms, the government voluntarily dismissed its appeal. *See* Judgment, *California v. U.S. Dep't of Educ.*, No. 25-1244 (1st Cir. Apr. 23, 2025).

## II. Plaintiffs are not entitled to a TRO, because they are not likely to succeed on the merits of their challenge.

### A. The district court lacks jurisdiction over plaintiffs' challenge, which must be brought in the Court of Federal Claims.

Plaintiffs are not entitled to a TRO because the district court lacked jurisdiction over their suit.

**1.** The federal government is generally "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted); *Department of Educ. v. California*, 145 S. Ct. at 968. That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 215.

Where a party seeks funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is suit under the Tucker Act, not the APA.

The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The proper recourse for asserted violations of those grant agreements is a "suit in the Claims Court for damages relating to [the] alleged breach." *Id.*

As this Court has long recognized, the APA thus precludes suit in district court where "the essence of the action is in contract"—and plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Ct. of the U.S.*, 340 F.2d 947, 948 (1st Cir. 1965)). Other courts of appeals, in determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017)

(applying *Megapulse* test); *accord Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) ("Because it seems clear that the injury Diaz is alleging is pecuniary in nature and at bottom what he seeks is monetary relief based on what he perceived as a contract created by the communications he received in response to his proposal, Diaz cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act.").

The Supreme Court recently granted a stay of another order to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA." *Department of Educ. v. California*, 145 S. Ct. at 968. Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over such suits. *Id.* That reasoning applies with full force here. In *Department of Education v. California*, a number of states challenged the Department of Education's termination of various education-related grants for "discriminatory practices—including in the form of DEI." Application to Vacate the Order Issued by the United States District Court for the District of Massachusetts and Request for an Immediate Administrative Stay at 5, *Department of Educ. v. California*, 145 S. Ct. 966 (No. 24A910), 2025 WL 945313, at *5 (quotation omitted). The district court temporarily enjoined the grant terminations, and the district court and this Court denied motions to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court then granted the government's request for emergency relief, reaffirming that "the APA's limited waiver

of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Department of Educ. v. California*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

The government is likely to succeed in showing the district court lacked jurisdiction for the same reasons as in *Department of Education v. California*. Plaintiffs here have brought a claim "to enforce a contractual obligation to pay money." *Department of Educ. v. California*, 145 S. Ct. at 968 (quotation omitted). The source of plaintiffs' purported rights to payment are the grant agreements in question, which bear all the hallmarks of a contract. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many . . . federal grant programs" are "much in the nature of a contract" (quotation omitted)); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("[W]e have followed our predecessor court in treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound."). The grant agreements at issue are written agreements, agreed to by both the government and grantee, and specify the amount the government agreed to pay, the work the grantee is to perform in exchange for the payment, the performance period for the work, and all applicable policies and procedures, including the conditions where the grant could be terminated. *See* A22-24; *see also, e.g.*, A177; A181; A184; A215-22 (grant agreement between plaintiff Intermountain Fair Housing Council and HUD). Indeed, the cited termination

provision at issue here—where the government determines the grant "no longer effectuates the program goals or agency priorities"—is expressly incorporated into the grant agreements. *See, e.g.*, A219 (citing 2 C.F.R. § 200.340).

The harm plaintiffs allege and the relief they seek underscores that this is, at base, a contractual dispute. Plaintiffs' concern is their loss of federal funds and the relief they request is the reinstatement of their grant awards. *See* A45 (requesting that the district court order HUD "to reverse the termination decision as communicated on February 27 and immediately reinstate class members' FHIP awards"); *see also, e.g.*, A15; A40. The payment of money, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of their suit. *Crowley*, 38 F.4th at 1112 (quotation omitted). This suit is thus not a challenge to some regulatory action with monetary implications but rather a suit for money due from the government. *Knudson*, 534 U.S. at 212; *see Maine Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020); *cf. Bowen v. Massachusetts*, 487 U.S. 879 (1988). Where, as here, "the alpha and omega of this dispute" is a contract claim for moneys allegedly owned, the district court lacks jurisdiction under the APA. *United States v. J & E Salvage Co.*, 55 F.3d 985, 989 (4th Cir. 1995).

