No. 25-1368

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

MASSACHUSETTS FAIR HOUSING CENTER; INTERMOUNTAIN FAIR
HOUSING COUNCIL; SAN ANTONIO FAIR HOUSING COUNCIL, INC.,
d/b/a FAIR HOUSING COUNCIL OF SOUTH TEXAS; and HOUSING
RESEARCH AND ADVOCACY CENTER, d/b/a FAIR HOUSING CENTER
FOR RIGHTS & RESEARCH, INC., *on behalf of themselves and all those
similarly situated*,
Plaintiffs-Appellants,

*v.*

THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT
TURNER, *in his official capacity as Secretary of Housing and Urban
Development*; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY
ORGANIZATION; and AMY GLEASON, *in her official capacity as Acting
Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary
Organization*,
Defendants-Appellees,

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 3:25-cv-30041-RGS

## REPLY TO DEFENDANTS-APPELLEES' BRIEF

Lila Miller (Bar No. 1216671)
Reed Colfax (Bar No. 1216672)
RELMAN COLFAX PLLC
1225 19th Street NW Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com

May 12, 2025

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES.................................................................... ii

PRELIMINARY STATEMENT................................................................1

I.   This Court Has Jurisdiction. ............................................................2

II.  This Appeal Is Not Moot Regardless of Whether This Court Decides Plaintiffs' Appeal by May 16. .........................................................3

    A. The Collateral Consequences of the Dissolution Order Will Continue After May 16. ........................................................................5

    B. May 16 Does Not Have the Significance Defendants Attach to It. ............8

    C. Defendants Fail to Meaningfully Distinguish *California*..........................9

III. The Tucker Act Does Not Require This Case to Be Brought in the Court of Federal Claims. ................................................................10

IV. HUD's Midstream Termination of Existing Grants Was Not Committed to Agency Discretion. ................................................................14

V.   Preliminary Relief Remains Appropriate. ......................................................20

    A. Plaintiffs Are Likely to Succeed on the Merits of their APA Claim.........20

       1. HUD Acted Arbitrarily and Capriciously. ...........................................21

       2. HUD Acted Contrary to Law..............................................................25

    B. The Equities Favor Preliminary Relief. ...................................................25

CONCLUSION ........................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abbott v. Perez*,
   585 U.S. 579 (2018)............................................................................2, 3, 6

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014).......................................................22

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)...................................................................12, 13

*California v. Dep't of Educ.*,
   132 F.4th 92 (1st Cir. 2025)................................................15, 17, 27

*Carroll v. Pres. & Comm'rs of Princess Anne*,
   393 U.S. 175 (1968)............................................................5, 6, 7, 8

*Carson v. Am. Brands, Inc.*,
   450 U.S. 79 (1981)............................................................................6

*Carter v. Fleming*,
   879 F.3d 132 (4th Cir. 2018) .........................................................5, 6

*Dahl v. HEM Pharm. Corp.*,
   7 F.3d 1399 (9th Cir. 1993) ..............................................................5

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019)...................................................................15, 17

*Dep't of Educ. v. California*,
   145 S. Ct. 966 (2025) (per curiam)...........................................2, 9, 26

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)...................................................................21, 22

*Heckler v. Chaney*,
   470 U.S. 821 (1985)........................................................................19

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)........................................................................26

*Lincoln v. Vigil*,
   508 U.S. 182 (1993).................................................................................18, 19

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982)..............................................................11

*N.A.A.C.P. v. Sec'y of Hous. and Urban Dev.*,
   817 F.2d 149 (1st Cir. 1987)............................................................17, 18

*Policy & Research, LLC v. U.S. Dep't of Health and Human Servs.*,
   313 F. Supp. 3d 62 (D.D.C. 2018)..........................................................19

*United States v. Munsingwear, Inc.*,
   340 U.S. 36 (1950)..............................................................................8

*Utah v. Evans*,
   536 U.S. 452 (2002).............................................................................8

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   586 U.S. 9 (2018)..............................................................................15

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
   --- F. Supp. 3d ----, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ........................19

## Statutes and Regulations

2 C.F.R. § 200 *et seq.*..........................................................................16

24 C.F.R. § 125 *et seq.*.........................................................................16

5 U.S.C. § 701(a)(2).....................................................................14, 15, 20

28 U.S.C. 2106......................................................................................9

42 U.S.C. § 3608(e)(5)...........................................................................17

42 U.S.C. § 3616a.........................................................................15, 16, 19

## Rules

Fed. R. Civ. P 65(b)(2)...........................................................................9

**Other Authorities**

13C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc.
    Juris. § 3533.3.2 (3d ed.) .......................................................................7

# PRELIMINARY STATEMENT

This Court has jurisdiction to resolve Plaintiffs' appeal. Defendants assert that, irrespective of appellate jurisdiction, Plaintiffs' appeal will become moot in a matter of days, but the ascription of talismanic-like meaning to May 16 is misguided. Although the now-dissolved Temporary Restraining Order would have expired on May 16, the order on appeal is the Dissolution Order itself, which continues to dictate the trajectory of Plaintiffs' Administrative Procedures Act ("APA") claim and their ability to obtain injunctive relief.