**2.** Plaintiffs' counterarguments are unavailing. Plaintiffs attempt to recharacterize their suit as seeking an "order reinstating a grantor/grantee relationship" that "may result in monetary payments." Br. 18. But attempts by plaintiffs to reframe or recharacterize their claims cannot alter the relief being sought nor this Court's

jurisdiction. Were it otherwise, any plaintiff could recast its breach-of-contract claim as a request to enjoin the counterparty to continue complying with the terms of the contract. When claims like plaintiffs' are "[s]tripped of [their] equitable flair," the "requested relief seeks one thing: . . . the Court to order the Government to stop withholding the money due" under the grants. *U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-cv-00465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). In other words, plaintiffs "want[] the Government to keep paying up." *Id.* Such a claim for "the classic contractual remedy of specific performance" "must be resolved by the Claims Court." *Id.* (quotation omitted).

In arguing otherwise, plaintiffs rely heavily on *Bowen*, 487 U.S. 879. *See* Br. 18-24; Br. 26. But *Bowen*—which did not involve contracts with the government at all—only highlights the absence of any precedent for a lawsuit in federal district court contending that the government has failed to properly terminate a contract. As explained, the present case is not just one that "may ultimately result in some monetary payments" (Br. 21)—the receipt of specific monetary payments is the entire purpose of this suit. And the bare request for reinstatement of the grants at issue here does not have the same prospective effect as the relief sought in *Bowen*, where, as plaintiffs note, the permissibility of the Medicaid disallowance at issue would affect "what expenses [would] or [would] not qualify for reimbursement moving forward," Br. 22 (citing *Bowen*, 487 U.S. at 907). The present dispute is about specific contractual agreements and resolution in plaintiffs' favor would not necessarily "require[] the Secretary to modify

future practices." *Bowen*, 487 U.S. at 905. Regardless of the result here, HUD may well choose to bestow FHIP grants on plaintiffs in the future, provided the terms of such grants align with program goals and agency priorities.

That the Court of Federal Claims lacks the general equitable powers of a district court (*see* Br. 26) does not provide a basis for circumventing the exclusive jurisdictional provisions of the Tucker Act—on the contrary, it simply reflects Congress's determination that specific performance should be generally unavailable in contract claims against the government. *See Albrecht*, 357 F.3d at 68 ("We have held that the Tucker Act impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not." (quotation omitted)). Contrary to plaintiffs' assertion (Br. 27), they do argue that HUD violated the terms of the grant agreements, because they argue that HUD terminated the agreements for unacceptable reasons. *See, e.g.*, Br. 40.

Plaintiffs cannot avoid the force of the Supreme Court's reasoning in *Department of Education v. California*, 145 S. Ct. 966. The Court saw no conflict between its conclusion that the government was likely to succeed in showing that the district court lacked jurisdiction and its decision in *Bowen*—as plaintiffs note, the Court acknowledged *Bowen* in its analysis. *See* Br. 31; *see also Department of Educ. v. California*, 145 S. Ct. at 968. And the underlying facts in *Department of Education v. California* are not meaningfully distinguishable from the facts in this case. The degree to which the plaintiffs invoked specific grant agreement language in their complaint (Br. 32-33) does not change the

essential nature of the suit. *American Sci. & Eng'g, Inc.*, 571 F.2d at 63 ("We have concluded that the essence of the action is in contract, and plaintiff cannot 'by the mystique of a different form of complaint' make it otherwise[.]"). And the fact that the plaintiffs in *Department of Education v. California* were not themselves grantees only underscores the district court's lack of jurisdiction in this case. Where, as here, a contractual party seeks enforcement of a contractual instrument, the case belongs in the Court of Federal Claims.