As to the District Court's jurisdiction over Plaintiffs' APA claim, Defendants repeatedly invoke the *Department of Education v. California* per curiam, but that preliminary order did not overturn the long-standing precedent that vests jurisdiction in federal district court, not the Court of Federal Claims. Defendants' assertion of agency discretion also fails to deprive the District Court of jurisdiction. Discretion was not at issue in the Dissolution Order and thus is not presented by this appeal, but even if the Court reaches that issue, the applicable statutes and regulations provide meaningful standards for APA review.

As to the propriety of preliminary relief, Defendants have not justified HUD's termination decision under any of the applicable APA standards, nor have they shown that the equities weigh in their favor, and this Court can remand to the District Court to consider such issues in the first instance.

Accordingly, for the reasons set forth in Plaintiffs' Brief ("Pl. Br."), this Court should vacate and reverse the Dissolution Order and remand for further proceedings.

## I.     This Court Has Jurisdiction.

The Parties agree, and the law compels the finding, that this Court currently has appellate jurisdiction. As Plaintiffs detailed in their opening brief, the Dissolution Order had "the 'practical effect of refusing an injunction' and will have 'serious, perhaps irreparable, consequences' that can be 'effectually challenge[d] only by an immediate appeal.'" Pl. Br. at 11 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84, 88–89 (1981)). Defendants agree, noting that the Dissolution Order was "tantamount to denial of a preliminary injunction" and "was an injunction for purposes of § 1292(a)(1)." Def. Br. at 1. As the Supreme Court recently found in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025) (per curiam), the denial of a stay of a temporary restraining order – even one with a formal expiration date – was appealable because it "carrie[d] many of the hallmarks of a preliminary injunction." *Id.* at 968; *see also Abbott v. Perez*, 585 U.S. 579, 595 (2018) (noting that when an order is the "practical equivalent of an order denying an injunction and threaten[s] serious and perhaps irreparable harm if

not immediately reviewed," it "should be treated as [an injunction] for purposes of appellate jurisdiction").[1]

Thus, there is no controversy that this appeal is properly before the Court. Defendants contend that this Court will lose jurisdiction after May 16, the date the Temporary Restraining Order was scheduled to expire if it had not been dissolved, but they are mistaken. As described below, the Dissolution Order—which is the actual order on appeal, not the Temporary Restraining Order—does not expire on May 16; rather, its reasoning is broad enough to govern the remainder of this case absent immediate appellate review. This Court's review of the Dissolution Order's determination regarding the Tucker Act will govern further proceedings in this case, whether issued before or after May 16.

## II. This Appeal Is Not Moot Regardless of Whether This Court Decides Plaintiffs' Appeal by May 16.

The practical effect of the Dissolution Order is sweeping: The District Court made clear that it believes it lacks jurisdiction over "this case." A725. This holding is not limited to Plaintiffs' entitlement to a temporary restraining order, and so the Dissolution Order will continue to dictate the outcome of any future motions

---

[1] The *Abbott* Court cited the fact that "lawful and important conduct may be barred" as an important reason for courts to take a practical approach to reviewing injunctions. 585 U.S. at 595. As discussed in Plaintiffs' opening brief, the Dissolution Order bars substantial lawful and important conduct. *See, e.g.*, Pl. Br. at 5 (describing Plaintiffs' FHIP activities).

before the District Court, effectively precluding Plaintiffs from obtaining injunctive relief if it is not corrected. The Dissolution Order thus has broader and more lasting effect than the Temporary Restraining Order it dissolved, making it irrelevant that the Temporary Restraining Order (which is not the order on appeal) would have expired on May 16. Neither the Dissolution Order (the actual order being reviewed) nor its effects expire on May 16. Where, as here, an order has ongoing effects on the parties' rights, courts have looked at those practical impacts to find the order not moot even if that order has expired.

Accordingly, while a decision before May 16 would avoid any mootness argument, this Court need not resolve this case prior to May 16 to avoid mootness. Nor would a decision issued before May 16 grant such fleeting relief that it would amount to an advisory opinion. Defendants' suggestion to that effect ignores that the May 16 date was not keyed to any real-world event but was part of a broader scheduling order designed to facilitate preliminary injunction briefing. Should this Court reverse the District Court's jurisdictional ruling and remand for further proceedings, the District Court would be free to extend the Temporary Restraining Order to cover a new preliminary injunction briefing schedule. Finally, Defendants fail to distinguish *Department of Education* for mootness purposes.

In short, this Court has jurisdiction over this appeal now and will retain jurisdiction after May 16. Moreover, resolution of Plaintiffs' appeal now rather

than requiring Plaintiffs to file a futile preliminary injunction motion and then a new appeal is the efficient and practical option: Doing so will resolve a live dispute that continues past May 16 and enable the case to proceed in an orderly manner.