**B.    The grant termination decisions at issue are committed to agency discretion by law.**

HUD's grant termination decisions are not reviewable under the APA for the additional reason that they are committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

**1.** An agency decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993). The Court explained in *Lincoln* that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making this allocation, the agency must engage in "'a complicated balancing of a number of factors . . . within its expertise,'" including "whether its 'resources are best

spent' on one program or another; whether it 'is likely to succeed' in fulfilling its

statutory mandate; whether a particular program 'best fits the agency's overall policies';

and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.*

at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). As long the agency abides

by the relevant statutes and by whatever self-imposed obligations may arise from

regulations or grant instruments, the APA "gives the courts no leave to intrude." *Id.* As

the D.C. Circuit has recognized, this logic applies not just to lump-sum appropriations

but to other funding programs that leave to the agency "the decision about how the

moneys" for a particular program "could best be distributed consistent with" the

statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions

also "clearly requir[e] a complicated balancing of a number of factors which are

peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

The grant program at issue here is just such a program: it provides significant

discretion in determining how best to allocate appropriated funds across grant

applicants. The statute governing FHIP grants provides that the Secretary "may make

grants to, or (to the extent of amounts provided in appropriation Acts) enter into

contracts or cooperative agreements" with various entities "to develop, implement,

carry out, or coordinate . . . programs or activities designed to obtain enforcement of

the rights granted by . . . the Civil Rights Act of 1968" and substantially equivalent state

and local housing discrimination laws. 42 U.S.C. § 3616a(a); *see also id.* § 3616a(a)(2)

(listing "a range of investigative and enforcement activities" that these agreements

could support). It does not direct the Secretary how to choose between grant applicants or how to prioritize amongst the Fair Housing Act rights sought to be vindicated.

Moreover, the specific context of the FHIP program only reinforces the extremely discretionary nature of the agency's determinations. As explained, FHIP funds are designed to support private enforcement of the Fair Housing Act as a supplement to the federal government's own enforcement. But an agency's decisions regarding how best to enforce a statute are a quintessential example of decisions that are committed to agency discretion by law. *See Heckler*, 470 U.S. at 831 ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). There is thus no doubt that if the agency itself decided to shift its enforcement efforts to prioritize enforcing against certain types of violations, that decision would be wholly discretionary and unreviewable. The fact that the shift in the agency's enforcement priorities here is reflected in its decision to terminate grants that were intended to support certain enforcement does not alter that conclusion.

**2.** Plaintiffs argued in district court that the grant termination decisions were not committed to agency discretion on the logic that the decisions were constrained by various statutes and regulations. *See* 2 C.F.R. § 200.340(a) (Office of Management and Budget regulation concerning grant termination); 24 C.F.R. § 84.1 (equivalent HUD regulation); 42 U.S.C. § 3616a (establishing FHIP); *see also* Dkt. No. 22-1, at 4 (citing

these provisions). But those provisions do not constrain HUD's discretion in determining how best to allocate the funding for the program among many different potential grant recipients, nor do they purport to provide an exhaustive list of considerations that might come into play in determining whether a particular grant agreement is ineffectual or counterproductive. On the contrary, the overarching grant-termination regulation was adopted precisely to give agencies maximum flexibility. Guidance for Grants and Agreements, 85 Fed. Reg. 49,506, 49,508 (Aug. 13, 2020) (rejecting requests to limit Section 200.340(a)(4) to terminations "for cause," and explaining the provision was intended to allow termination where it "may be in the interest of the government to terminate the Federal award"). As a result, there is no meaningful standard for a court to apply in reviewing HUD's exercise of its broad discretion within the outer bounds of the "permissible statutory objectives." *Lincoln*, 508 U.S. at 193. HUD's decision to award or terminate a grant is at most reviewable (in an appropriate forum) for compliance with the terms of the governing statutes, regulations, and funding instruments.

### C.   The grant termination decisions did not violate the APA.

Even if HUD's discretionary decisions were subject to review, they do not violate the APA.