### A.    The Collateral Consequences of the Dissolution Order Will Continue After May 16.

The broad language and reasoning of the Dissolution Order—in which the district court found an "unmistakable directive" from the Supreme Court that it lacked jurisdiction over "this case," not just the immediate motion—has the effect of preventing Plaintiffs from securing injunctive relief in the District Court at *any* procedural juncture. Adjudicating this appeal, even after May 16, would therefore resolve a live and pressing legal question in this case.

Appellate courts have maintained jurisdiction over appeals from "expired" orders where resolution of the appeal would sufficiently impact the parties' ongoing legal rights and obligations. *See, e.g.*, *Carroll v. Pres. & Comm'rs of Princess Anne*, 393 U.S. 175, 178 (1968) (expiration of a temporary injunction against rallies by white supremacist group did not moot the case when the expired order had become the basis for ongoing denials of the group's efforts to hold future rallies even after its expiration); *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (expiration of inmate's suspension from a prison program did not moot his claim that such suspension was unlawful because the outcome of the court's decision could affect his eligibility for future inclusion in the program); *Dahl v.*

*HEM Pharm. Corp.*, 7 F.3d 1399, 1402–03 (9th Cir. 1993) (finding that the court had jurisdiction over an appeal from a one-year preliminary injunction even after its expiration because the court's decision on the injunction's validity would determine whether a related civil contempt judgment could stand). The core question in these cases was whether deciding the appeal would resolve "an existing unresolved dispute which continues," *see Carroll*, 393 U.S. at 178, and whether such resolution "could provide meaningful redress." *Carter*, 879 F.3d at 139.

Here, while the immediate effect of the Dissolution Order was to dissolve the Temporary Restraining Order scheduled to expire on May 16, the Dissolution Order's reasoning sweeps further and precludes *any* injunctive relief in the District Court. *See* A724–A725 Dissolution Order ("…for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims."). The District Court's finding that the proper forum "for this case" is the Court of Federal Claims—the only basis for its dissolution of the Temporary Restraining Order—resolves *ex ante* any motion for any further temporary or preliminary injunctive relief, and thus has the "practical effect of" refusing an injunction." *See Carson*, 450 U.S. at 83; *see also id.* at 88–89.[2] The effects of the Dissolution Order extend far beyond simply

---

[2] Just as labels alone do not determine appellate jurisdiction, *see Carson*, 450 U.S. at 83; *Abbott*, 585 U.S. at 597, it is of no significance that the Dissolution Order did not formally cast its decision as the denial of an injunction. The question is whether the order has the "practical effect" of doing so. The Dissolution Order did

granting or denying a temporary restraining order until May 16, affecting the availability of all potential preliminary relief if not the overall viability of the claim. The "collateral consequences" of the Dissolution Order thus preclude a mootness finding even after the formal date on which the temporary restraining order would have expired. 13C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3533.3.2 (3d ed.).

Here, resolution of Plaintiffs' appeal would not simply resolve the propriety of the dissolution of the Temporary Restraining Order—it also would resolve the Parties' dispute over whether the District Court has jurisdiction over Plaintiffs' APA claim, including the District Court's authority to issue any form of preliminary injunctive relief. Indeed, the text of the Dissolution Order itself establishes that it is based entirely on a legal determination that controls the fate of this case moving forward: Because the District Court believed it lacked jurisdiction over Plaintiffs' claims, it declined to address the question of whether Plaintiffs would be irreparably harmed by the dissolution of the TRO, finding such issue "moot[.]" A724–A725. Hence, the District Court's error in holding that the court lacks jurisdiction will "continue[] to have an adverse effect upon petitioners' rights." *Carroll*, 393 U.S. at 178. Under such circumstances, "[t]he underlying

---

so here because a District Court cannot grant any injunctive relief if it lacks jurisdiction over the case.

question persists" and the appeal is not moot. *Id.* at 179; *see also Utah v. Evans*, 536 U.S. 452, 464 (2002) (Article III redressability met when the "practical consequence" of a change in legal status "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered").[3]

## B. May 16 Does Not Have the Significance Defendants Attach to It.

Contrary to Defendants' assertions, May 16 is not a date with an independent significance; it simply is part of a scheduling order designed to provide adequate time for the Parties to brief and the District Court to decide a preliminary injunction motion. A687. Indeed, Defendants expressly stated that extending the Temporary Restraining Order would serve "the purpose of briefing the propriety of entering a preliminary injunction." A685. At the time of dissolution on April 14, there remained 32 days of temporary relief to facilitate this briefing.