The APA "requires that agency action be reasonable and reasonably explained." *Federal Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy

judgment for that of the agency." *Id.* The grant terminations at issue here meet this deferential standard. As explained, HUD terminated the grants in question after conducting an award-by-award review of FHIP grants. A672. This review identified 78 FHIP grants—that is, some but not all of the existing FHIP grants—that, in HUD's judgment, no longer effectuated the program's goals or agency priorities. A672-73. The review concluded that these grants were incompatible with one or more of the President's executive orders because the grants "include language that specifically imposes DEI, DEIA, and/or 'equity' actions, initiatives, plans, programs, grants, contracts, performance requirements, or preferences" and that authorizes the use of federal funds for activities "beyond the scope of the statutorily enumerated protections of the Fair Housing Act and other Civil Rights laws." A672-73. In addition, the review concluded that using federal funds for purposes beyond the scope of those laws "dilutes and diminishes the availability of Federal funds to carry out the specific, statutorily-authorized functions of the Department." A673. HUD therefore determined that it was best able to meet its statutory duties by terminating the grants in question and refocusing its efforts "toward effectuating the plain language of these statutes." A673. A HUD delegee performing duties of the Deputy Secretary of HUD reviewed and ratified each termination decision and executed the grant termination letters. A673; *see* A671. HUD's policy choices about how to allocate grant funds to accomplish its statutory functions are discretionary and warrant deference. *Cf. Shansky v. United States*, 164 F.3d 688, 695 (1st Cir. 1999) ("An agency that has discretion to make policy choices

can change its view as to the proper balance of relevant concerns as time passes and experience accrues.").

These termination decisions were adequately explained—HUD noted in each letter that the award was being terminated "because it no longer effectuates the program goals or agency priorities." A161; A384; A387; A390; A474; A627; A630. And HUD has explained the award-by-award analysis that went into those decisions before they were issued. *See* A672-73; *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019) (confirming that courts may consider agency declarations that "accurately reflec[t] the contemporaneous reasoning of the" agency). Plaintiffs suggest that the grant termination decisions "ru[n] counter to the evidence," because, in plaintiffs' view, their grants do still effectuate the program goals and agency priorities. Br. 40. But the allocation of grant money amongst organizations based on an assessment of program goals and agency priorities is an assessment for HUD to make, not plaintiffs. Nor do plaintiffs have any basis to conclude that HUD identified the grants for termination "without a thought" for the consequences. *See* Br. 41.

The fact HUD terminated only some FHIP grants further supports the reasonableness of the termination decisions here. So too does the fact that HUD identified and terminated grants on the basis of common characteristics. Indeed, treating similarly situated grants in similar ways honors the APA, for "[r]easoned decisionmaking requires treating like cases alike." *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).

Plaintiffs take issue with the termination notices' mention of Executive Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025), Establishing and Implementing the President's "Department of Government Efficiency." *See* Br. 41-42. As HUD has explained, it conducted the initial award-by-award review underlying the challenged grant terminations through its internal DOGE task force—established by HUD and composed of HUD employees—in collaboration with HUD's Office of Fair Housing and Equal Opportunity. A672. The cited executive order directs agency heads to establish internal DOGE task forces like the one that conducted the initial award-by-award review here. *See* Exec. Order No. 14,158, 90 Fed. Reg. 8441. The termination notices' reference to that executive order is therefore unsurprising and does not render the terminations arbitrary and capricious.

Nor are the grant terminations contrary to law. Plaintiffs argue that the terminations "ru[n] counter to Congressional intent" because Congress "intended to increase the resources available for fair housing enforcement activities." Br. 43. But HUD's decision to terminate the particular grants at issue here does not run counter to that goal. Plaintiffs' criticism is premised on the assumption that HUD will not reallocate the funding previously awarded to plaintiffs to new FHIP grantees. *See* Br. 43-44. But plaintiffs do not explain the basis for that unfounded assumption. Nor do plaintiffs cite any statutory provision that they believe HUD has violated by conducting its award-by-award review through its DOGE task force in comportment with the administration's overarching priorities. *See* Br. 44.