Should this Court reverse the Dissolution Order's legal determination regarding jurisdiction—either before or after May 16—and remand for further proceedings, the District Court would be empowered to set a new preliminary injunction briefing schedule and extend the Temporary Restraining Order to return

---

[3] In such an event, there would also be no basis for Defendants to move for vacatur pursuant to *United States v. Munsingwear, Inc.* because the temporary restraining order would not be moot. 340 U.S. 36, 39 (1950) (limiting vacatur to certain conditions, including where the order at issue is moot).

the Parties to the positions they were in prior to the Dissolution Order. *See* Fed. R. Civ. P 65(b)(2) (permitting extension of temporary restraining orders for good cause). Nothing happens on May 16 that would change that situation; the District Court will have the same authority to act before and after that date. Accordingly, if this Court reverses the Dissolution Order, implementing the Parties' and District Court's intent prior to the dissolution would lead to leaving a reinstated temporary restraining order in place pending briefing and resolution of a preliminary injunction motion. And even if there were any doubt on that score, this Court has the authority to modify the expiration date of the Temporary Restraining Order in service of maintaining its appellate jurisdiction and otherwise serving justice on remand. *See* 28 U.S.C. 2106 (permitting the Court of Appeals to remand and direct the entry of appropriate relief or further proceedings as may be just). May 16, therefore, is not a turning point for this appeal or the Dissolution Order at issue.

### C. Defendants Fail to Meaningfully Distinguish *California*.

Defendants' attempt to distinguish *California*, 145 S. Ct. 966, for mootness purposes is also unavailing. Defendants characterize the Department of Education's efforts to stay a temporary restraining order in that case (which the Supreme Court treated as a preliminary injunction) as "a classic instance of a party seeking immediate relief from a judicial order that continued to cause harm." Def. Br. at 15. That is precisely what Plaintiffs are seeking here. *See* Pl. Br. at 44–49

(describing the irreparable harm that the Termination Notices have caused for Plaintiffs' operations). Nor is there any reason to assume that "dissolution of the TRO in this case will no longer [cause such harm] as of May 16" as Defendants claim, because (1) the Dissolution Order effectively precludes any motion for preliminary relief and (2) if the Dissolution Order is vacated, Plaintiffs will seek reinstatement and extension of a temporary restraining order to permit briefing and resolution of a preliminary injunction motion.

## III. The Tucker Act Does Not Require This Case to Be Brought in the Court of Federal Claims.

As Plaintiffs explained in their opening brief, Plaintiffs' APA claim falls within the APA's waiver of sovereign immunity; it is not a contract claim that must be brought in the Court of Federal Claims under the Tucker Act. *See* Pl. Br. at 17–30. In arguing otherwise, Defendants largely or completely ignore many of Plaintiffs' arguments. Defendants do not contest that the text and legislative history of the APA demonstrate that this case is properly brought under the APA, nor do they contest that Plaintiffs' proposed relief does not include payment for past work. Defendants also do not specify the contractual theories purportedly hiding within Plaintiffs' pleadings or the grant agreement terms allegedly implicated by Plaintiffs' challenge.

Rather than addressing any of these topics, Defendants repeatedly cite the Supreme Court's short order in *California* for the bald proclamation that Plaintiffs'

challenge sounds in contract, without ever explaining why or how such a finding could be reconciled with the APA's text or caselaw or other precedent.

*First*, Defendants deem Plaintiffs' APA claim to be a contract claim, based entirely on the premise that Plaintiffs' grant instrument might be considered a contract. *See* Def. Br. at 19–20. Plaintiffs' grant instruments do not necessarily qualify as contracts, *see* Pl. Br. at 29 n.11. But even if they did, that would not mean the right at issue in this case derives from that contract. As the foundational circuit court opinion on the "source of the right" analysis held, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The right Plaintiffs seek to vindicate is the right to be free from agency action that is arbitrary, capricious, and contrary to law. This right was set forth by Congress in the APA; it is not found in Plaintiffs' grants. Evaluating the adequacy of the Termination Notice and HUD's reasoning bears no resemblance to the analysis required to consider a contract claim, and it involves no grant term or condition. Similarly, evaluating whether eliminating Plaintiffs' FHIP awards is contrary to Congressional appropriations and the FHA does not require analysis of contractual terms; it is a matter of statute. The District Court will not have to rule

on a contract issue, and the mere existence of a grant agreement—which may or may not be a contract—does not alone determine the nature of Plaintiffs' claims.

**Second**, Defendants gloss over the importance of *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the binding Supreme Court case that confirms the District Court's jurisdiction. Defendants dismiss the applicability of *Bowen* in a brief paragraph, arguing that Plaintiffs here are challenging the termination of a grant whereas the plaintiffs in *Bowen* sought a modification of reimbursement formulas for future payments. Def. Br. at 21–22. Nothing in *Bowen* itself suggests that such a distinction matters. Defendants fail to explain why a challenge to an agency action that reduces the amount that will be paid to a grantee (as in *Bowen*) is not a claim for monetary damages, whereas a claim that the agency terminated altogether the grant relationship between the parties (as in this case) is.