## III. The equities do not support a TRO.

**A.** The balance of equities does not support a TRO here. In particular, a TRO—to the extent it would have any practical effect going forward, *see supra* Part I—risks irreparable harm to the government and to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). First, a TRO risks irreparably harming the public fisc. As in *Department of Education v. California*, the government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. Plaintiffs have not "promised to return withdrawn funds should [their] grant termination[s] be reinstated," *see id.* (quotation omitted), nor did the district court impose a bond when it imposed the TRO, A684-86. If the TRO dissolution is affirmed, HUD will retain the grant money at issue and plaintiffs may obtain appropriate money damages if they are ultimately successful on their claims in the appropriate forum. But the opposite is not necessarily true. Were plaintiffs to receive funds while a TRO is in place, HUD may well be left with no meaningful recourse to reclaim its funds even if it prevails. *See Department of Educ. v. California*, 145 S. Ct. at 968-69 (noting, in granting a stay, that "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed").

Second, a TRO would harm the President's ability to execute core executive branch policies. By requiring the government to expend money in support of causes that are inconsistent with the Executive Branch's policy objectives, a TRO would inflict

an irreparable loss of control vested in the agency and in the President and, by extension, an irreparable harm on the public.

**B.** Plaintiffs, meanwhile, would not be irreparably harmed absent a TRO. The gravamen of plaintiffs' injury is monetary—the classic example of reparable harm. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (it is "well settled that economic loss does not, in and of itself, constitute irreparable harm"); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm" (alteration in original) (quotation omitted)). If plaintiffs prevail in the appropriate forum, they will receive funds to the extent required by law. That fact fatally undermines plaintiffs' assertion of irreparable harm.

Plaintiffs assert that they "are not able to absorb the loss of this funding stream." Br. 45. But plaintiffs' own declarations belie the claim that they will be irreparably harmed unless the TRO is restored. Plaintiffs do not aver that the absence of any particular disbursements they might have received under a TRO would have been sufficient to cause them irreparable harm. In any event, the fact that a temporary loss of funds may affect plaintiffs' ability to carry on certain programs to the same extent does not transform what is fundamentally a pocketbook injury into an irreparable harm. Nor does plaintiffs' assertion that two of them face closure in six months and one faces closure in eight months (*see* A90-91; A174; A392) establish irreparable harm from the

dissolution of a TRO that was scheduled to expire well before then. To the extent plaintiffs ask this Court to consider the harm they may suffer if a preliminary injunction were to be denied, that request is premature for the reasons discussed above. *See supra* Part I.

## CONCLUSION

For the foregoing reasons, the appeal should be dismissed or, in the alternative, the dissolution of the TRO affirmed.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI

  *s/ Sarah Clark Griffin*
SARAH CLARK GRIFFIN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7216*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8727*
  *sarah.c.griffin@usdoj.gov*

MAY 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,363 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sarah Clark Griffin*
Sarah Clark Griffin

# CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system and thereby electronically served a copy of the foregoing document on the parties to this litigation through:

Reed Colfax
Relman Colfax PLLC
1225 19th St NW
Washington, D.C. 20036
rcolfax@relmanlaw.com

Lila Miller
Relman Colfax PLLC
1225 19th St NW
Washington, D.C. 20036
lmiller@relmanlaw.com

Zoila E. Hinson
Relman Colfax PLLC
1225 19th St NW
Washington, D.C. 20036
zhinson@relmanlaw.com

Yiyang Wu
Relman Colfax PLLC
1225 19th St NW
Washington, D.C. 20036
ywu@relmanlaw.com

Robert William Hunter
Relman Colfax PLLC
1225 19th St NW
Washington, D.C. 20036
rhunter@relmanlaw.com

Daniel Ordorica
Heisler Feldman & Ordorica PC
293 Bridge St
Springfield, MA 01103
dordorica@hfmgpc.com

Rebecca Livengood
Relman Colfax PLLC
1225 19th St NW
Washington, D.C. 20036
rlivengood@relmanlaw.com

Anthony Raduazo
NYS Office of the Attorney General
28 Liberty St
New York, NY 10005
anthony.raduazo@ag.ny.gov

*s/ Sarah Clark Griffin*
Sarah Clark Griffin