Tellingly, in trying to characterize the Plaintiffs' claims as ones for monetary damages, Defendants ignore the fact that HUD's Termination Notice acknowledged that the Parties would be paid out for past work performed. *See* A161–A162 (Plaintiff Massachusetts Fair Housing Center's Termination Notice). The only work affected by grant reinstatement is therefore future work, *i.e.*, the Parties' forward-looking relationship, just as in *Bowen*. *See* Pl. Br. at 5–6, 24–25. As Plaintiffs argued in their opening brief, and as Defendants fail to address, an order in this case would not—and in fact could not—take the form of an order to

pay a specific amount, because any grant payment remains contingent on performance and deliverables. *Id.* at 24–25. Plaintiffs could win reinstatement of their grants and still not be entitled to payment should they fail to perform on them. If anything, this case is thus *less* reducible to money than *Bowen* was. In eliding these facts, Defendants have wholly failed to grapple with *Bowen*, and thus fail to overcome its dispositive application to this case.[4]

**Third**, Defendants assert that the Supreme Court's per curiam order in *California* nonetheless dictates the outcome of this case. *See* Def. Br. at 18–19, 22–23. According to Defendants, the "reasoning" of that preliminary order "applies with full force here." Def. Br. at 18; *see also id*. at 21. But the Supreme Court's order did not contain meaningful reasoning in the single paragraph on jurisdiction. Nor did it conclusively resolve jurisdiction even for that case, and it does not carry the ordinary precedential weight of a Supreme Court opinion on the merits. *See* Pl. Br. at 34–35. Put simply, Defendants put more weight on *California* than that short order can bear.

---

[4] Defendants also argue that the unavailability of a remedy in the Court of Federal Claims does not support the District Court's jurisdiction but rather "reflects Congress's determination that specific performance should be generally unavailable in contract claims against the government." Def. Br. at 22. But this argument, too, wrongly presumes that Plaintiffs claims are disguised contract claims. *Bowen* also expressly noted that "the doubtful and limited relief available in the Claims Court" means that forum "is not an adequate substitute for review in the District Court." 487 U.S. at 901.

Unable to point to useful reasoning in *California*, Defendants argue for its applicability by saying that its facts are "not meaningfully distinguishable from the facts in this case," Def. Br. at 22. But this, too, is wrong. Plaintiffs here seek to reestablish a prospective grantor/grantee relationship, not money owed for past work, which sets this case apart from *California*. *See* Pl. Br. at 31–34. The *California* Plaintiffs' claims, by their own description, *did* derive from the terms and conditions of their grant agreements. *Id.* at 33. These distinctions set Plaintiffs' APA claim apart from the one at issue in *California*.

All said, Defendants' jurisdictional arguments boil down to an unsupported assertion that *California*, in some unexplained way, has fundamentally altered the relevant analysis. It does not. For the reasons explained in Plaintiffs' opening brief, the Tucker Act is inapplicable, and the District Court had jurisdiction over Plaintiffs' APA claim.

## IV. HUD's Midstream Termination of Existing Grants Was Not Committed to Agency Discretion.

Defendants also ask this Court to affirm the decision below for the independent reason, not contained in the Dissolution Order or in the *California* per curiam, that their actions are unreviewable under 5 U.S.C. § 701(a)(2) because they were committed to agency discretion. This Court need not pass on this question and can instead remand for the District Court to consider it in the first instance. But in any event, Defendants' position is without merit.

There is a "strong presumption favoring judicial review of administrative action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). The exception for agency action committed to agency discretion by law is "quite narrow" and applies only in the "rare circumstances" in which a court would have "no meaningful standard against which to" review an agency's conduct. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (describing the limits of 5 U.S.C. § 701(a)(2)). This case does not present those rare circumstances. On top of the constraints in the FHA itself, the implementing FHIP regulations and the applicable Office of Management and Budget ("OMB") regulations provide meaningful standards for judicial review of agency grant terminations. *See California v. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir. 2025) (finding OMB regulations provided sufficient standards for agency review). Defendants' response fails to grapple with the robust set of standards at issue, ignores binding Circuit precedent, and relies on inapposite cases.

The award and termination of FHIP grants are governed by a comprehensive statutory and regulatory scheme. The FHA mandates that HUD "shall" award certain categories of grants when Congress appropriates money, as Congress has done every year since enacting the FHIP provision. 42 U.S.C. § 3616a. The statutory text explains FHIP's goals: to fund "programs or activities designed to obtain enforcement of the rights granted by" the FHA and to fund "education and

outreach programs" to inform the public about the FHA. 42 U.S.C. § 3616a(a). The statute goes further—it specifies what activities may be funded through each category of FHIP grant, such as testing, technical assistance, litigation costs, and capacity enhancement. *Id.* at § 3616a(b)–(d). The statute is so granular as to provide for the dissemination of public service announcements, posters, and brochures. *Id.* at § 3616a(d)(1). The FHIP regulations provide additional requirements regarding program administration, including eligibility. 24 C.F.R. § 125 *et seq.* Accordingly, there exists exhaustive detail about what FHIP activities are permissible means of achieving the program goals. The applicable OMB regulations drill down further on HUD's obligations regarding grant administration, including notices of funding availability, application review, monitoring, and reporting. 2 C.F.R. § 200 *et seq.* The OMB regulations also include multiple sections dedicated to grant termination and noncompliance. *Id.* § 200.339–343. These provisions detail the limited conditions under which HUD may terminate an existing award and how such a termination must be effectuated. *Id.* § 200.340–341.

It is against this backdrop that Plaintiffs' challenge to HUD's termination decision is evaluated, and Defendants' assertion that "there is no meaningful standard for a court to apply in reviewing HUD's exercise of its broad discretion" is demonstrably false. Def. Br. at 26. The extensive statutory and regulatory

requirements readily supply the "meaningful standard[s] by which to judge [HUD's] action." *Dep't of Com.*, 558 U.S. at 772. Indeed, this Court just reached that conclusion in the *California* case, where the same OMB provisions governed grant terminations and were complemented by a statutory framework. 132 F.4th at 98 (describing relevant regulatory and statutory provisions).

In addition to the Court's ruling in *California*, this Court has previously rejected arguments that HUD's authority to award and administer grants is unreviewable under the APA. *N.A.A.C.P. v. Sec'y of Hous. and Urban Dev.*, 817 F.2d 149 (1st Cir. 1987). The plaintiffs in *N.A.A.C.P.* argued that HUD's administration of certain grant programs was discriminatory and thus violated HUD's obligation to affirmatively further fair housing. *Id.* HUD responded that its grant activity was committed to agency discretion and thus not reviewable under the APA, as it argues here. *Id.* Then-judge Stephen Breyer rejected that argument on behalf of a unanimous panel, reiterating that the narrow exception to reviewability applies only where "a court cannot review even to determine whether the agency, exceeding the scope of its broad power, acted *unlawfully.* Such cases are few, and typically involve areas where the very act of reviewing may impede the agency's ability to carry out its statutory functions." *Id.* at 157. This Court then found that the directive in 42 U.S.C. § 3608(e)(5) that HUD "administer the programs and activities relating to housing and urban development in a manner

affirmatively to further the policies of this subchapter" provided an adequate standard against which to measure HUD's pattern of grant activity over time. *Id.* at 158–59. In reaching this conclusion, this Court also found it important that the rights at issue were significant, that judicial review would not interfere with HUD's ability to carry out its statutory mission, and it was possible for the court to fashion an appropriate remedy. *Id.*

N.A.A.C.P. all but dooms Defendants' reviewability arguments in this case. If a single subsection of the FHA was adequate for judicial review of HUD's funding activity, then a robust statutory mandate, complemented by an extensive regulatory regime, is certainly sufficient for judicial review of HUD's grant termination decision. The other factors identified in *N.A.A.C.P.* also support reviewability: fair housing enforcement is a topic of great importance; judicial review will promote realization of the FHA's anti-discrimination goals; and it is possible to award prospective equitable relief that will redress Plaintiffs' injuries.

Defendants' arguments to the contrary are unavailing. Defendants first invoke *Lincoln v. Vigil*, 508 U.S. 182 (1993), to argue that "allocation of funds from a lump-sum appropriation" is a matter of agency discretion. Def. Br. at 23–25. But Plaintiffs' claims do not concern funding allocation, or even reallocation; they address grant termination. *Lincoln* says nothing about grant termination, and

thus is of little utility here.[5] As one district court recently explained when rejecting

*Lincoln*-based reviewability arguments from federal agencies, "because the funds

at issue here were already awarded to the Nonprofits, more obligations apply."

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, --- F. Supp. 3d -

---, 2025 WL 1116157, at *12–16 (D.R.I. Apr. 15, 2025) (granting injunction).

Then-Judge Ketanji Brown Jackson reached the same conclusion in *Policy &*

*Research, LLC v. U.S. Department of Health and Human Services*, holding that

HHS regulations—similar to the OMB regulations—provided "meaningful

standards that cabin[ed the agency's] discretion to terminate grant funding." 313 F.

Supp. 3d 62, 76–78 (D.D.C. 2018). So too here. Plaintiffs already received FHIP

awards from HUD, and that receipt triggered additional requirements that will

guide judicial review of HUD's termination decision.

Defendants next argue that matters of statutory enforcement are committed

to agency discretion, citing *Heckler v. Chaney*, 470 U.S. 821 (1985). But Plaintiffs

do not aim to compel HUD to take specific enforcement actions, as was the case in

*Heckler*. HUD remains free to pursue FHA enforcement as it sees fit, within in the

bounds of its statutory obligations. Plaintiffs instead endeavor to ensure that HUD

---

[5] *Lincoln* is materially distinct in other ways, too. For example, there the
Congressional appropriation did not mention the public health program that was
terminated, whereas here Congress has specifically appropriated funds under
Section 3616a. *Lincoln*, 508 U.S. at 186 ("Congress never expressly appropriated
funds for these centers.").

complies with *Congress*'s decision to promote FHA enforcement through the establishment of FHIP and through the appropriation of funding for FHIP awards.

HUD cannot simply ignore the obvious set of standards that govern Plaintiffs' claim to shoehorn this case into a deliberately narrow exception to the presumption of judicial review. Section 701(a)(2) does not deprive the District Court or this one of jurisdiction.

## V.     Preliminary Relief Remains Appropriate.

The Defendants also argue that preliminary relief is not warranted for other reasons that the District Court did not rely on in the Dissolution Order. This Court can remand to the District Court to consider the other injunction issues in the first instance, but in the event it chooses to consider the question, Defendants have not justified HUD's termination decision under any of the applicable APA standards, nor have they shown that the equities weigh in their favor.

### A.     Plaintiffs Are Likely to Succeed on the Merits of their APA Claim.

Plaintiffs challenge HUD's termination decision as arbitrary and capricious and as contrary to law, either of which would alone be sufficient to sustain a ruling in their favor. *See* Pl. Br. at 36–44. Plaintiffs are likely to succeed under both theories.

### 1. HUD Acted Arbitrarily and Capriciously.

In disputing the arbitrariness of their conduct, Defendants principally contend that the Ammon Declaration and Termination Notice together provide an adequate explanation for reasonable agency action. This is not so, and none of Defendants' other arguments erodes Plaintiffs' likelihood of success.

*First*, as to the adequacy of HUD's explanation for its termination decision, HUD points to the Ammon Declaration's statement that Plaintiffs' grants were terminated for containing "language" that related to DEI and that authorized funds for activities beyond the protections enumerated in the FHA. Def. Br. at 27–28.[6] But the fact that a formulaic keyword search turned up certain words in certain grant documents hardly qualifies as a reasonable basis for agency action and is a far cry from substantively analyzing an organization's deployment of grant funding. Even if the Court were to accept that HUD's word search qualifies as a grant-by-grant determination, that does not mean that HUD has provided the requisite grant-by-grant *explanation*.

An agency's explanation must be "clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419

---

[6] This Court may disregard the Ammon Declaration as it rejected a litigation declaration in *California*, *see* Pl. Br. at 39, but it does not change the outcome at any rate.

U.S. 281, 286 (1974)). But here, Plaintiffs are left to guess what "DEI," "DEIA," and equity mean in this context, and what it means for key words (let alone actual grant activities) to be "related to" those concepts. Each Plaintiff is also left to guess which language in their grants either ran afoul of the cited Executive Orders ("E.O.") or placed their activities outside the scope of the FHA. HUD neither explained what language triggered termination, nor—more importantly—why that language would justify stripping Plaintiffs of their grants entirely. The generalized explanation in the Ammon Declaration, which makes no effort to explain how any of these stated reasons apply to any specific grant and warrant the challenged termination, is not adequate. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an 'agency's statement must be one of *reasoning*[.]" (emphasis in original)).

**Second**, the record shows that HUD's decision was unreasonable in multiple ways. To begin, categorizing grants based on the presence or absence of certain language is not a reasonable or defensible basis for stripping Plaintiffs of existing grants. HUD's simplistic linguistic exercise hardly supports HUD's ultimate stated determination that activities under Plaintiffs' grants are at odds with program goals or agency priorities or are unsupported by statute. Indeed, Plaintiffs' attempt to duplicate HUD's methodology by searching for offending terms in their grant documents confirmed that HUD's stated explanation lacked a "rational connection

between the facts found and the choice made." *Encino Motorcars*, 579 U.S. at 221.

For example, Plaintiff Fair Housing Center of South Texas's FHIP documents

mention "diversity" in only a single sentence, which noted that, although there is a

State fair housing enforcement body (a "FHAP"), "the sheer physical size *and*

*diversity* of the State can present obstacles for the FHAP and it cannot sufficiently

serve these underserved areas need for fair housing services in Texas." A738.

Plaintiff Massachusetts Fair Housing Center's grant includes the word "equity" in

only two contexts: one is a sample conflict-of-interest policy HUD provided,

which contains references to "equity securities," and the other is an E.O. President

Biden issued entitled "Advancing Racial Equity and Support for Underserved

Communities Through the Federal Government," which was a HUD-generated

attachment. A680. This language neither portends DEI activities nor extends the

grants beyond the text of the FHA. It is objectively unreasonable to terminate

Plaintiffs' grants based on this language alone.

　　*Third*, Defendants' remaining arguments are similarly unpersuasive.

Defendants say that Plaintiffs have no basis to conclude that HUD did not consider

reliance interests. *See* Def. Br. at 28. Notably, Defendants' Brief makes no effort to

say that such interests were, in fact considered. Such a representation would be

difficult to make on this record given that the Ammon Declaration purports to offer

a complete explanation yet is silent on this front.

Defendants next say that the termination of a subset of grants based on common characteristics renders the decision reasonable. *Id.* But this does not follow. By Defendants' reasoning, they could decide to terminate all grants made to entities starting with the letters "A" through "E," and this would constitute reasoned decision-making so long as they apply that made-up rule consistently. As demonstrated above, here HUD has applied a similarly arbitrary rule (grant document contains certain keywords) that has little connection to the stated purposes of the terminations, and it has yielded quintessentially arbitrary results.

Finally, Defendants say that reference to the DOGE E.O. is "unsurprising" in this context, not an improper consideration, because the E.O. references the establishment of DOGE task forces within federal agencies. *See* Def. Br. at 29. But this is irrelevant. The President may establish agency task forces in an E.O., but that does not mean HUD is free to terminate FHIP awards "at the direction" of DOGE. A161. In other words, Plaintiffs do not attack the legitimacy of the E.O., but rather the propriety of terminating a FHIP award based on a DOGE E.O. or agenda when HUD's ability to terminate FHIP awards is constrained by the FHA, the FHIP regulations, and the OMB regulations.

Plaintiffs remain likely to succeed on their claim that HUD's termination was arbitrary and capricious.

### 2. HUD Acted Contrary to Law.

Plaintiffs also argued that HUD's termination of their FHIP awards was independently invalid under the APA because it countermanded the FHA and Congressional appropriations statutes. *See* Pl. Br. at 43–44. Defendants' only rejoinder is to say that Plaintiffs have not proven that HUD is not lawfully reallocating the FHIP funding. *See* Def. Br. at 29. This formulation—attempting to put the burden on Plaintiffs to prove a negative—is telling. Defendants had the opportunity in the Ammon Declaration to represent that they *will* reallocate the FHIP funding elsewhere, and they did not do so.

The practical effects of terminating Plaintiffs' grants also confirm that HUD's action is contrary to law because it undermines the FHA. With their FHIP awards—comprised of funds appropriated by Congress and awarded by HUD—Plaintiffs actively worked to realize the anti-discrimination goals of the FHA through the activities enumerated in the statute. Without their FHIP awards, Plaintiffs cannot do this work. That means fewer programs related to enforcing the FHA, which directly undercuts Congress's goals as reflected in the FHIP provision. HUD has thus acted contrary to law.

### B. The Equities Favor Preliminary Relief.

Plaintiffs argued that terminating their FHIP awards would cause immediate irreparable harm and that this harm tipped the balance of the equities in their favor.

Pl. Br. at 44–49. In response, Defendants do not dispute that Plaintiffs are injured by the loss of their FHIP awards, nor do Defendants attempt to refute that these injuries likewise harm the public. Defendants instead attempt to tip the scales in their favor with three arguments, yet none carries any weight.

First, Defendants return to the *California* per curiam, arguing that, as with the agency there, the equities favor Defendants because they will not be able to recoup any disbursed funds. *See* Def. Br. at 30. But the *California* per curiam's assessment of the equities was largely (if not exclusively) driven by the fact that the plaintiff-states had the financial "wherewithal" to keep the programs funded by the terminated grants running during the pendency of the litigation. 145 S. Ct. at 969. That is not the case here, where the absence of preliminary relief will force many Plaintiffs to close entirely. *See* Pl. Br. at 44–45.

Second, without citing any authority, Defendants argue that temporary relief would harm the President's ability to execute his policy agenda. *See* Def. Br. at 30. But of course, that agenda, at least as it is to be implemented by federal agencies, must conform to Congressional authorizations and appropriations. *See, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). Here, Congressional enactments support grant reinstatement. *Supra* Section V.A.2.

Third, Defendants opine that Plaintiffs' injuries are monetary. In doing so, they neither address the factual record of irreparable harm nor offer any legal authority for their position. The harm Plaintiffs have articulated—ending programs, laying off staff members, terminating leasing, turning away potential clients, and ending services for current clients—are not mere pocketbook harms, nor could later monetary relief (even if available) compensate for them.

None of Defendants' arguments changes the calculus. Notably, Defendants do not contend with the fact that this Court weighed similar equities in the *California* case and found in favor of the plaintiff-states. *California*, 132 F.4th at 100. The same result should obtain here: The absence of temporary relief will impair Plaintiffs' missions and programs and inflict existential harm, and this harm overshadows the minimal risk that Defendants will prevail and be unable to recoup funds that were disbursed consistent with Congressional intent and allocation.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court vacate the Dissolution Order and remand the case for further proceedings consistent with its opinion.

Dated: May 12, 2025                    Respectfully submitted,

                                       *s/Lila Miller*
                                       Lila Miller (Bar No. 1216671)
                                       Reed Colfax (Bar No.1216672)
                                       RELMAN COLFAX PLLC

1225 19th Street NW Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Reply to Defendants-Appellees' Brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because the brief contains 6425 words. The Reply complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) for briefs because it has been prepared using Microsoft Word 2016 in proportionately spaced 14-point Times New Roman typeface.

Dated: May 12, 2025

*s/ Lila Miller*
Lila Miller
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2025, I electronically filed the foregoing

Reply to Defendants-Appellees' brief with the Clerk of the Court for the United

States Court of Appeals for the First Circuit using the appellate CM/ECF system.


Dated: May 12, 2025                              *s/ Lila Miller*
                                                 Lila Miller
                                                 *Counsel for Plaintiffs-Appellants*